**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| STEVEN LAZAR, | | : | |
| | Petitioner, | : | CIVIL ACTION |
| v. | | : | No. 14-6907 |
| BRIAN V. COLEMAN, | | : | |
| | Respondent. | : | |

MCHUGH, J.                                                        MARCH 1, 2017

## MEMORANDUM

Judicial recognition of a confession's power as evidence dates back centuries:  "[A] free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt; and therefore it is admitted as proof of the crime to which it refers." *King v. Warickshall* (1783) 168 Eng. Rep. 234, 234–35 (KB).  Modern courts still recognize that a "confession is like no other evidence."  *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991).  In this habeas case, Petitioner Steven Lazar was interrogated by police over a 30-hour period about a homicide, giving two different accounts of the crime.  The second account, which was critical to Lazar's ultimate conviction for felony murder, was given while Lazar was in acute methadone withdrawal.  At trial, both the jury and court were unaware of this, because, unfortunately, defense counsel stipulated that Lazar had not taken a daily dose of methadone for a month prior to the interrogation.  In fact Lazar had taken methadone a mere 24 hours before.

Given that incorrect stipulation, it is hardly surprising that on collateral review the state courts found Lazar's trial counsel's performance deficient, satisfying the first of two elements of an ineffective-assistance claim under *Strickland v. Washington*, 466 U.S. 668 (1984).  But the courts decided that the second element—prejudice—had not been met, and therefore denied relief.  The well-reasoned Report and Recommendation of United States Magistrate Judge

1

M. Faith Angell also concludes that federal relief should be denied.  I am constrained to agree with Judge Angell and will adopt that part of her Recommendation.  But I base my denial of relief solely on the exceedingly deferential framework imposed on me by 28 U.S.C. § 2254(d).  And I write separately to stress my serious concern about the state courts' prejudice analysis and to explain why I will grant a certificate of appealability.

## I.      Background

### A.  Facts at Trial

In January 2007, an elderly man was found in his North Philadelphia home hacked to death.  His wallet and keys were missing and his drawers ransacked.  The case went unsolved at first, but a few months later, the victim's daughter, while cleaning out the back porch of her father's home, found a bag with several items linked to Lazar:  a letter to him from a methadone clinic, a yearbook with his photograph, his social security card, and an access card in his name.  When police brought Lazar in for questioning, he told them his friend had taken his bag and given it to another man.  Lazar was released.

But over the next several months, Lazar made statements to others that seemed to implicate him in the murder.  For example, he told two of his neighbors that he would be going to jail because he had "killed somebody with an axe," and he told one of his friends that "if you are going to kill somebody," the "best weapon to use . . . [is] a hatchet."  He made similar statements to two other individuals.  All five testified at trial.  (As discussed in more detail below, each was impeached to some degree, and none would be considered a pristine witness for the prosecution.)  That November, after the friend contacted police about what Lazar had told him, homicide detectives interrogated Lazar over a 30-hour period.

During the interrogation, Lazar gave two statements.  First, at 7:20 PM on November 19 (the first day of the interrogation) he said that on the night of the murder, he and a friend ("John") had been doing drugs in an abandoned house near the victim's.  John had a hatchet and talked about robbing the victim.  After police drove by, the two briefly separated, and Lazar then went into the victim's home to look for John.  He found John covered in blood, ransacking the drawers, and the victim dead.  But Lazar's second statement, given at 2:45 PM on November 20, told a different story.  In this version, he and John had gone to the victim's house to perform oral sex on him—which, after John pulled a hatchet out to threaten the victim, they did.  When the victim tried to reciprocate, Lazar hit the victim with his hand, and John hit the victim with the hatchet.  John then took the victim's wallet and went through his drawers.

The jury convicted Lazar of second-degree murder, robbery, and possession of an instrument of crime.

### B.  Essential Facts of Lazar's *Strickland* Claim

At trial, Lazar's counsel stipulated that Lazar, a known methadone user, had last taken a daily dose of methadone on October 24, nearly a month before the interrogation.  That stipulation was wrong, in a significant way:  Lazar had actually last taken methadone at 10:34 AM on November 18, the day before the interrogation began.[1]  And shortly after giving

---

[1] Methadone is categorized as an "essential" medicine by the World Health Organization. Though one might assume that withdrawal from a medication used to treat addiction is less traumatic than withdrawal from an abused substance itself, that assumption is problematic. Highly respected addiction specialists first questioned it over 25 years ago.  *See generally* Michael Gossop & John Strang, *A Comparison of the Withdrawal Responses of Heroin and Methadone Addicts During Detoxification*, 158 Brit. J. Psychiatry 697 (1991).  And a recent empirical study surveying 215 inmates reflected that 70 percent would rather endure unsupported withdrawal from heroin as compared to methadone, and that the trauma of methadone withdrawal following arrest was so severe as to discourage future participation in methadone treatment.  *See generally* Jeannia J. Fu et al., *Forced Withdrawal from Methadone Maintenance*

the second statement, Lazar complained of painful urination and was taken to the hospital, where he reported leg pain, shaking, dizziness, nausea, and diarrhea, and blood tests were positive for multiple anti-withdrawal benzodiazepines, cocaine, and marijuana.  Notations in the hospital records, however, painted a slight contrast, describing Lazar's appearance as "neat and appropriate" and "oriented," his demeanor "irritable but cooperative," and his speech "normal in tone, rate, and rhythm."  PCRA Hr'g Tr. (Tr.) 12:23–13:5.  He was diagnosed with depression and hypertension and discharged that night after being treated with anti-withdrawal drugs.[2]

### C.  State-Court Collateral Review

On post-conviction review of Lazar's *Strickland* claim, the state trial court agreed with Lazar that his counsel was deficient in making the methadone-dosage-date stipulation, but found there was no prejudice.  In addition to considering the evidence before the jury, the court heard competing expert testimony on the effects of methadone withdrawal and observational testimony from the interrogating detectives.

Both experts agreed that an individual suffering from withdrawal could still give a voluntary statement, but they disagreed about how fast withdrawal symptoms (such as nausea, runny eyes and nose, and restlessness) set in:  Lazar's expert said it happened within a 24–36 hour window, while the Commonwealth's expert said it took longer, up to 50 hours.  The detectives, for their part, testified that Lazar did not appear sick just before he was taken to the hospital.  The court, however, gave the most weight to the notations in the hospital records.

The court concluded that if the jury were armed with all of that new evidence and the correct methadone-dosage date, there was still no reasonable probability that the outcome of the

---

*Therapy in Criminal Justice Settings:  A Critical Treatment Barrier in the United States*, 44 J. Substance Abuse Treatment 502 (2013).

[2] The jury heard the evidence relating to Lazar's hospital visit, *see* Trial Tr. (May 10, 2010) 180:19–183:21, but without the context of Lazar being in acute withdrawal.

4

trial would have been different.  As to Lazar's confession, the court stated: "At best, [the jury] would have heard from competing experts that the defendant was experiencing an unknown quantum of withdrawal symptoms during the taking of his statements."  Tr. 15:8–11.  Moreover, the court found that even disregarding Lazar's confession, there was "overwhelming evidence of guilt," Tr. 15:20–21—namely, the implicating statements he made to the five individuals who testified at trial.

The Superior Court affirmed, and the Pennsylvania Supreme Court denied Lazar's petition for review.

## II.    Standard of Review

Among its other restrictions on habeas corpus, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) severely limits a federal court's ability to grant habeas relief as to "any claim that was adjudicated on the merits in State court."  28 U.S.C. § 2254(d).  When reviewing such a claim, a federal court may not grant relief unless, as relevant here, the state court's decision "involved an unreasonable application of" Supreme Court precedent, *id.* § 2254(d)(1)—in this case, *Strickland* and its progeny.

The Supreme Court has concluded that § 2254(d) "imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'"  *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).  For my purposes, then, the question is not whether the state court decisions were right or wrong.  *See White v. Woodall*, 134 S. Ct. 1697, 1702 (2014).  Rather, the question is whether they were "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Only then can I decline to defer to them.

5

### III.   Discussion

Because I cannot say that the state courts here—in deciding that, despite Lazar's counsel's deficiencies, there was no prejudice—made an error clear "beyond any possibility for fairminded disagreement," I must deny federal relief.  But I remain troubled by that result.

To show *Strickland* prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694.  Here, unlike the state courts that denied relief, I would have found that such a "reasonable probability" exists—because the tainted evidence is a confession.

Embracing the insight of eighteenth-century British jurists, American courts in an unbroken line of cases have recognized that a voluntary confession has "always ranked high in the scale of incriminating evidence."  *Bram v. United States*, 168 U.S. 532, 544 (1897) (quoting *Brown v. Walker*, 161 U.S. 591, 596 (1896)).  It is considered "evidence of the most satisfactory character" and "among the most effectual proofs in the law."  *Hopt v. Utah*, 110 U.S. 574, 584–85 (1884).  Even as other rules of law have changed dramatically over time, that core principle—that a defendant's voluntary confession has a "profound impact on the jury" and "is probably the most probative and damaging evidence that can be admitted against him," *Fulminante*, 499 U.S. at 296—has gone unchanged.

That probative force, of course, applies only to *voluntary* confessions, for the presumption that "one who is innocent will not imperil his safety or prejudice his interests by making an untrue statement" does not lie if he has been "deprive[d] . . . of that freedom of will or self-control essential to make his confession voluntary."  *Hopt*, 110 U.S. at 585.  For many years, however, voluntariness was the only touchstone, because it was thought that a voluntary yet false

confession was "scarcely conceivable."  Brandon L. Garrett, *The Substance of False Confessions*, 62 Stan. L. Rev. 1051, 1052 (2010) (citation omitted).  But since "the experience of the courts, the police, and the medical profession recounts a number of false confessions voluntarily made," *Smith v. United States*, 348 U.S. 147, 153 (1954), it has become clear that relying solely on voluntariness is not enough:  a confession must also be tested for reliability.

Indeed, in a case like this, where it seems probable that Lazar's confession was voluntary but withdrawal-tainted, that reliability backstop becomes even more important.  It is not a new idea that someone whose mental and emotional faculties are impaired could freely give a false confession.  Nearly a century ago, Dean Wigmore noted that the usefulness of a confession largely "depends upon the mental and emotional traits of the accused":  "We may believe that rationally a false confession is not to be apprehended from the normal person . . . [,] but we have here perhaps a person not to be tested by a normal or rational standard."  3 Wigmore, *Evidence* §§ 820a–b (Chadbourn rev. 1970).  The Supreme Court has similarly observed that "under certain stresses a person, especially one of defective mentality or peculiar temperament, may falsely acknowledge guilt," *In re Gault*, 387 U.S. 1, 44–45 (1967) (quoting 3 Wigmore, *Evidence* § 822 (3d ed. 1940)), and that "the physical and psychological environment that yielded the confession can . . . be of substantial relevance to the defendant's guilt or innocence," *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).  Further, where (as here) the confession was given during a "prolonged and persistent" interrogation, that "count[s] heavily against the confession."  *Ashcraft v. Tennessee*, 322 U.S. 143, 161–62 (1944).

Consider then the state post-conviction courts' decisions in this case.  Those courts found no *Strickland* prejudice—that is, no "reasonable probability" that, if the new methadone-withdrawal evidence had been before the jury, "the result of the proceeding would have been

different."  Given what is now known about false confessions, and the fundamental precept that a confession's "probative weight . . . [is] a matter that is exclusively for the jury to assess," *Crane*, 476 U.S. at 688, that seems like a difficult conclusion to support.

As in every case, only the members of the jury that convicted Lazar could say on what evidence they placed the most weight.  And the confession hardly stood alone, as there was also the testimony of the five witnesses to whom Lazar made (seemingly implicating) statements, plus his bag at the scene.  But three items stand in counterbalance.  First, juries place significant, often dispositive, emphasis on confessions.  As a result, where the evidence tainted by deficient counsel performance is a confession, courts should hesitate—or, to borrow a phrase, "think hard, and then think hard again," *Camreta v. Greene*, 563 U.S. 692, 707 (2011)—before finding there was no prejudice.  Second, that general principle has specific application in this case, where the five civilian witnesses all had various credibility problems:  one, Lazar's friend, had a theft conviction and had contacted the police about Lazar's statements only after getting into a dispute with Lazar; two others had pending robbery or theft cases against them at the time of trial; and the last two changed their stories on the stand.  Thus to the extent courts should ever feel comfortable finding the untainted evidence to be "overwhelming" and sufficient grounds for finding no prejudice, this does not seem like the right case for it.  Finally, the Commonwealth's heavy reliance on the confession, throughout trial and specifically in closing argument, speaks volumes about the confession's importance to the case.  *Cf. United States v. Brownlee*, 454 F.3d 131, 148 (3d Cir. 2006) ("[I]t is difficult for the Government to argue with effect that the admission of the confession did not contribute to Brownlee's conviction when it submitted just the opposite view to the jury during the trial.").  In my view, these factors strongly suggest that the deficient performance of Lazar's trial counsel was prejudicial.

More generally, I believe *Strickland* prejudice is an area where courts should tread with special care.  An important distinction needs to be drawn between *Strickland*'s two prongs—counsel's performance and prejudice.  When a federal court reviews a claim regarding *counsel's performance* that was decided on the merits in state court, thus triggering deference under § 2254(d), review is said to be "doubly" deferential.  *See Harrington*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).  This is because § 2254(d) requires a federal court to give the state court deference, and *Strickland* required the state court to give counsel deference.

But there is an inherent tension between this "layered reasonableness" standard of review and the legal precepts that define *Strickland*'s second prong:  *prejudice*.  That tension exists because of the test for prejudice:  to find no prejudice, a court must find there is *no reasonable probability* that, without counsel's deficiencies, the result of the proceeding would have been different—a proceeding where the prosecution must prove its case beyond a reasonable doubt. In other words, a collateral-review court must conclude there is no "reasonable probability that at least one juror," *Wiggins v. Smith*, 539 U.S. 510, 537 (2003), if given the new information withheld because of counsel's errors, would have reached anything less than a "subjective state of certitude of the facts in issue," *In re Winship*, 397 U.S. 358, 364 (1970) (citation omitted). The Supreme Court recently reaffirmed this principle in its latest *Strickland* decision, with Chief Justice Roberts identifying the prejudice inquiry as whether there is a "reasonable probability that . . . at least one juror would have harbored a reasonable doubt."  *Buck v. Davis*, No. 15-8049, 2017 WL 685534, slip op. at 17 (U.S. Feb. 22, 2017).

Taken seriously, this is a high standard to meet.  At a conceptual level, it reinforces the principle that a jury cannot convict someone of a crime unless all twelve jurors are persuaded

beyond a reasonable doubt.  In practical terms, it underscores the importance of a jury deciding a criminal case only after reviewing all relevant evidence.  When that evidence relates to a tainted confession, the defendant's inability to put it before the jury "strips [him] of the power to describe to the jury the circumstances that prompted his confession" and "effectively disable[s him] from answering the one question every rational juror needs answered:  If [he] is innocent, why did he previously admit his guilt?"  *Crane*, 476 U.S. at 689.  So I hesitate to conclude that if Lazar's jury had known he was suffering from methadone withdrawal while under interrogation, there is "no reasonable probability that at least one juror" might have had a reasonable doubt.

I recognize that some courts of appeals have applied the double-deference standard to both counsel's performance and prejudice.  *See, e.g.*, *Frazier v. Bouchard*, 661 F.3d 519, 534 (11th Cir. 2011); *Foust v. Houk*, 655 F.3d 524, 534 (6th Cir. 2011).  The Supreme Court, without explicitly holding so, also seems to assume double deference applies to prejudice.  *See, e.g.*, *Cullen v. Pinholster*, 563 U.S. 170, 202 (2011).

But applying extreme deference to state-court determinations of prejudice seems to not only be inconsistent with Supreme Court precedent otherwise defining prejudice—it actually undermines its vitality.  The test for prejudice as defined by *Wiggins*—is there a "reasonable probability that at least one juror" would have had a reasonable doubt?—has a broad reach, and errs on the side of finding prejudice when a defendant did not receive a fair trial.  But the protection conferred by *Wiggins* (and other cases defining prejudice broadly) evaporates once a state court answers that question "no," because of the need to show not just that the state court's conclusion is wrong, but wrong "beyond any possibility of fairminded disagreement."  In a disturbing  irony, then, a defendant deprived of the right to have the entirety of his case

examined through the prism of reasonable doubt is then deprived of collateral relief because he cannot meet a similarly onerous standard.[3]

**IV.    Conclusion**

Because of these profound concerns, although I feel constrained to deny Lazar's habeas petition, I will issue a certificate of appealability.[4]  An appropriate order follows.


                                               _____/s/ Gerald Austin McHugh_____
                                               United States District Judge

---

[3] I would adopt the position advanced by Judge Jordan of the Eleventh Circuit in his concurring opinion in *Evans v. Secretary, Department of Corrections*, 703 F.3d 1316, 1333–36 (11th Cir. 2013) (en banc), and not apply "double deference" to the issue of prejudice.

[4] "A certificate of appealability may issue . . . if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(a) (district judge may issue one).  "That standard is met when 'reasonable jurists could debate whether . . . the petition should have been resolved in a different manner.'"  *Welch v. United States*, 136 S. Ct. 1257, 1263 (2016) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  For reasons already given I find that standard met here, and so will grant a certificate of appealability on the issue whether the state courts in this case unreasonably applied *Strickland* prejudice.