IN THE DISTRICT COURT
OF THE EASTERN DISTRICT
OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVEN LAZAR, | : | |
| Petitioner, | : | |
| | : | 2:14−cv−06907-GAM |
| v. | : | |
| | : | |
| | : | |
| GEORGE LITTLE, Secretary, Pennsylvania | : | |
| Department of Corrections; | : | |
| ERIC ARMEL Superintendent, | : | |
| SCI Fayette; | : | |
| LAWRENCE KRASNER, District Attorney | : | |
| of Philadelphia. | : | |
| | : | |

**AMENDED PETITION FOR WRIT**

**OF HABEAS CORPUS**

**PURSUANT TO 28 U.S.C. 2254**

PAUL JUBAS, ESQUIRE
Pa. I.D. No.: 311832
PAUL JUBAS LAW, P.C.
P.O. Box 10704
Pittsburgh, PA 15203
(412) 230-0023
pjubasesq@gmail.com

*Counsel for Steven Lazar*

Jennifer Merrigan
Pa I.D. No.: 318243
Elie Kirshner
Pa I.D. No.: 330863
Jenny Osborne
Pa I.D. No.: 328656
Phillips Black
1901 S. 9th, 608
Philadelphia, Pa 19148
888.532.0897 (tel)
888.543.4964 (fax)
j.merrigan@phillipsblack.org

# TABLE OF CONTENTS

PARTIES ............................................................................................................................... 1

INTRODUCTION ................................................................................................................ 1

PROCEDURAL HISTORY ................................................................................................. 5

STATEMENT OF FACTS ................................................................................................... 8

I.    Trial Proceedings ..................................................................................................... 8

II.   PCRA Proceedings.................................................................................................. 18

III.  Newly Disclosed Evidence .................................................................................... 19

    A.   The Commonwealth possessed records documenting law enforcement's failure to competently investigate two alternate suspects, despite making multiple misrepresentations to the contrary. ..................................................................................................................... 19

    B.   Law enforcement possessed in its file an exculpatory crime scene photograph of a chair in the decedent's backyard ................................................................................................ 20

    C.   The Commonwealth was aware of misconduct by Detectives David Baker and Kenneth Rossiter pre-dating Mr. Lazar's trial ....................................................................... 21

    D.   The Commonwealth's file contained numerous tips implicating other suspects that were inexplicably abandoned, contradicting the Commonwealth's representations at trial................... 21

GROUNDS FOR RELIEF ................................................................................................. 23

PRELIMINARY STATEMENT ON EXHAUSTION AND STANDARD OF REVIEW ........................ 24

ARGUMENT ...................................................................................................................... 26

I.    Legal Standards ....................................................................................................... 26

II.   Claims for Relief...................................................................................................... 33

CLAIM I: The Pennsylvania courts erroneously determined that Mr. Lazar was not prejudiced by counsel's omissions, entitling Petitioner to review of that claim and relief. ....................................... 33

    A.   Background .................................................................................................... 33

    B.   Argument ....................................................................................................... 37

CLAIM II: Newly disclosed contemporaneous investigation documents undermines law enforcement's investigation and reveals that the prosecutor failed to correct multiple instances of perjury and misrepresented the investigation in violation of *Brady* and *Napue*. ..................... 41

    A.   Newly disclosed evidence reveals that the Commonwealth failed to correct false testimony about Steven Lazar's role as the lone suspect in the case in violation of *Napue v. Illinois*. ........... 43

        1.   Law enforcement received and investigated several credible tips between January and April 2007. ............................................................................................................ 43

        2.   Baker testified falsely about the investigation and the prosecution failed to correct him... 48

        3.   The prosecutor's failure to correct these false assertions was material under *Napue*. ........ 49

    B.   Newly disclosed evidence reveals that the Commonwealth misrepresented the law enforcement's investigation into alternate suspects, Berrios and Rosa. ......................................... 52

        1.   Newly discovered evidence reveals that law enforcement botched the investigation of Berrios and Rosa and never excluded them. .......................................................................... 55

    2.    The Commonwealth's misrepresentations continued throughout Mr. Lazar's appellate process, constituting an ongoing violation of *Brady* and *Napue*.................................57

    3.    The evidence, and the Commonwealth's misrepresentations, are material under *Brady* and *Napue*. .................................................................................................................59

    C.    Cumulatively these violations undermine confidence in Mr. Lazar's verdict. ......................61

CLAIM III: Sarn Wilson received undisclosed favorable treatment in exchange for his testimony against Mr. Lazar. .................................................................................................................61

    A.    Sarn Wilson received undisclosed favorable treatment. ..........................................63

    B.    The suppressed evidence that Sarn Wilson received favorable treatment is material.............65

CLAIM IV: A recently disclosed Brady proffer from the Commonwealth reveals that Detective Baker had committed extensive investigative misconduct and perjured himself in a prior homicide trial, undermining confidence in Mr. Lazar's conviction. ...................................................66

    A.    Previously undisclosed evidence of Detective Baker's misconduct .......................67

    B.    Detective Baker's credibility was critical to the case against Mr. Lazar. ..............................69

    C.    The newly disclosed evidence of Detective Baker's lengthy history of investigative misconduct and perjury undermines confidence in the verdict.......................................................71

CLAIM V: The Commonwealth failed to disclose a crime scene photograph in its file depicting an empty chair in the victim's backyard where Mr. Lazar's suitcase was purportedly found, undermining confidence in the verdict, and violating Mr. Lazar's rights under the state and federal constitutions. ...................................................................................................................75

    A.    The suitcase and the investigation...........................................................................75

    B.    The suitcase at trial .................................................................................................78

    C.    The previously undisclosed photo undermines confidence in the verdict and amounts to a violation of *Brady v. Maryland*.................................................................................81

        1.    The chair photo was suppressed.....................................................................81

        2.    The evidence is exculpatory and material. ......................................................81

        3.    Mr. Lazar is entitled to a hearing. .................................................................84

CLAIM VI: A new prior misconduct disclosure reveals that Detective Rossiter, who took Mr. Lazar's alleged confession, had previously been investigated for and had a sustained finding of physical abuse of a suspect. ...................................................................................................84

    A.    Rossiter's misconduct. ............................................................................................85

    B.    The newly disclosed Brady proffer pertaining to Detective Rossiter undermines confidence in the verdict...................................................................................................................86

CLAIM VII: Evidence demonstrating that Baker repeatedly testified falsely at trial, the Commonwealth failed to disclose critical evidence and then argued its absence undermines confidence in the verdict and negates the reliability of Petitioner's conviction such that due process is violated. ...................................................................................................................88

CLAIM VIII: The cumulative effect of the suppressed evidence undermines confidence in the outcome at trial. .................................................................................................................89

CLAIM IX: Mr. Lazar is innocent. ...................................................................................92

    A.    Newly disclosed evidence reveals that Mr. Lazar is innocent ................................95

      1.     The Commonwealth withheld an exculpatory crime scene photograph. ............................ 96

      2.     Extensive misconduct by Detective David Baker and Detective Kenneth Rossiter further undermines the integrity of Mr. Lazar's conviction.................................................................. 97

      3.     Newly disclosed evidence reveals that the Commonwealth elicited false testimony about Steven Lazar's role as the lone suspect in the case..................................................................... 98

      4.     Newly disclosed evidence further establishes the lack of credibility of the witnesses against Mr. Lazar................................................................................................................................. 99

    B.   Relief is required.......................................................................................................... 100

REQUEST FOR RELIEF ............................................................................................................. 100

Petitioner, STEVEN LAZAR, through undersigned counsel, respectfully files this Amended

Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254.

## PARTIES

Petitioner STEVEN LAZAR is a state prisoner in the custody of the Commonwealth of

Pennsylvania. He is currently incarcerated at the State Correctional Institution at Fayette.

Respondent GEORGE LITTLE is the Secretary of the Pennsylvania Department of

Corrections.

Respondent LAWRENCE KRASNER is the District Attorney of Philadelphia.

Respondent ERIC ARMEL is the Superintendent at SCI Fayette.

## INTRODUCTION

The case against Steven Lazar was tenuous: a suitcase found in the victim's backyard 14

weeks after the crime, a confession given after over 30 hours of questioning while Mr. Lazar was

in withdrawal from methadone, and the statements of several drug addicted individuals who this

Court observed "all had various credibility problems." *Lazar v. Coleman*, CV 14-6907, 2017 WL

783666, at *4. To bolster its case, the Commonwealth emphasized that Steven Lazar was law

enforcement's *lone suspect*, eliciting testimony that law enforcement received "no leads"

between January and July, when the case went cold, and that the only other leads in the case had

been affirmatively excluded.

For years, Mr. Lazar has steadfastly maintained his innocence.[1] Since his incarceration,

Mr. Lazar has diligently sought to overturn his wrongful conviction.[2] In the twelve years since

his conviction, Mr. Lazar has remained focused on his own case; he has not incurred a *single*

---

[1] Mr. Lazar has always maintained his innocence. Immediately after the verdict was read Mr. Lazar stated: "I'm sorry for your family, but I'm not the person that killed your father. . . I want to say I'm innocent." N.T. 5/11/10, at 147-148.
[2] *See e.g.,* n6 *infra*, for a discussion of Mr. Lazar's pro se efforts to obtain evidence of his innocence through FOIA and related litigation; *see also* App. 83-116.

1

disciplinary infraction—a nearly impossible feat in a correctional institution. His dedication to proving his innocence led him to the prison's law library, where he has been employed for over a decade. It led him to pursue, for the first time in his life, college courses, through Pittsburgh and West Virginia University.

For a decade, the Commonwealth vigorously defended law enforcement's interrogation of him, doubled down on its claim that he was the only viable suspect in the case, and denied multiple requests for related discovery.

Now, over a decade later, the Commonwealth has disclosed to Mr. Lazar its file, along with several *Brady* disclosures relating to officer misconduct, and conceded that it made material misrepresentations about two key alternate suspects. The newly disclosed documents reveal, for the first time, evidence thoroughly undermining Mr. Lazar's conviction, dismantling each pillar of the case against him, and exposing multiple instances of perjury on the part of law enforcement witnesses.

First, the newly disclosed evidence reveals that, in contrast to repeated representations by the Commonwealth to several courts, law enforcement *never* excluded the two viable suspects it did disclose to counsel, Victor Berrios and William Rosa.

Relatedly, the documents establish that, despite the explicit testimony of Detective Baker and the Commonwealth's protestations to the contrary, law enforcement received other credible leads and tips between the months of January and July in the murder of Dario Gutierrez.

These documents prove multiple instances of law enforcement perjury that went uncorrected by the Commonwealth. Critically, they rebut the Commonwealth's narrative painting Steven Lazar as the lone suspect in a cold case.

Second, the file reveals that the Commonwealth had in its file a photograph of an empty plastic chair where Mr. Lazar's suitcase had allegedly been found. The photograph, which all evidence indicates was taken *before* the suitcase was found, is convincing evidence that the suitcase did not sit from January to April in a chair in the victim's yard, as the Commonwealth alleged at trial. The suitcase was the only physical evidence tying Mr. Lazar to the scene and the sole reason that he came to the attention of law enforcement. The suitcase was also featured in his statement and the statements of others. Its absence from the yard in January eliminates not only his sole connection to the crime scene, but proves that his confession and several witness statements were false.

Critically, the chair photograph also contradicts testimony from Detective Baker about the bumbling investigation undertaken by law enforcement. Without the photograph, the Commonwealth was able to actually use the faulty investigation *against* Mr. Lazar: "could they have done a better job? Absolutely. Could Baker have gone and stayed there longer than five minutes? Absolutely. . . The scene wasn't done correctly. It wasn't done right. They would have found it if they went in the yard and they didn't. They didn't. And he almost got away with it. He took advantage of it and is trying to take advantage of it again, and don't let him." N.T. 05/11/10 at 62. Armed with the photograph of the chair, reasonably diligent trial counsel would have cast doubt on Mr. Lazar's guilt, and undermined law enforcement's investigation.

Third, the *Brady* disclosures reveal a history of misconduct by Detectives Baker and Rossiter, which predated Mr. Lazar's trial and which the Commonwealth was or should have been aware of under *Kyles*.

Critically, the disclosures reveal a pattern and practice by Detective Baker of coercing statements and feeding information to witnesses and suspects. Mr. Lazar has always maintained

that any knowledge of the crime, echoed in the statements from him and the witnesses, came from Baker's initial meeting with him. At trial, the Commonwealth mocked this argument: "And he wants you to think that Baker and Verrecchio and all those other detectives are going to risk their over a hundred years of experience, all of their lives, their livelihood, their pension, their family lives and lie about that?" N.T. 5/11/10, at 30. *See also Id.* at 68 ("they want you to believe that [Baker] got off his butt while talking to Russell Angely, somehow got crime scene photos, and was trying to put this on somebody.") For the Commonwealth to affirmatively vouch for Detective Baker and deride the defense's arguments that he fed Mr. Lazar information--while withholding evidence of similar misconduct in other homicide cases--constitutes a violation of Mr. Lazar's constitutional rights and undermines confidence in his verdict.

The disclosures also reveal an incident of physical abuse of a suspect committed by Detective Kenneth Rossiter. Rossiter took Mr. Lazar's final statement, which Mr. Lazar has consistently maintained was coerced, after over 30 hours of interrogation during which Mr. Lazar was suffering withdrawal from methadone. This too was not previously disclosed to Mr. Lazar, despite his repeated attempts over the past decade to litigate the veracity of his confession.

Taken together, the newly disclosed documents reveal that the Commonwealth's case at trial was a house of cards, built on the false premise that Mr. Lazar's suitcase had sat on a chair in the victim's backyard undetected and unweathered for 14 weeks after the murder, that his knowledge of the homicide came from his presence at the crime scene, and not from Detective Baker, and that he was law enforcement's only viable suspect. The newly disclosed documents undermine confidence in his verdict. Armed with any of this evidence, reasonably competent counsel would have successfully rebutted the Commonwealth's case at trial.

On August 24, this Court granted relief pursuant to Rule 60(b) based on the fraudulent representations by the Commonwealth about Berrios and Rosa, reopening Mr. Lazar's original habeas proceedings. He now files this Petition for relief pursuant to to 28 U.S.C. §2254, reasserting his prior claims in light of the Commonwealth's fraudulent misrepresentations, and, additionally, presents the newly newly available claims under *Brady v. Maryland*, 373 U.S. 83 (1963), *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972) supported by newly disclosed evidence, which could not have been discovered previously through diligence.

## PROCEDURAL HISTORY

On May 11, 2010, Mr. Lazar was convicted of Second-Degree Murder, Conspiracy, Robbery, and a weapons offense. He was acquitted on the charge of First-Degree murder. He was sentenced to a mandatory term of life imprisonment on the same day the verdict was rendered. At sentencing Mr. Lazar maintained his innocence and complained of the false and coerced confession used against him at trial.[3]

 A direct appeal was filed and denied by the Superior Court on August 2, 2011, except to the extent of vacating the robbery sentence on merger grounds. Mr. Lazar raised claims of trial court error for failing to suppress his confession and insufficiency of evidence. *Commonwealth v. Lazar*, 1375 EDA 2010 (Pa Super. 2010).

After Mr. Lazar's direct appeal was finalized, initial post-conviction counsel, Jules Epstein, filed a petition for relief pursuant to the Pennsylvania Postconviction Relief Act (PCRA) on June 27, 2012, raising numerous claims. After multiple pleadings by Mr. Lazar and the Commonwealth, the trial court ordered an evidentiary hearing limited to the failure of trial counsel to procure records showing that Mr. Lazar had been administered high doses of

---

[3] "I'm sorry for your family, but I'm not the person that killed your father." N.T. 5/11/10, at 147.

methadone up to and on the day before his arrest. N.T. 5/30/13, at 2. While the PCRA was pending, counsel made several informal and formal discovery requests, including for additional information about two suspects, Victor Berrios and William Rosa. App. 14, 44-45.

The evidentiary hearing took place on May 30, 2013, and a decision on Mr. Lazar's petition was held in abeyance. On July 15, 2013, the PCRA court ruled that trial counsel was deficient for failing to secure the complete methadone records but that there was an inadequate showing of prejudice. The court denied PCRA relief. PCRA Opinion at 5, *Commonwealth v. Lazar*, Docket No. CP-51-CR 0002056 2008 (7/15/2013).

On July 23, 2014, the Superior Court denied relief in a Memorandum Opinion followed by a denial for Allowance of Appeal by the Pennsylvania Supreme Court on December 2, 2014. *Com. v. Lazar*, 628 Pa. 638, 104 A.3d 524 (2014)

On December 5, 2014, Mr. Lazar filed a Writ of Habeas Corpus in the United States District Court for the Eastern District of Pennsylvania. After hearing oral argument, Magistrate Judge, Faith Angell, issued a Report and Recommendation on September 29, 2016 recommending that the Petition be denied and that no Certificate of Appealability be granted. Magistrate Report and Recommendation at 18, *Lazar v. Coleman*, 2017 WL 783666 (E.D. Pa. 2017) (No. 14-6907).

Objections were filed and this Court upheld the Magistrate's Report and Recommendation, but overruled the COA denial. *Lazar v. Coleman*, No. 14-6907, 2017 U.S. LEXIS 28564, (E.D. PA March 1, 2017). This Court wrote that it was constrained to agree with the denial of habeas relief "solely on the exceedingly deferential framework imposed on me by 28 U.S.C. 2254(d). And I write separately to stress my serious concern about the state court's

prejudice analysis and to explain why I will grant a certificate of appealability." *Id.* at 1. A Notice of Appeal was then timely filed.

After hearing oral argument, the Third Circuit Court of Appeals affirmed the Superior Court's denial of relief. *Lazar v. Superintendent Fayette SCI*, 731 Fed.Appx. 119, 123 (3d Cir. 2018). Also noting that "on this record we are constrained by Section 2254(d)(1) to affirm." *Id.* at 123. In a footnote, the Circuit Court acknowledged that Mr. Lazar argued "that the police recovered a machete from another person. This matters little, as this weapon was rusty and the police eliminated the owner as a suspect." *Id.* Mr. Lazar then filed a pro se Petition for Certiorari with the United States Supreme Court. After briefing by the prosecution and Mr. Lazar, the United States Supreme Court denied relief on February 19, 2019. *Lazar v. Capozza*, 203 L.Ed.2d 201 (2019).

On April 27, 2022, petitioner, Steven Lazar, filed a state post-conviction petition based on newly disclosed evidence obtained when the Philadelphis District Attorney's Office opened its files to his counsel. *Commonwealth v. Lazar*, Docket No. CP-51-CR 0002056 2008 (4/27/22). Additionally, on the same day, he also moved to reopen this Court's judgment pursuant to Federal Rule of Civil Procedure 60(b). Motion for Relief Under 60B *from Final Order and Judgement*, No. 14-6907 (April 27, 2022). Mr. Lazar's motion detailed significant misrepresentations made by the Commonwealth in their pleadings that could not have been raised previously concerning the investigation and purported exclusion of key alternative suspects Victor Berrios and William Rosa.

The Commonwealth filed its response to Mr. Lazar's 60(b) Motion on June 13, 2022, conceding that it made misrepresentations to this Court, and that those misrepresentations constituted fraud amounting to an extraordinary circumstance, warranting relief under Rule

60(b). Response to Motion for Relief Under 60B *from Final Order and Judgement*, No. 14-6907 (June 23, 2022).

On August 24, this Court granted relief under Rule 60(b), reopening the present habeas proceedings. Memorandum and Order granting Motion for Relief Pursuant to Rule of Civil Procedure 60(b), No. 14-6907 (August 24, 2022).

## STATEMENT OF FACTS

### I.   Trial Proceedings

On May 3, 2010 the trial court held a suppression hearing on trial counsel's motion to suppress his client's statements. Officer Pedano testified that Mr. Lazar was taken to Homicide on November 19, 2007 shortly before 8:00 a.m. N.T. 5/03/10 at 13. Detectives testified that over the course of over 30 hours at the homicide unit. Mr. Lazar made two inculpatory statements, one at 7:00 p.m. that evening, and another the following day at 2:45 p.m., 31 hours after his arrest.  Officer Nally, who did not testify, took Mr. Lazar's biographical information and was identified as Mr. Lazar's cousin. *Id.* at 10. Detective McDermott testified that he knew Mr. Lazar had a significant drug problem and that he had been on methadone. *Id.* at 49. Mr. Lazar was placed in an 10 foot by 8 foot interview room with a table and a metal chair at homicide. McDermott questioned Mr. Lazar off and on until his first statement at 7:00 p.m.. *Id.* at 56. He testified that Mr. Lazar would have been given food and water but had no independent knowledge of whether Mr. Lazar received something to eat or drink. *Id.* at 57-58. Mr. Lazar was then left in the room overnight with just a table and two metal chairs. *Id.* at 63-65. McDermott testified that Mr. Lazar experienced no medical issues and made no requests until 10:00 p.m.,

after his second statement, when he went to the hospital after experiencing pain while urinating. *Id.* at 54.

Detective Rossiter took Mr. Lazar's second statement. He testified that Mr. Lazar was fine in his presence, and that he was not shaking or asking for methadone or medication. *Id.* at 99. Rossiter said he didn't raise his voice at all at Mr. Lazar. *Id.* at 95. The parties stipulated that the last time Mr. Lazar had received a methadone dose was October 24th, 2007.[4] The Commonwealth thus argued Mr. Lazar was not in withdrawal, and the Court agreed. *Id.* at 105. After argument the motion to suppress was denied. *Id.*

Trial began on May 4, 2010 with the testimony of Evelyn Gutierrez, who described going to check on her father on January 9, 2007. N.T. 5/4/10, at 55-56. She testified that she unlocked the front door and found his body on the floor. *Id.* Months later, while cleaning out the yard of her father's home she saw a travel bag on the "seat back there." *Id.* at 74. Specifically, Ms. Gutierrez said she saw a suitcase on a plastic chair under an awning that used to be in her father's backyard. *Id.* at 76. Ms. Gutierrez said she called police after looking through the bag. *Id.* at 79. She also described how the yard had changed since she found the bag, the porch and awning had been removed and the old "very weak" fence had been replaced with a new one. *Id.* at 86, 92. The family made these changes prior to selling the home in 2009. *Id.* at 87. On cross, Ms. Gutierrez confirmed that she found the bag on a plastic chair and that she noticed it immediately upon entering the backyard. *Id.* at 94. Ms. Gutierrez testified that she had used her own key to unlock the backdoor and go into the yard. *Id.* at 96-97.

The Commonwealth next called Russell Angely. Angely stated that he had actually come to CJC that day for his own open drug possession case. N.T. 5/4/10, at 100. He acknowledged a

---

[4] During PCRA proceedings it was revealed that counsel had not obtained the complete treatment records, and had failed to read the records he did have, so he did not know that Mr. Lazar was administered methadone the day prior to his arrest.

history of drug use including heroin, Percocet and Oxycontin, and testified that he met Mr. Lazar at the Goldman methadone clinic. *Id.* at 102-103. He testified that he moved in with Lazar at some point during 2006, and that he and Mr. Lazar had gotten into a fight on November 2, 2007. *Id.* at 106. Angely said he didn't want it to "turn into anything more than it was and I called the police just to cool it off." *Id.* On cross, however, he said that he and Mr. Lazar had both called the police. *Id.* at 138.

In the police car on the way from Mr. Lazar's residence, Angely testified that he began telling police that Mr. Lazar had told him about a homicide. *Id.* at 109. Though he initially testified that the police were taking him to a homeless shelter, eventually he acknowledged that "[t]hey weren't taking me to the homeless station, they were taking me down to the station, for fingerprints and all that." *Id.* at 112. He then recounted telling police of the multiple occasions during which he said Mr. Lazar had first alluded to and then confessed to murdering someone. *Id.* at 116-120. Angely testified that he told police about these incidents over the course of two days at the police station. *Id.* at 121. On cross, Angely testified that he was there for two and a half days and that he was "handcuffed to a bench" throughout this over 48 hour period "for their safety". *Id.* at 139-141.

The Commonwealth next called Sarn Wilson. Wilson acknowledged he had an open case for robbery, and denied that he had been offered any benefit in exchange for his testimony. N.T. 5/5/10, at 11-12. Wilson admitted that he had used cocaine and heroin and had also met Mr. Lazar and Russell Angely at the Goldman clinic. *Id.* at 14. Wilson testified that Lazar had shown him his suitcase the day he returned from Homicide, and that later on Lazar had said that he had "done it" and that "the best way to do something was to do it with an axe." *Id.* at 21. He recalled as many as four conversations during which Mr. Lazar talked about the murder, but at those

times Wilson never went to police because he "felt like maybe [Lazar] was bolstering." *Id.* at 23. Wilson acknowledged that Mr. Lazar "had a habit of trying to portray something else to me that he wasn't. . . so I didn't take it seriously." *Id.* Wilson ended up speaking to police when he happened to call Angely on November 2, 2007, and a detective got on the phone and asked him to come to the station. *Id.* at 24. Wilson testified that he then provided detectives with a statement concerning Mr. Lazar's comments about the murder.

On cross, Wilson denied talking to Angely about what Angely had told police or the incident leading to his arrest at Mr. Lazar's home. *Id.* at 30-35. Wilson confirmed that he had originally asked Mr. Lazar if Angely could live with him. *Id.* at 33. He claimed that Mr. Lazar had several homemade weapons around the house, and that he saw Mr. Lazar throw them against the wall in his bedroom. *Id.* 36-39. Wilson testified repeatedly that he'd given his November 12, 2007 statement the same night that Angely was removed from Mr. Lazar's home. *Id.* at 57. However, trial counsel noted that Angely's statement was dated November 2, 2007, and thus Wilson's actually took place ten days later. *Id.* at 65-66. Wilson elaborated that the detectives asked him to come down "late night early morning" and that the first time he went it had been to bring papers for Russell to be able to leave. *Id.* at 68-69. After Wilson brought the paperwork for Angely, detectives let him leave without giving a formal statement: "I didn't give anything that I signed on that day." *Id.* at 75.

Officer Javier Cortez, a neighbor of Mr. Gutierrez confirmed that the victim had a balcony built on the back of his house at the time of his death. *Id.* at 82. Officer Cortez also testified that Mr. Gutierrez had clashed with neighborhood drug dealers, and, within the week before his death, Mr. Gutierrez was having problems with an individual who was unable to repay a loan. N.T. 05/05/10, at 84-87.

Detective Crystal Williams testified that she picked up the suitcase from Evelyn Gutierrez on April 25th. Detective Williams stated that she went alone to the home, and picked up the suitcase from the living room. *Id.* 90-91. On cross, Williams testified that Evelyn did not show Williams where she found the bag, that she did not investigate where the bag was found, and that she never entered the backyard. *Id.* at 92.

The crime scene was processed by Police Officer Terrance Lewis. N.T. 05/05/10, at 95. Mr. Gutierrez's body was found in the living room just inside the front door of his home. *Id.* at 99-100. Officer Lewis never went into the basement or yard, and was unable to get fingerprints from most of the surfaces surrounding Mr. Gutierrez's body and in many other areas of the home. *Id.* at 106-09, 117-119. The prints he did obtain did not match Mr. Lazar. *Id.* at 124-29. Lewis testified that he had not taken any photos of the yard and didn't enter the yard at all: "the door was intact, there was a ladder against it, so I didn't go into the yard to photograph." *Id.* at 123, 152. Lewis stated that Detective Baker and Detective Verrechio were in charge of the scene. *Id.* at 132-133. He testified that he did not swab the doors for DNA because of their distance from the red stains inside the house, although he acknowledged that the murderers may have had blood on their hands given the amount of forensic evidence at the crime scene. *Id.* at 148-150.

Officer Jose Gutierrez, the son of the victim, testified briefly that he had asked for no special treatment for his father's case and that he had no knowledge of his father's personal life. N.T., 05/05/10, at 7.

Mark Kedra testified that parts of his police statement, in which he asserted that Mr. Lazar had confessed to the murder, had been fabricated: "They never asked me that because he never said he was involved in a murder." *Id.* at 27. Kedra testified that when he made his statement, he was brought down to homicide by detectives who came to his house and told him

he might be in trouble. *Id.* at 12. Kedra testified that he never saw beyond the first page of his statement at the time of his interview. *Id.* at 21-22. A year later, Kedra said he had heard that Mr. Lazar was concerned about statements people were making, and then went to visit him in jail. *Id.* at 33-34. He then spoke with Mr. Conroy and met with an investigator from Conroy's office. *Id.* at 37-39. Kedra testified that he spoke to Mr. Lazar after Lazar's July 3rd meeting with Detective Baker. Mr. Lazar told Kedra that Detective Baker had shown him photos of the crime scene and victim, and told him details of the crime. *Id.* at 55-56.

Detective William Kelhower, who took Kedra's statement alongside Detective Kenneth Rossiter, read Mr. Kedra's statement into the record and denied that it had been fabricated. *Id.* at 64-75.

June Blase testified that police overheard her saying to her husband that Mr. Lazar had told her he hit someone with an axe. N.T. 05/06/10, at 86. She confirmed that she made a statement to the same effect to detectives at homicide. *Id.* at 87. Blase acknowledged that she had an open case for theft. *Id.* at 82. On cross, Blase admitted that she also had a drug problem, and said Mr. Lazar exaggerated a lot. *Id.* at 92-93.

Detective Baker testified that he was the assigned detective on the case. N.T. 05/06/10, at 97. Baker stated he didn't direct the crime scene unit to search the perimeter of the house or inspect the yard because Detectives Verrechio and Singleton were in charge of the scene and he trusted his fellow detectives. *Id.* at 143-144. Initially, he insisted that he had never gone into the yard when he went to the crime scene, and did not return after reviewing the medical examiner's report which theorized the injuries were caused by an axe, machete, or hatchet. *Id.* at 105-106. When asked about his limited investigation of the crime scene, Baker stated, at odds with the testimony of Detective Lewis: "I was not controlling the scene, it was of no concern to me." *Id.*

at 102. Baker repeatedly testified that there were no leads in the case in the early months of the investigation, no interviews, and "no information coming in at all." *Id.* at 107.

Baker testified that on April 24th, he asked Detective Williams to pick up the suitcase from Evelyn Gutierrez. Baker stated he inspected the suitcase a month later. N.T. 05/06/10, at 177. Over a month after inspecting the suitcase, Baker picked up Mr. Lazar from outside the Goldman clinic. In his first statement, Lazar admitted to being the owner of the suitcase, but denied any involvement in the crime, or knowing how the suitcase ended up in the decedent's backyard. He explained that he'd lost the suitcase when he was with a friend, a Puerto Rican man named John, doing drugs in an abandoned property in the area of Kensington and Somerset. *Id.* at 125-128. Baker returned Mr. Lazar's suitcase to him after the interview. *Id.* at 129. He denied giving Mr. Lazar any details about the crime or showing him any crime scene photos. *Id.* at 121-123. At the conclusion of direct, Baker testified that he had not participated in the investigation of Victor Berrios, but that he knew he had not been arrested. *Id.* at 133. On cross, Baker admitted that he had gone into the yard two weeks or a month after the murder, but claimed he had not noticed a suitcase or chair because he was looking for a weapon. *Id.* at 159-162.

Dr. Edwin Lieberman, a forensic pathologist, examined Mr. Gutierrez's body and testified that given its condition, at the time his corpse was discovered he would have been dead for several days and thus was most likely killed on January 7, 2007. N.T. 05/06/10, at 196, 205. The cause of death was twelve "sharp force injuries," or chop wounds, to Mr. Gutierrez's face and skull caused most likely by an object such as a hatchet, axe or machete. *Id.* at 199-205.

John Barry, another neighbor of Mr. Lazar and the husband of June Blase, testified that Mr. Lazar told him police might be looking for him for hitting somebody with an axe. *Id.* at 215. Barry stated he didn't think it was true and that he knew Mr. Lazar to exaggerate. *Id.* at 218.

Detective Booker responded to the disturbance call at Mr. Lazar's home on November 2, 2007. *Id.* 221. He testified that Angely was upset with Mr. Lazar. *Id.* 222. Conflicting with Angely's testimony, Booker said Angely was never handcuffed at the station and that he had not been at the station for two days. *Id.* at 230-231. Booker also took Mr. Lazar's biographical information on November 19, 2007, when he had been in custody for about an hour. *Id.* at 235. Booker testified that Lazar was a bit agitated but his demeanor was fine at that time. *Id.*

Benjamin Levin testified about the forensic evidence recovered from 2767 Mascher street. Mr. Lazar was excluded as a source of all the DNA tested. N.T. 5/10/10, at 35.

Detective McDermott prepared the warrant for Mr. Lazar's residence after the interview with Sarn Wilson. He confirmed that Angely was never handcuffed. *Id.* at 86. He participated in the search in the morning of November 19, 2007 and then took Mr. Lazar's second statement that evening. *Id.* at 39-40. The suitcase, which had been returned to Mr. Lazar by Detective Baker, was the only item recovered from his home. *Id.* at 44. No weapons were found, conflicting with what Russell Angely and Sarn Wilson had alleged in their statements. *Id.* at 95. McDermott testified that Mr. Lazar was placed in a 10 foot by 8 foot room after he was brought into the station at 8:30 AM. *Id.* at 47. He stated that Lazar was very cooperative, said he had already given a statement, and thought the case was all cleared up. *Id.* 48-49. McDermott recounted that Mr. Lazar said that a man named John was the one who committed the murder, and that they spent most of the day attempting to identify John. *Id.* at 50-51.

At 7:30 PM on November 19, Detective McDermott began a formal interview of Lazar. In this interview, McDermott testified that Lazar stated that while doing drugs in an abandoned property, he discussed going to the Mr. Gutierrez's home with a man named John, to get money from the victim because he didn't pay John's girlfriend after she gave him oral sex. *Id.* at 63. The

statement continues that a cop car went by the abandoned home where they were talking and Mr. Lazar fled and paid a woman $40 dollars to cut through her home. *Id.* at 65. Mr. Lazar then purportedly asked people if they had seen a Puerto Rican man with his bag, and was told he had gone into a house nearby. *Id.* The door to the house was ajar, John was covered in blood and going through drawers. *Id.* McDermott continued to testify to the statement, that Lazar had never personally entered Dario Gutierrez's home, received nothing from the robbery and that he'd seen John after and he'd said he left the bag behind. *Id.* The statement concluded with Mr. Lazar stating he told various friends and neighbors about what happened, that he hadn't seen the hatchet before, and offering an apology to the victim's family. *Id.* at 69.

McDermott testified that Mr. Lazar made six corrections and signed each page. *Id.* at 70-72. McDermott said the investigation continued at this point, and both he and Detective Rossiter went to the area but failed to locate the woman Lazar purportedly paid, or an abandoned house nearby Mascher street. *Id.* at 75. The detectives went home that night and left Mr. Lazar in the interview room overnight. *Id.* at 77. McDermott was not present for Rossiter's interview the following day. He testified that Mr. Lazar was brought to the hospital at 10:00 p.m. on November 20th and remained there for three hours. He asserted that throughout the day of the 19th and 20th Mr. Lazar appeared normal and did not ask for medication or to speak to anyone. *Id.* at 107-108. McDermott confirmed that Lazar's third statement on November 20, took place 30 hours after he was taken into custody. *Id.* at 119.

Detective Rossiter participated in the interviews of June Blase and John Barry, and spoke to them while executing the search warrant at Mr. Lazar's home at 599 East Cheltenham. *Id.* at 128-132. Rossiter testified that, at East Cheltenham, no axe or hatchet was recovered from Mr. Lazar's room or the basement. *Id.* at 159. Rossiter was also present for the interview of Mark

Kedra, and testified that his statement was accurate. *Id.* at 138. After Mr. Lazar's November 19,

Rossiter went to the area of Mascher street and reported back that he was unable to corroborate

details of the statement, such as the presence of an abandoned house and cinderblock wall. *Id.* at

140.

Detective Rossiter testified that on November 20, Rossiter took Mr. Lazar's third

statement. Rossiter began interviewing Mr. Lazar at 2:45 p.m. on November 20th - thirty-one

hours after his arrest - and in this statement, Mr. Lazar told him the abandoned house must have

been on a different block, and that he had gone into Mr. Gutierrez's house to find John was

receiving oral sex from Mr. Gutierrez. N.T. 05/10/10, at 149-151. The statement continues that

Mr. Gutierrez offered Mr. Lazar oral sex as well, but that just before he began, he struck him in

the forehead with his palm and then John began going through the drawers and then hit the man

with a hatchet five times. *Id.* at 11-152. Rossiter testified that he was the only one present for Mr.

Lazar's final statement. *Id.* at 173. Over 30 hours into his time in police custody and without

methadone, Rossiter said that Mr. Lazar did not ask for food or medicine or complain of any

pain, and that he declined to have the statement videotaped. *Id.* at 176-177. The parties stipulated

that the last time Mr. Lazar had received a methadone dose was October 24th, 2007.[5] *Id.* at 180.

The defense called Detective John Verrechio to begin its case. Verrechio testified that

some items had been moved prior to his arrival at the crime scene. N.T. 05/10/10, at 187.

Verrechio said he was not controlling the crime scene or directing Officer Lewis. *Id.* 188-189.

He denied entering the yard and did not know if anyone else did. *Id.* at 198.

---

[5] As stated above, it was later revealed during PCRA proceedings that trial counsel had failed to
obtain the full records, or to read the records he did have. Mr. Lazar had received a methadone
dose the day prior to his arrest. Thus, he had been without methadone for at least 50 hours by the
time of his second statement.

The defense concluded its case with two character witnesses, Anne Gray and Caroline Geiger. Each testified that Mr. Lazar has a reputation in the community for being a peaceful and respectful person. N.T. 05/10/10, at 215-22.

Immediately after sentencing, Mr. Lazar professed his innocence: "I'm sorry for your family, but I'm not the person that killed your father. . . I want to say I'm innocent." N.T. 5/11/10, at 147-148.

## II.    PCRA Proceedings

After Mr. Lazar's direct appeal was finalized, PCRA counsel, Jules Epstein, filed a PCRA petition on June 18, 2012 and an accompanying memorandum of law on June 27, 2012. The petition raised numerous claims including that trial counsel had been ineffective for failing to present complete methadone records reflecting that Mr. Lazar had used methadone up until the day prior to his arrest. Mr. Epstein also submitted informal and formal requests for discovery related to Victor Berrios and William Rosa.

The trial court summarily denied all of Mr. Lazar's claims and motions for discovery, and ordered an evidentiary hearing limited to trial counsel's failure to procure records showing that Mr. Lazar had used methadone until the day prior to his arrest. N.T. 4/15/2013, at 8.

The evidentiary hearing took place on May 30, 2013. Dr. George Woody, an expert in substance addiction and methadone withdrawal, testified that Mr. Lazar was on a high dose of methadone, that Mr. Lazar was experiencing withdrawal when he was in police custody, and that the withdrawal symptoms undermined the reliability of Mr. Lazar's purported confessions. N.T. 5/30/2013, at 11, 21, 32, 43-45. On July 15, 2013, the court ruled that trial counsel was ineffective for failing to secure the complete methadone records, but found that there was an inadequate showing of prejudice and denied relief. N.T. 7/15/2013, at 20. PCRA Opinion at 5.

The PCRA court issued a written opinion on December 20, 2013. *Commonwealth v. Lazar*,

Docket No. CP-51-CR 0002056 2008 (12/20/2013).

### III.    Newly Disclosed Evidence

As discussed infra, Mr. Lazar has consistently maintained his innocence. In PCRA

proceedings, Mr. Lazar made multiple formal and informal discovery requests for information

about alternate suspects, including Victor Berrios and William Rosa, all of which were rejected

by the court and the Commonwealth. App. 14-48, 51-52.   Thereafter, Mr. Lazar made a series of

FOIA requests to the FBI, ultimately filing a legal challenge against the FBI, which was

dismissed. *See Lazar v. Fed. Bureau of Investigation*, 207 F.Supp.3d 557, 564 (E.D. Pa. 2016).

In March 2021, he submitted an evidence search request to the Philadelphia Police Department.

On April 27, 2021, the PPD provided counsel with information about several property receipts,

and advised that the car owned by Rosa, which law enforcement seized from Berrios's home

following an anonymous tip, had been auctioned in March 2007. App. 140-41. Subsequently, in

September 2021, the DAO disclosed its file to counsel, revealing a multitude of documents that,

individually and collectively, devastate the integrity of Mr. Lazar's conviction.

> **A. The Commonwealth possessed records documenting law enforcement's failure to competently investigate two alternate suspects, despite making multiple misrepresentations to the contrary**.

Officers received a confidential tip regarding the murder of Dario Gutierrez. The tip

stated that Victor Berrios and William Rosa accompanied a woman to the victim's home and

followed her in when the victim opened the door. The tip also told police that the two men drove

a Black Honda Accord "when they [did] their jobs." App. 283-84. As part of their investigation,

law enforcement seized the Black Honda Accord, owned by William Rosa, from the home of

Victor Berrios. The newly disclosed DAO records reveal that the car was never tested and that law enforcement never actually investigated or excluded the pair.

On April 27, 2021, post-conviction counsel, Paul Jubas, received an email from the police department stating that the Honda was auctioned two months after it was seized on March 15, 2007. App. 140-41. Further, a newly disclosed memorandum from the DAO file reveals that just two weeks after William Rosa's Black Honda was seized, it was deemed "no longer needed for the investigation" and a request was made to authorize its release to its owner/agent. App. 324. There are no reports or inventory logs demonstrating that the car was subjected to any testing or examination by police before it was released. Police never disclosed that the Honda was authorized for release from its custody and auctioned before any testing was done.

On June 13, 2022 the Commonwealth filed its reply to Mr. Lazar's Rule 60(b) Motion, conceding their prior misrepresentations. Response to Motion for Relief Under 60B *from Final Order and Judgement*, No. 14-6907 (June 23, 2022). In support, the Commonwealth attached a 2012 internal Memorandum providing that "there is no evidence police even investigated other suspects" in Mr. Lazar's case. *Id.* Ex. A; App. 512-13. The Memorandum directly contradicts the Commonwealth's prior repeated assertions that Berrios and Rosa had been excluded by law enforcement.

### B. Law enforcement possessed in its file an exculpatory crime scene photograph of a chair in the decedent's backyard

A review of the previously undisclosed DAO file reveals that the Commonwealth had in its possession a crime scene photograph depicting an empty chair in the backyard of Dario Gutierrez's home. The evidence indicates that this photo was taken during the months between the murder and the discovery of the suitcase. The newly disclosed photo undermines the only evidence tying Mr. Lazar to the crime scene, and contradicts Mr. Lazar's purported confession,

his alleged inculpatory statements to other witnesses, and the testimony of Russell Angely and Sarn Wilson. The newly disclosed photograph also significantly undermines the testimony of Detective Baker and law enforcement's investigation more broadly.

### C. The Commonwealth was aware of misconduct by Detectives David Baker and Kenneth Rossiter pre-dating Mr. Lazar's trial

Newly disclosed *Brady* proffers from the District Attorney's office reveal that critical law enforcement witness Detective Baker, and Detective Rossiter, who took Mr. Lazar's final statement, each had a history of serious and relevant misconduct predating Mr. Lazar's trial.

The Baker disclosure includes an Internal Affairs finding of misconduct in 1998, stipulations from the Commonwealth related to the exoneration of Chester Hollman, and details of misconduct in Lavar Brown's homicide investigation wherein Detective Baker fed information to witnesses and repeatedly perjured himself in the 2004 trial. App. 183-282.

The Rossiter disclosure includes a 1991 incident wherein he fabricated a story that he was forced to tackle a man to the ground because he tried to struggle free of his fellow officer's grip. His fellow officer immediately contradicted the statements, revealing that Rossiter had actually beaten the person, repeatedly hitting him with his nightstick as he lay on the ground. App. 339.

### D. The Commonwealth's file contained numerous tips implicating other suspects that were inexplicably abandoned, contradicting the Commonwealth's representations at trial

Contradicting the Commonwealth's assertions at trial, along with the testimony of law enforcement that the case had almost immediately gone cold, and that they had no viable leads or information, the DAO file revealed that officers had extensive information pointing to credible alternative suspects that were simply abandoned. This suppressed information includes a specific threat against Dario Gutierrez, tips about drug dealers with recent arrests in the immediate

vicinity of the victim's home, and detailed information and an investigation into a wanted man who had committed a brutal and similar crime with a crowbar.

Early on, police learned of an individual named Leon Ryans who "beat down an old head." App. 356. Police began investigating Ryans, finding two significant violent episodes, one involving a home invasion where he beat the homeowner with a crowbar with two other assailants. App. 416-17. As of January 12, 2007, Ryans remained a wanted person. App. 413.

The undisclosed files also reveal that police received information about a specific threat against Dario Gutierrez. Toward the end of January, Anita Gutierrez, the victim's daughter, called police to tell them about a threat against her father and her family. App. 316. Emily Gonzalez had threatened Anita and Dario Gutierrez a couple of months earlier stating that she, "better watch [herself] because my [Emily's] father is a big man and knows a lot of people," and she could get the whole family. Anita further stated that David Centeno, her ex-husband, had been attacked by Emily and two males, even stating he had to draw his gun to protect himself. App. 316.

The file also revealed that officers had credible information about specific drug dealers in the neighborhood who had issues with the victim. In February, district officers questioned Holly McBride (AKA Stacey McBride) about the homicide. She gave the names of Flaco (AKA Victor Flores) and Black (AKA Pablo Costoso) as the perpetrators. App 438. She added that Money Mike (AKA Michael Bozyk) believed the murder took place because Gutierrez was causing problems for drug dealers, adding "the old guy [was] killed on Mascher St. for snitching on the boys selling on Mutter St." App. 439.

As early as January 2007, police also focused on two additional drug dealers, Hector Valentin and Melvin Martinez. Both had lengthy criminal histories associated with selling drugs

in the vicinity of Gutierrez's home. Investigative records reveal a note to "target Hector Valentine," while Martinez "sells drugs @ Mascher & Somerset," the intersection where the victim's corner lot sits. App. 486, 441.

These files are significant, because the Commonwealth repeatedly argued that the absence of other viable suspects strengthened the likelihood of Mr. Lazar's guilt. The newly disclosed files also directly contradict detective testimony that there were "no tips" coming in after the murder, false testimony that went uncorrected.

Since his conviction, Mr. Lazar has steadfastly maintained his innocence and doggedly challenged his conviction. Despite his diligence, he was not able to obtain this evidence over the past decades, nor could he have obtained this information through another source. As Petitioner argues more fully in Section B below, the newly disclosed evidence reveals multiple *Brady* violations by the Commonwealth. Further, the newly discovered evidence proves that the prosecution engaged in misconduct during Petitioner's trial by failing to correct false and deliberately misleading testimony in violation of Petitioner's right to due process of law. In multiple instances and respects, the Commonwealth violated its obligations under *Brady*, *Napue*, and *Giglio*. For the reasons stated below, relief should be granted.

## GROUNDS FOR RELIEF

By this Amended Petition for Writ of Habeas Corpus, Mr. Lazar asserts that his convictions violate the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, for each of the reasons set forth herein. Moreover, the rulings and decisions of the state courts, including the Pennsylvania Supreme Court, were contrary to, and/or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, and/or were based on an unreasonable determination of the facts in

light of the evidence presented and/or proffered to the state courts.

## PRELIMINARY STATEMENT ON EXHAUSTION AND STANDARD OF REVIEW

The claims herein are properly in front of this Court. Mr. Lazar has at all times been diligent. To the extent the claims have not been presented to the state courts, Mr. Lazar cannot be faulted. Any lack of exhaustion is due to the Commonwealth's failure to disclose evidence or the absence of a state corrective process. Pursuant to Rule 5 of the Rules Governing § 2254 Cases in the United States District Courts (hereinafter "Habeas Rules"), non-exhaustion and procedural default are affirmative defenses that must be raised by Respondents in their answer. Habeas Rule 5 ("The answer must address the allegations in the petition. In addition, it must state whether any claim in the petition is barred by a failure to exhaust state remedies, a procedural bar, non-retroactivity, or a statute of limitations."); *see also Granberry v. Greer*, 481 U.S. 129, 134 (1987) ("When the State answers a habeas corpus petition, it has a duty to advise the district court whether the prisoner has, in fact, exhausted all available state remedies").

Claim I was adjudicated in state court and previously presented to this Court. Deference to the state court's adjudication of Claim I therefore applies pursuant to 28 U.S.C. §§ 2254(d)(1) and 2254(d)(2) (*see* Legal Standards *infra*). In Claim I, Mr. Lazar argues that this Court's prior analysis of the state court's adjudication of the claim was improperly tainted by the Commonwealth's repeated misrepresentations. He respectfully requests that the Court reconsider the reasonableness of the state court's determination of the facts and the state court's application of clearly established law in light of those misrepresentations. Because of the state court's unreasonable prejudice analysis under *Strickland* and in light of the evidence presented in the state court, Mr. Lazar contends he is entitled to de novo review of Claim I. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) ("When a state court's adjudication of a claim is

dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires."). In reasserting Claim I, Mr. Lazar is not requesting that the Court consider new evidence, but rather that the Court eliminate the Commonwealth's misrepresentations from its analysis. To the extent this Court need consider new evidence in support of this claim, the exhaustion requirement is waivable.

Claims II-VII have not yet been exhausted in state court. Mr. Lazar raised Claims II-VII in a PCRA Petition filed on April 27, 2022. That petition is pending in the Philadelphia County Court of Common Pleas. These claims are based on newly disclosed evidence, which was within the exclusive control of the Commonwealth at all times. Despite Mr. Lazar's diligence for the past decade, he was unable to obtain this evidence and develop the factual basis for these claims in state court. Mr. Lazar therefore did not fail to develop these claims in state court and any default is excused for purposes of federal review. *See Williams v. Taylor*, 529 U.S. 420, 442-443 (2000) (factual develop in federal court of claims not raised in state court appropriate where petitioner was not on notice of the facts giving rise to juror misconduct and prosecutorial misconduct claims); *id* at 444 ("Our analysis should suffice to establish cause for any procedural default petitioner may have committed in not presenting these claims to the Virginia courts in the first instance.") Moreover, the exhaustion requirement is waivable and Mr. Lazar respectfully suggests that, given the history of this case and the equities, it is appropriate for the Commonwealth to waive exhaustion.

Claim VIII asserts that Mr. Lazar is actually innocent. This claim is not cognizable in state court, as Pennsylvania's narrow post-conviction statute does not grant jurisdiction for successors based on actual innocence. Because of the absence of a state corrective process, this

Court may consider this claim. 28 U.S.C. § 2254(b)(1)(B)(i). Because he is actually innocent, Mr. Lazar encourages Respondents to waive any exhaustion or procedural default defenses and allow these claims to be heard on their merits.

## ARGUMENT

The Commonwealth has disclosed to Mr. Lazar its file, along with several *Brady* disclosures relating to officer misconduct, and conceded that it made affirmative misrepresentations about law enforcement's investigation into alternate suspects in the case. The newly disclosed documents squarely undermine each element of the case against Mr. Lazar, exposing misconduct that permeated his trial and resulted in a tainted conviction. As discussed below, Petitioner has met his burden under 2254(d)(2) and *Williams v. Taylor* and established claims under *Brady v. Maryland* and its progeny and *Napue v. Illinois* and is entitled to relief under 28 U.S.C. 2254. Due process under the United States Constitution requires that his sentence be vacated.

### I.   Legal Standards

### A.  AEDPA

Once a claim has been adjudicated on the merits in state court proceedings, federal habeas relief may be obtained pursuant to § 2254 if a showing is made under either § 2254(d)(1) or 2254(d)(2). Section 2254(d)(1) allows federal habeas relief if the state court adjudication of that claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Section 2254(d)(2) allows federal habeas relief if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id*. Although the 2254(d) standards require deference to

the state courts and were intended to be difficult to meet, they do not impose a bar or a prohibition on a federal habeas court to grant relief on a claim that was rejected by a lower state court. *See Harrington*, 131 S. Ct. at 786. The Supreme Court has recognized that this deference does not preclude relief in an appropriate case. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief."); *see also Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (recognizing that the habeas standards are "demanding but not insatiable").

### 1. 2254(d)(1) Standard.

Under section 2254(d)(1), federal habeas relief is proper if the state court's adjudication of the claim is "contrary to, or involved an unreasonable application of, clearly established Federal law." The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meaning. *Penry v. Johnson,* 532 U.S. 782, 792 (2001). The threshold inquiry is whether there exists clearly established federal law, which is an inquiry that focuses on Supreme Court decisions. A state court decision is "contrary to" clearly established federal law if it reaches a conclusion opposite that of the Supreme Court on a question of law or applies a rule that contradicts the governing law as set forth in Supreme Court decisions. *Williams v. Taylor,* 529 U.S. 362, 405 (2000); *see also Penry,* 532 U.S. at 792. A state court decision is also "contrary to" established federal law if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from that precedent. *Williams,* 529 U.S. at 406.

A state court decision involves an "unreasonable application" of clearly established federal law where it identifies the governing legal rule, but applies it unreasonably to the facts of

a particular case. *Williams,* 529 U.S. at 407-08 ("[W]hen a state-court decision unreasonably applies the law of [the Supreme] Court to the facts of a prisoner's case, a federal court applying § 2254(d)(1) may conclude that the state-court decision falls within that provision's 'unreasonable application' clause.") A federal court may grant habeas relief when a state court has misapplied a "governing legal principle" to a set of facts different from those of the case in which the principle was announced. *Wiggins v. Smith,* 539 U.S. 510, 520 (2003).

A federal habeas court making an "unreasonable application" inquiry should ask whether the state court application of clearly established federal law was objectively unreasonable. *Penry,* 532 U.S. at 793. A federal habeas court may not grant relief because it reaches in its own judgment a different conclusion from the state court—the federal court must find that the state court's application of clearly established federal law was also unreasonable. *Williams,* 529 U.S. at 411. If a lower state court applies an incorrect legal standard to assess a claim, the state court decision will be deemed contrary to clearly established federal law. *Lafler v. Cooper,* 132 S. Ct. 1376, 1390 (2012). And in that instance, the federal habeas court is permitted to determine the principles necessary to grant relief and analyze the claim under the correct legal standard. *See id.*

In reviewing whether a state court decision is an unreasonable application of Supreme Court precedence, the Eighth Circuit has observed that it is appropriate to consider "lower" federal court decisions in factually commensurable cases. *Atley v. Ault,* 191 F.3d 865, 871 (8th Cir. 1999). The analysis conducted under § 2254(d)(1) is also limited to the record that was before the state court that adjudicated the prisoner's claim on the merits. *Cullen v. Pinholster,* 131 S. Ct. 1388, 1398 (2011).

### 2. § 2254(d)(2) Standard.

Habeas relief can also be granted if the lower state decision "was based on an

unreasonable determination of the facts . . ." under § 2254(d)(2). *See also Simmons v. Luebbers,* 299 F.3d 929, 937 (8th Cir. 2002) (rejecting factual conclusions of the Missouri Supreme Court as "inaccurate."). A state court decision resting upon a determination of fact that lies against the clear weight of the evidence is, by definition, a decision that is "so inadequately supported by the record' as to be arbitrary and therefore objectively unreasonable. *Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003). If a federal habeas court determines that the lower court decision rests upon significant factual flaws, it is free to review the claim and grant relief if a non-harmless constitutional violation has occurred. *Miller-El v. Dretke,* 545 U.S. at 240 (rejecting lower court's factual findings and granting habeas relief on *Batson* claims); s*ee also Simmons,* 299 F.3d at 937-38.

### B. *Strickland v. Washington*

Ineffective assistance of counsel claims under the Sixth and Fourteenth Amendments are evaluated under the two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984). Petitioner must show: (A) counsel's deficient performance, i.e., that his attorney's performance fell below "an objective standard of reasonableness," *id*. at 688; and (B) prejudice, i.e., that confidence in the result of the original proceeding is undermined as a result of counsel's deficiencies, *id.* at 694; see also *Williams v. Taylor*, 529 U.S. 362 (2000); *Rompilla v. Beard*, 545 U.S. 374 (2005).

Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. Prejudice is present whenever "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Williams*, 529 U.S. at 371; *Rompilla*, 545 U.S. at 390. The Supreme Court has stressed that "the adjective is important." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "The question is not whether the

defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.;* see also *Strickland,* 466 U.S. at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case").

### C. *Brady/Napue*

#### 1. *Brady*

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or punishment, irrespective of the good or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87 (1963). *Brady* requires the prosecutor to disclose all material evidence favorable to the defense. *Id.* "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (internal quotation marks omitted). Under this standard, the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434. Accordingly, a "reasonable probability" of a different result is "shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (internal quotation marks omitted).

The *Brady* rule encompasses both "exculpatory" and "impeachment" evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Kyles v. Whitley*, 514 U.S. at 433 (internal quotations omitted). *see also Breakiron v. Horn*, 642 F.3d 126, 133 n.8 (3d Cir. 2011) (it is "so well-established" as to be "axiomatic that prosecutors must disclose impeachment evidence");

*Bridges v. Beard*, 706 F. App'x 75 (3d Cir 2017) (non-precedential). The substantive admissibility of the suppressed evidence is not dispositive of a *Brady* claim. *Commonwealth v. Johnson*, 174 A.3d 150, 1056 (Pa. 2017) (*Johnson-2*).

A prosecutor's failure to disclose *Brady* material requires a new trial where "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Simmons v. Beard*, 590 F.3d 223, 233 (3d Cir. 2009) (quoting *Bagley*, 473 U.S. at 682). *See Wearry v. Cain,* 136 S. Ct 1002, 1006 (2015) (same). Materiality is established where the nature and quality of that evidence would have created a reasonable probability of a different result by raising a reasonable doubt about the defendant's guilt. The reasonable probability standard is less than the preponderance of the evidence standard; it merely requires that the likelihood of a different verdict is sufficient to undermine confidence in the outcome. *Johnson* at 1057. *See United States v. Agurs*, 427 U.S. 97, 112 (1976) ("It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed"); *accord Hinton v. Alabama,* 134 S. Ct. 1081, 1089 (2014) (prejudice exists where there is a reasonable probability that new evidence would lead the jury to have a reasonable doubt about defendant's guilt); *accord Strickland v. Washington*, 466 U.S. 668, 695 (1984).

In determining materiality, "the reviewing court may consider directly any adverse effect . . . on the preparation or presentation of the defendant's case. The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response." *Bagley*, 473 U.S. at 683. Ultimately, the

question is "not whether the defendant would more likely than not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434; *accord Wilson v. Beard*, 589 F.3d 651, 665 (3d Cir. 2009). Thus, *Brady* may be violated even when "the undisclosed information may not have affected the jury's verdict." *Wearry,* 136 S. Ct at 1006 n.6.

The sufficiency of the untainted evidence is not the test of materiality. Petitioner need not demonstrate that "in light of the undisclosed evidence, there would not have been enough left to convict . . . [S]ufficiency of [the remaining] evidence [is not] the touchstone" of materiality. *Kyles*, 514 U.S. at 434-35 & n.8. The materiality of suppressed evidence must be "considered collectively, not item by item." *Id.* at 436; *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 312 (3d Cir. 2016) (en banc). The prosecutor's duty to disclose is "absolute" and the defense may rely on the presumption that the prosecutors have met their obligations. *Id.* at 290.

### 2. *Napue*

A criminal defendant's right to due process is violated when a prosecutor presents testimony or evidence that he knew or should have known was actually false and material to the verdict. *See Napue v. Illinois*, 360 U.S. 264, 269-271 (1959); see also *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Alcorta v. Texas*, 355 U.S. 28, 31-32 (1957). The use of false evidence at trial is material, and therefore requires reversal under *Napue*, if it "may have had an impact on the outcome of the trial." *Napue*, 360 U.S. at 272; accord *Bagley*, 473 U.S. at 680 (holding that knowing use of perjured testimony is material unless it is harmless beyond reasonable doubt).

In circumstances where the prosecutor knowingly conveys, or fails to correct, false information to the jury, in violation of its obligations under *Giglio* and *Napue* an even more

defense-friendly materiality standard applies. When that occurs, the proper materiality standard is that of *Bagley*, 473 U.S. at 678-79 & n.9, and *Agurs*, 427 U.S. at 103, which require the Commonwealth to show that the error is harmless beyond a reasonable doubt. *Haskell v, Superintendent, Greene SCI,* 866 F'3d 139, 141, 146 (3d Cir. 2017) (petitioner entitled to relief when he shows a reasonable likelihood that the prosecutor's knowing use of false testimony could have affected the jury). *See also United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995) (quoting *Agurs*) (when the prosecutor knowingly conveys false information to the jury, the falsehood is material "if there is any reasonable likelihood" it "could have affected the judgment of the jury," requiring the State to show "harmless[ness] beyond a reasonable doubt"); *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008) (although *Napue* does not create a *per se* rule of reversal, "if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic").

## II. Claims for Relief

**CLAIM I: The Pennsylvania courts erroneously determined that Mr. Lazar was not prejudiced by counsel's omissions, entitling Petitioner to review of that claim and relief.**

### A. Background

The Commonwealth's circumstantial case rested largely upon Mr. Lazar's confession. In his initial PCRA in state court, Mr. Lazar attacked the confession, presenting documentary evidence that he had been in withdrawal from methadone during his 30-hour interrogation. Specifically, Mr. Lazar provided medical records establishing that since early 2006 he had been administered daily high doses of methadone. Between December 2006 and November 18, 2007, the day before his lengthy interrogation, he had had been administered a high dose of methadone *every single day*. App. 516-526. In sharp contrast, Mr. Lazar's jury was told that he had not been

administered methadone for approximately one month before his interrogation. At the post-conviction hearing, Dr. Woody, a leading expert in methadone withdrawal, explained that patients *begin* to experience withdrawal 24-36 hours after their last dose. N.T. 5/30/13 at 24. The symptoms of methadone withdrawal, he testified, are more severe than heroine withdrawal. Because Mr. Lazar had been administered a relatively high dose of methadone (260 mg), Dr. Woody concluded, his experience of withdrawal would be substantial.

Mr. Lazar was forthright with his trial counsel about his drug addiction and the withdrawal he experienced, directing his counsel to the records from the clinic where he had been receiving methadone for years. Yet, trial counsel failed to obtain the complete records, or to review the records he did have, before trial. Thus, the jurors were unaware that Mr. Lazar was experiencing acute methadone withdrawal at the time that he gave two statements: 36 hours and 50 hours after his last dose of methadone. The state court agreed that trial counsel's performance was deficient, but found that Mr. Lazar had made an inadequate showing of prejudice. The court found that even if the statements had been affected by the methadone withdrawal, there existed "overwhelming evidence of guilt as provided by the defendant himself in making statements regarding his involvement in the murders (*sic*) to numerous witnesses who testified." Trial decision, pronounced in court on July 15, 2013.

In his initial federal habeas proceeding Mr. Lazar argued that the state court findings were unreasonable because the court failed to consider the entire record. First, Mr. Lazar argued that the state court unreasonably failed to take into account the confession's *reliability* (separate and apart from its voluntariness). Second, Mr. Lazar argued that the state court unreasonably failed to consider the unreliability of the witnesses against him. Third, and most critically for present purposes, Mr. Lazar argued that the state court's failure to consider significant alternate

suspects rendered its prejudice finding unreasonable. As to the latter point, Mr. Lazar argued to

this court that:

> A murder occurred in January 2007 with the police having reason to
> believe that it was committed by drug dealers who resented the victim
> trying to keep them from the neighborhood. Nine days after the murder,
> the police searched the home of Victor Barrios, a known drug dealer who
> "federal authorities were looking for, and recovered a machete, the
> precise type of weapon alleged to have been used on Mr. Gutierrez.

*See* Petitioner's Answer to the Response to the Petition for Habeas Corpus and Memorandum of

Law in Support of his Previously Filed Petition for Writ of Habeas Corpus and Addressing the

Anti-Terrorism and Effective Death Penalty Act, No. 14-6907, D.E. 9 at 9 (E.D. Pa. Mar 12,

2015).

In its sur-reply to Mr. Lazar's initial habeas petition, the Commonwealth dismissed Mr.

Lazar's contentions that Berrios and Rosa were viable alternate suspects, asserting that trial

counsel had argued "this point in his opening using the classic strategy of trying to pin the crime

on another person by mentioning initial police investigate leads that were *dead-ends* Sur-Reply,

No. 14-6907, D.E. 12 at 20 (E.D. Pa. Mar 12, 2015) (emphasis added).

On September 29, 2016, the Magistrate recommended that the Petition be denied and Mr.

Lazar objected, again faulting the state court's failure to consider favorable evidence pointing to

alternative suspect Victor Berrios in its prejudice analysis. Petitioner's Objections to Magistrate

Judge's Proposed Findings, Recommendations and Report, No. 14-6907, D.E. 20 at 5 (E.D. Pa.

Mar 12, 2015) (emphasis added). The Commonwealth again responded that "Victor Berrios, a

local drug dealer on whom petitioner now wishes to pin the murder was one of the initial non-

fruitful leads police investigated. The victim had been known to chase drug dealers from his

front steps, but the *evidence showed Berrios was not involved*." Response to Objections, No. 14-

6907, D.E. 23 at 12 (E.D. Pa. Mar 12, 2015) (emphasis added).

In upholding the Magistrate's Report, this Court wrote that it was constrained to agree with the denial of habeas relief "solely on the exceedingly deferential framework imposed on me by 28 U.S.C. 2254(d)." *Lazar v. Coleman*, CV 14-6907, 2017 WL 783666, at *5 (E.D. Pa. Mar. 1, 2017). This Court "[wrote] separately to stress [its] serious concern about the state court's prejudice analysis and to explain why I will grant a certificate of appealability." *Id.* "[T]o the extent courts should ever feel comfortable finding the untainted evidence to be 'overwhelming' and sufficient grounds for finding no prejudice, this does not seem like the right case for it." *Id.* at 4.

Mr. Lazar filed a timely Notice of Appeal to the Third Circuit, raising the same claims, including that the lower courts failed to consider alternative suspect Victor Berrios in its prejudice analysis. App. 111. In its brief before the Third Circuit, the Commonwealth again insisted that Berrios had been eliminated as a suspect: "A nearby drug dealer, Victor Berrios, had a rusty machete that could not have been the murder weapon. He was quickly *eliminated as a suspect* and never arrested." App. 140-141. The Commonwealth also noted that "Lazar calls Berrios an alternative suspect,' LB 17, 21, 33. That is *false and was resolved against him at trial*." *Id.* at 141 (emphasis added).

After hearing oral argument, the Third Circuit Court of Appeals denied relief, also noting that "on this record we are constrained by Section 2254(d)(1) to affirm." *Lazar v. SCI Fayette Superintendent*, No. 17-1491 (3d. Cir. 2018), at 8. In a footnote, the Third Circuit relied on the Commonwealth's representations to dismiss Mr. Lazar's claim concerning Berrios and Rosa: "Lazar also argues that the police recovered a machete from another person. This matters little, as this weapon was rusty and the police *eliminated the owner as a suspect*." *Id* (emphasis added).

It has now come to light that the Commonwealth was not being truthful when it repeatedly and vehemently asserted that law enforcement had investigated and excluded Berrios and Rosa. Response to Motion for Relief Under 60B from Final Order and Judgement, No. 14-6907, D.E. 38 (June 23, 2022). Based on those misrepresentations, this Court granted 60(b) relief and reopened the proceedings. Memorandum granting Motion for Relief Pursuant to Rule of Civil Procedure 60(b), No. 14-6907, D.E. 37 (August 24, 2022). Mr. Lazar respectfully suggests that the Commonwealth's repeated misrepresentations tipped the scale against him.[6] Removing the Commonwealth's false arguments, it becomes clear that Mr. Lazar is entitled to relief.

### B. Argument

The impact of Mr. Lazar's statement to police cannot be overstated. *Gonzales v. McKune*, 2001 U.S. App. LEXIS 7101, *21 (10th Cir. 2011)("To a jury which may otherwise be uncertain about a defendant's guilt in light of evidence presented, a confession can erase any traces of doubt.") Had the jury known that at the time he gave the statements to police Mr. Lazar was physically, psychologically and cognitively compromised, they likely would have given less

---

[6] For purposes of AEDPA, in the present claim, Mr. Lazar is not seeking to introduce new evidence. Instead, he is removing the Commonwealth's improper argument. Elsewhere in this petition, Mr. Lazar introduces newly disclosed evidence, not previously available to him through the exercise of diligence. *See* Claim # (newly disclosed evidence reveals that the Commonwealth withheld evidence of viable alternate suspects, misrepresented its investigation, and mischaracterized Mr. Lazar as a lone suspect); Claim # (newly disclosed evidence reveals that just 2 days after he testified against Mr. Lazar, Sarn Wilson pled guilty to a robbery, informed his own sentencing court that he had just testified in a homicide and successfully deterred his sentencing so that Mr. Lazar's trial prosecutor could speak on his behalf); Claim # (a newly disclosed prior misconduct disclosure reveals that Detective Baker has been repeatedly cited for giving information to witnesses when he questions them). In the present claim, however, he is merely asking the Court to reconsider his initial habeas claim, absent the Commonwealth's misrepresentations about viable alternative suspects. Though much of the newly disclosed evidence is related to this claim, because of the procedural posture of this claim, Mr. Lazar is not asking the Court to consider those pieces of evidence in conjunction with this claim. Instead, Mr. Lazar believes that this Court can and should revisit its initial conclusion that state-court deference prevented habeas relief, now without the Commonwealth's misrepresentations which affected this court treatment of the state court's unreasonable prejudice analysis.

weight to those confessions. But they were deprived of that information. The lower court recognized correctly that trial counsel's failures in this regard constituted deficient performance. Nonetheless, the court found the error harmless, because of "overwhelming" evidence against Mr. Lazar, in the form of statements that Mr. Lazar purportedly made to five other people.

The court's opinion was an unreasonable determination of the facts in light of the record as a whole. First, the court wholly ignored the record with regard to the five witnesses. As this Court correctly observed, "the five civilian witnesses all had various credibility problems: one, Lazar's friend, had a theft conviction and had contacted the police about Lazar's statements only after getting into a dispute with Lazar; two others had pending robbery or theft cases against them at the time of trial; and the last two changed their stories on the stand." *Lazar v. Coleman*, CV 14-6907, 2017 WL 783666, at *4 (E.D. Pa. Mar. 1, 2017). Significantly, one of the latter two, Mark Kedra, testified that police had fed him information and then fabricated a statement—the *exact* scenario faced by Mr. Lazar. The tenuous, unreliable, and incentivized statements of these witnesses do not constitute overwhelming evidence of guilt.

Nor do the witness statements shore up the confession. The opposite is true. The confession is what bolstered the unreliable and incentivized statements. Knowing that the confession came from an individual who was compromised by the acute effects of withdrawal fatally undermines the evidentiary value of the witness statements.

Notably, the state court also unreasonably failed to consider evidence of alternate suspects William Rosa and Victor Berrios, known drug dealers at the time. Police had received a tip shortly after the crime from a witness who observed the two men with a woman at the home of the victim. The woman knocked on the door, and when the victim opened it, Berrios and Rosa followed her in. The tipster also informed police that Berrios and Rosa drove a black Honda

Accord. Multiple witnesses had told police that the victim had ongoing tension with drug dealers in the neighborhood. Police immediately acted on the tip, serving a search warrant on Berrios's home, where they found Rosa's black Honda Accord, just as the tipster had said. Police seized multiple pieces of property from the two men, including the car, two pairs of boots and a machete.

Fourteen weeks after the crime, the victim's daughter found a suitcase in her father's backyard. An officer came and picked up the suitcase from the living room of the victim's home, and took it to the station where it sat for another month. Finally, Detective Baker looked inside and found a yearbook, identification, and papers belonging to Steven Lazar. None of the items showed any weather damage. None of the yearbook pages stuck together. The papers were not runny or smeared. Cards and other papers in his wallet were still intact.

Another month passed. On July 3, 2007, Detective Baker brought Mr. Lazar down to the station to question him about his bag. Mr. Lazar went willingly and cooperatively. During that interrogation, Detective Baker told Mr. Lazar about the crime, and even showed him photos of the victim's body. Mr. Lazar told Detective Baker that he knew nothing of the crime or how his bag had come to be there. He had been squatting at a drug house nearby, had run when police were coming, and had lost the bag. Ultimately, Detective Baker concluded that Mr. Lazar had nothing to do with the crime and sent him on his way with his suitcase.

Months later, Mr. Lazar again came to the attention of police, when he got into a drug dispute with his roommate, Russell Angely. Mr. Lazar called the police, and they came and arrested Mr. Angely, who was angry with Mr. Lazar. Angely told the police that Mr. Lazar had confessed to him. At some point during Angely's arrest, Sarn Wilson, another friend, called Angely and spoke with detectives, though there are no records of these discussions. On

November 12, Wilson returned to Homicide. This time in a documented statement, Wilson claimed Lazar had made inculpatory statements to him about the murder, similar to those alleged by Angely. As this Court noted, Mr. Wilson had a pending theft case against him when he made his statements and gave testimony against Mr. Lazar.

Police then arrested Mr. Lazar, and kept him for 37 hours. Throughout the course of the interrogation Mr. Lazar gave two statements to the police while he was in acute withdrawal. Those statements came 36 hours and 50 hours after his last dose of methadone; a dose which was particularly high. Police admitted that they did not administer methadone to Mr. Lazar while he was being interrogated. They rushed him to the hospital after the second statement.

As this Court noted, the other three witnesses, June Blase, John Barry, and Mark Kedra too had "various credibility problems" and both Barry and Kedra "changed their stories on the stand." *Lazar v. Coleman*, CV 14-6907, 2017 WL 783666, at *4 (E.D. Pa. Mar. 1, 2017). Further, Kedra maintained that police had fabricated his statement.

Police never excluded Berrios or Rosa, despite the Commonwealth's misrepresentations to this Court. Instead, they belatedly shifted their focus to Mr. Lazar, relying on compromised witnesses to give unreliable information, leading to an unreliable and protracted confession from a vulnerable man who was actively going through acute withdrawal from methadone. Had Mr. Lazar presented the evidence of his withdrawal, through the records and the expert he presented in post-conviction, the jury would have understood how unreliable that confession was. They would have seen how the unreliable statement propped up the unreliable witnesses. The existence of two prime suspects underscores the prejudice against Mr. Lazar. Instead of investigating the obvious suspects in front of them, to which all evidence led, police focused on a

vulnerable man who was only linked to the crime scene 14 weeks after the murder by a happenstance occurrence.

Without the confession, the Commonwealth's case falls a house of cards. Each piece of evidence against Mr. Lazar resting on another precarious piece. To examine the confession in a vacuum, as the state courts did, constitutes an unreasonable determination of facts in light of the evidence in front of the state courts. Reading the record as a whole, it is clear that Mr. Lazar's trial did not result "in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434. This Court should grant Mr. Lazar's Claim and vacate his conviction.

> **CLAIM II: Newly disclosed contemporaneous investigation documents undermines law enforcement's investigation and reveals that the prosecutor failed to correct multiple instances of perjury and misrepresented the investigation in violation of *Brady* and *Napue*.**

The Commonwealth's narrative at trial was that Steven Lazar was law enforcement's only suspect in a case that had long gone cold. Elicited primarily through the testimony of Detective Baker, the jury learned that law enforcement had essentially no information early in the investigation. The meager tips that they did have were disposed of, and, in the Commonwealth's telling, conclusively ruled out.

The prosecution introduced its narrative in opening arguments: "[B]asically the case goes cold, and it goes cold pretty fast." N.T. 5/04/10, at 25. It further developed it during the testimony of Detective Baker. N.T. 5/6/2010, at 108 ("there were no leads coming". . . "in between January 9th and April 24th") In closing, it returned to its refrain: "they weren't working on this. It was cold as cold can be." N.T. 5/11/10, at 70. "What did I tell you at the beginning? This is the case that probably would have gone unsolved had the Defendant never opened up his mouth. Because there wasn't a lot of evidence, wasn't there?" N.T. 5/11/10, at 59.

Any tips that had come in, the Commonwealth was clear, had been affirmatively ruled out. Specifically, counsel had been made aware of a tip related to two individuals: William Rosa and Victor Berrios. After the two were named by an informant, police searched their home and seized boots, a car, and a machete. But any attempts to reference the Berrios and Rosa tips were quickly shut down by the Commonwealth, which steadfastly maintained that the two had been affirmatively excluded by law enforcement. *See e.g.,* N.T. 5/6/10, at 186 ("Conroy: Judge, there was some anonymous tips and they went and served a search warrant on a house and recovered a machete and questioned some guys. Hurley: It's all hearsay, it was thrown out, it's irrelevant.")

Newly disclosed evidence, not previously available to Mr. Lazar, reveals that this narrative of the case, oft repeated by the Commonwealth, was simply not true. First, as discussed in Claim I, the Commonwealth misrepresented the status and handling of a critical tip that was disclosed. . Second, there were many credible tips and leads, some of which law enforcement clearly credited, and nearly all of which involved drug dealers in the neighborhood. Here, the patently false testimony of Detective Baker obscured both impeachment evidence and alternative suspects, misrepresented law enforcement's investigation, and deprived trial counsel of significant arguments in Mr. Lazar's defense. The fiction presented at trial – that detectives did not have any other credible leads or information pointing to other suspects – left the jury with the false impression that Mr. Lazar was law enforcement's *only* viable suspect. It also misrepresented to the jury the integrity of law enforcement's investigation, and hid the extent of their incompetence.

These misrepresentations, and the failure to correct Baker's false testimony, constitute violations of *Napue v. Illinois* and *Brady v. Maryland*. When considered against the tenuous evidence of Mr. Lazar's guilt and the flawed crime scene investigation, it is clear that these

misrepresentations were material.  As discussed below, these constitutional violations undermine confidence in Mr. Lazar's conviction and require a new trial.

## A. Newly disclosed evidence reveals that the Commonwealth failed to correct false testimony about Steven Lazar's role as the lone suspect in the case in violation of *Napue v. Illinois*.

In September 2021, the DAO disclosed its file to counsel for Mr. Lazar. In the file were a multitude of documents revealing that officers had extensive information pointing to credible alternative suspects that were simply abandoned. This suppressed information includes a specific threat against Dario Gutierrez, tips about drug dealers with recent arrests on the victim's block, and detailed information of an investigation into a wanted man who had committed a similarly brutal crime with a crowbar. In a case such as this, where the prosecution made *the absence* of any other suspects a key component of its case, its failure to be forthright with this evidence is material. Further, the prosecution's misrepresentations deprived Mr. Lazar of a key argument at trial. The evidence is exculpatory and material, and warrants a new trial.

### 1. Law enforcement received and investigated several credible tips between January and April 2007.

In sharp contrast to the Commonwealth's arguments at trial, the newly disclosed evidence reveals that law enforcement received a wealth of tips, leads, and information implicating other suspects in the murder of Dario Gutierrez. They pursued several of these leads, before inexplicably abandoning them. Nearly all of the leads related to drug dealers in the neighborhood, some who had even been arrested within the immediate vicinity of the victim's house, a fact which aligns with Gutierrez's known practice of calling police and reporting illegal drug activity. Another involved a drug-related attack in which the suspect, along with two other males, broke into the victim's house and assaulted him mercilessly with a crowbar. The Commonwealth failed to disclose this evidence to trial counsel, and then suborned testimony that

argued that no such evidence existed. ("[B]asically the case goes cold, and it goes cold pretty fast."). N.T. 5/04/10, at 25.

Newly disclosed files reveal that officers suspected the involvement of two drug dealers named Victor "Flaco" Flores and Pablo "Black" Costoso. Detectives identified the men based upon a tip from Holly McBride. Detectives documented that "she was told by Michael 'Money Mike' Bozyk that the murder happened because the decedent was "giving the drug dealers problems." App. 438. And, more specifically, that Gutierrez was killed "for snitching on the boys selling on Mutter St." App. 439. Based on the lead, detectives pulled photographs of each man, noting that each "[sold] drugs in the 25th [district] around the corner from the decedent's home." App. 473, 495. Additionally, they found that Flaco did indeed live on Mutter Street, and had been arrested multiple times for drug related offenses in the area. App. 317-21. Officers also investigated Bozyk, collecting numerous documents related to him, showing that "he [sold] drugs in the hood," and had been arrested for drug related offenses numerous times, as well as an assault charge. App. 285-301. These photos and related documents are dated February 21, 2007. *Id*. At trial, the prosecution disclosed only that Holly McBride was transported to Homicide for an interview; the contents of that interview and the subsequent investigation of this credible lead were withheld. App. 440.

The undisclosed files reveal that detectives were investigating two other drug dealers: Hector Valentin and Melvin Martinez. Both men had been arrested in the immediate vicinity of the victim's house. App. 441-467. The files, in which detectives noted, "target Hector Valentin," reference a known drug dealer with recent arrests who lived two doors down from the victim. App. 486, 491. Detectives ran a search for "Complaints by Nickname Valentine." App. 484. They executed a residential records review of Valentin's 2763 N. Mascher Street home address.

App. 492-94. Detectives pulled Valentin's Criminal History, and learned that he was arrested under the alias Juan Valentin around the corner from both his and Gutierrez's residence at 2721 N. Hope Street on August 8, 2006. App. 492. Detectives ran these searches and pulled these documents on January 11, 2007.

On January 10th, 2007, police transported Anthony Thomas to homicide to interview him about Gutierrez's murder. App. 356. Newly disclosed files reveal that the police obtained from him information about an individual named Leon Ryans, AKA "Muhammed." Thomas told police that Ryans, a local drug dealer, participated in the murder of Gutierrez. Specifically, Thomas provided information "from Ryons [sic] that he beat down an old head." App. 356. Another record reflected that "[Muhammad] allegedly has info re murder MO7-14, info given by Anthony Thomas…" App. 379.  As law enforcement continued to investigate this tip, they contacted another witness, Edward Marshall, who confirmed that Muhammed's real name was Leon Ryans. App. 367. The newly disclosed records indicate that police pursued Ryans as a suspect, running his background and attempting to locate him. The file gives every indication that police intended to interview Ryans; one such locate report contained a handwritten note reading: "Location where Leon Ryans is allegedly receiving mail" App. 399.  In the course of their investigation, law enforcement uncovered Ryans' significantly violent criminal history, including two incidents for which he was charged, one of which bore a striking resemblance to the Gutierrez homicide.

Officers learned that on April 8th, 2006, Ryans was arrested and charged with Aggravated Assault, Robbery, PIC, Terroristic Threats, Simple Assault, REAP, and Theft-Unlawful Taking. Ryans had repeatedly stalked and chased an individual multiple times throughout the day, attempting to rob her and threatening, poking, and cutting her in the face

with a broken bottle. The victim eventually found refuge in a restaurant where a staff person sheltered her until she could escape and call 911. App 418.

Ryans' second arrest, which occurred a few weeks later, involved a drug-related break-in and assault, the details of which directly mirror the facts of the Gutierrez homicide. On May 25th, 2006, complainant Alton Williams, a middle-aged male, was inside his residence at 234 N. 52nd St., when two unknown Black males, along with a Muhammed, entered the residence and demanded to know where their $300 worth of crack was. The taller of the two unknown males instructed Muhammed to attack Williams. Muhammed pulled Williams's legs out from underneath him and punched him in the face. Williams was then made to go to the upstairs floor of the residence, where Muhammed punched him in the face again, then grabbed a fluorescent light from the ceiling and struck Williams across the face with it. Muhammed then brandished a crowbar and struck Williams with it repeatedly. Williams was treated for his injuries at the Hospital of the University of Pennsylvania. He sustained a broken left orbital bone, a broken front tooth, numerous stitches to the top right portion of his head, as well as stitches over his right eyebrow. Shown a photo lineup, Williams identified Leon Ryans as the male known to him as Muhammed, the same male who punched him in the face and struck him with a fluorescent light and a crowbar. Williams's brother was an eyewitness to the attack, and also identified Leon Ryans as the attacker. App. 416. This brutal attack resulted in charges for Criminal Conspiracy, Aggravated Assault, PIC, Simple Assault, Terroristic Threats, and REAP. App. 416. The files note that as of January 12, 2007, Ryans remained a wanted person. App. 413.

Despite significant evidence that Ryans had committed brutal and factually similar assaults in the months leading up to the murder, the Commonwealth never disclosed Leon Ryans' name or the results of its investigation. Police investigated Ryans' whereabouts but never

interviewed him. As with the Holly McBride tip, trial counsel was provided only with an incident report reflecting that Anthony Thomas had been transported to homicide, but the information he provided was withheld. App. 7.

Finally, the Commonwealth failed to turn over a detailed memo to Detective Baker from a Sergeant, describing a call from Anita Gutierrez on January 26, 2007.  App. 316. The letter reflects that Anita Gutierrez told the Sergeant she had received, a few months prior, a specific threat against her and her family from her ex-husband's girlfriend, Emily Gonzales. *Id.* "Anita says that Emily threatened…that she 'better watch yourself, my father is a big man and knows a lot of people.' [Emily] also stated that she knows Dario is [Anita's] father and she could get the whole family." *Id*. The letter further details an incident in which Anita's ex-husband, David Centeno, was attacked by Gonzalez and two males while he was on the phone with Anita, and that he had to pull his gun to get them away; Centeno's hand was injured and his phone broken as a result. *Id.* The letter, which also contains Gonzalez's address, concludes: "[Anita] wanted to pass this information on because she thought it might be important to the case. She said she wrote the date of the threats down in her calendar book and will call back with the date." *Id.* The investigation records indicate that police ran extensive background reports attempting to locate Gonzalez, but, incomprehensibly, they attempted no further contact with Anita to elicit additional details about the threat to Dario Gutierrez, or to retrieve her contemporaneous notes regarding the incident. App. 316. At trial, the Commonwealth withheld from counsel that the victim's daughter reported a specific threat was made against Dario Gutierrez shortly before his murder.

**2. Baker testified falsely about the investigation and the prosecution failed to correct him.**

When Detective Baker took the stand at trial, he refused to acknowledge the existence of any of these tips, denying that law enforcement had received any information in the early months of the investigation. First, Baker testified that detectives looked at drug dealers in the neighborhood, who might have targeted the victim because of his status as a Townwatch member. N.T. 5/6/2010, at 106 ("After speaking with the neighbors, we were checking the drug dealers and drug activity in the neighborhood. He was a member of the Townwatch, looking for similar crimes in the neighborhood and we came up with nothing."). This avenue was important for police to have explored; the jury had heard evidence that the victim frequently put himself in the cross hairs of dangerous drug dealers, and such angered drug dealers would have been likely suspects. Detective Baker was emphatic that "there was no information coming in at all." N.T. 5/6/2010, at 107 (emphasis added).

> Q: When you said you couldn't find anything, how long were you working on this after January 9th, '07 following these leads? Tell us what you do.
>
> A: Actually until shortly after July it was still an open case, but there was no information coming in *at all*.
>
> Q: When you say information, you had no interviews from people, anyone telling you anything about the case?
>
> A: No.

*Id*. (emphasis added).

Baker was also emphatic that the case went cold--and that detectives were not actively investigating because there were no leads.

> Q: So in between January 9th and April 24th, '07, are you working on other investigations you're assigned to and are you assisting other detectives on investigations they are assigned to?

A: Yes.

Q: So how much time do you devote to the death of Dario Guttierez at that time?

A: Not a lot because there were *no leads coming.*

N.T. 5/6/2010, at 108 (emphasis added).

The newly disclosed files reveal that Baker's testimony was patently false. It obscured specific and detailed information and leads that law enforcement received and developed early on in their investigation. Several of these leads were linked to neighborhood drug dealers. Another included a specific threat against Dario Gutierrez made shortly before his murder. Baker's repeated assertions are directly contradicted by his own files.

Instead of correcting this false testimony, the Commonwealth capitalized on it, sewing it into the fibers of its narrative. See e.g., N.T. 5/11/10, at 59 ("What did I tell you at the beginning? This is the case that probably would have gone unsolved had the Defendant never opened up his mouth. Because there wasn't a lot of evidence, wasn't there?") The prosecutor had "an affirmative duty to correct the testimony of a witness which he knows to be false." *Commonwealth v. Carpenter*, 472 Pa. 510, 372 A.2d 806, 810 (1977). Yet it failed to do so.

### 3. The prosecutor's failure to correct these false assertions was material under *Napue*.

Baker's testimony and the Commonwealth's closing were part of a broad narrative of an otherwise "cold case" where the only possible suspect was Mr. Lazar. The Commonwealth repeatedly suggested that Mr. Lazar would have gotten away with it since there was so little evidence in the case: "they weren't working on this. It was cold as cold can be." N.T. 5/11/10, at 70. *See also* N.T. 5/11/10, at 59. Baker's false testimony concerning the lack of credible leads and investigative information and the testimony and pleadings detailed below in Section B reveals the lengths that the Commonwealth went to in order to deny the existence of alternative investigative leads. The jury never learned that in reality there had been significant credible

information gathered and then abandoned by police. The previously undisclosed information unravels the cold case narrative that was presented to the jury.

This narrative also papered over the detectives' multitude of investigative errors. By asserting that Mr. Lazar was the only plausible suspect, the Commonwealth was able to downplay the ramifications of a badly mishandled crime scene investigation, and actually use it against Mr. Lazar. As the prosecutor argued in closing: "The scene wasn't done correctly. It wasn't done right. They would have found [the suitcase] if they went in the yard and they didn't. They didn't. And he almost got away with it. He took advantage of it and is trying to take advantage of it again, and don't let him." N.T. 05/11/10, at 62. By falsely denying that detectives received information during the early months of the investigation, the Commonwealth was able to obscure the magnitude of their errors and the potential implications. Instead, the Commonwealth deflected from officers' errors, by arguing to the jury that it was Mr. Lazar who was "tak[ing] advantage" of a case that had gone cold through no fault of detectives. As far as the jury knew, Mr. Lazar was the only plausible suspect in a case that "was cold as cold can be." N.T. 5/11/10, at 70.

Detective Baker's deceptions obscured information that further undermined law enforcement's investigation, and would have led the jury to question law enforcement's focus on Steven Lazar. Obscuring evidence of credible leads essentially shored up the Commonwealth's case against Steven Lazar, as the existence of credible alternative suspects would have further revealed to the jury the relevance of detectives' failure to properly process and investigate the crime scene. Law enforcement's failure to follow up on relevant leads puts their failure to adequately process the crime scene in a new light. A clearer pattern emerges and, suddenly, the

case growing cold is not a matter of Steven Lazar taking advantage of law enforcement's one-off blunder, but a result of an incompetent and inadequate investigation.

The false testimony also prevented the jury from learning about the existence of these alternative suspects. The jury was repeatedly told that there was no information pointing to neighborhood drug dealers with motive to murder Gutierrez. Yet four of these alternate suspects were drug dealers operating in the immediate vicinity of Dario Gutierrez's home. Numerous statements indicated that Gutierrez's murder was related to drug activity in the neighborhood, as Gutierrez had often argued with dealers, attempted to thwart their operations, and reported them to authorities through his role in town watch. App. 1-6, 322, 477, 468-469. The Commonwealth's case against Mr. Lazar lacked forensic evidence and lacked a concrete motive, but the jury never learned of the existence of credible alternative suspects that aligned with the defense's theory of the case. In stark contrast, they were led to believe that Mr. Lazar was the only viable suspect.

In addition to establishing a violation of *Napue*, the newly disclosed evidence also establishes a *Brady* violation. Evidence need not be admissible in order to constitute a violation under *Brady. See Wood v. Bartholomew*, 516 U.S. 1 (1995). The Third Circuit determined that instead of requiring admissibility as part of materiality, "[t]he proper inquiry…[is] to consider whether disclosure of the [undisclosed evidence] would have impacted the course of trial, which includes investigative activities." *Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 308 (3d Cir. 2016) (finding that disclosure of suppressed evidence would have empowered defense counsel to pursue strategies and preparations he was otherwise unequipped to pursue). The Court should consider materiality of a piece of suppressed evidence in terms of its value to defense counsel's ability to strategize, prepare, investigate and present their case at trial. *Dennis*

*v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d at 311 ("Alterations in defense preparation and cross-examination at trial are precisely the types of qualities that make evidence material under *Brady*.").

The Commonwealth's failure to disclose these documents obscured the relevance of key witnesses that trial counsel could have investigated and interviewed such as Anita Gutierrez, Holly McBride, Michael Bozyk, and David Centeno; each of whom police learned had information directly related to the murder Dario Gutierrez. In the case of the Anita Gutierrez tip, the Commonwealth withheld and then obscured the existence of a specific threat against Dario Gutierrez made shortly before he was murdered. Bozyk's information about drug dealers killing Gutierrez because he was snitching on them was also covered up by the Commonwealth's misrepresentations. Baker's false testimony and the Commonwealth's repeated misrepresentations obscured the existence of credible leads identifying drug dealers in the neighborhood, leaving counsel to make empty and unsupported arguments that Gutierrez's murder was drug related. This information would certainly have altered counsel's trial preparation and strategy.

> **B. Newly disclosed evidence reveals that the Commonwealth misrepresented the law enforcement's investigation into alternate suspects, Berrios and Rosa.**

In the few tips the Commonwealth had disclosed to counsel was one involving William Rosa and Victor Berrios. Less than one week after the murder of Dario Gutierrez, the police received the tip from a confidential informant that he or she had seen the two men entering the victim's house. App. 283. According to the informant, a woman knocked on the door first, and, when the victim let her in, Berrios and Rosa entered the house with a Black male. *Id*. The tipster reported the make and model of the car that they drove, "when they [did] their jobs," a black

Honda Accord. App. 283. On January 18, 2007, law enforcement served a search warrant on the home of Victor Berrios and seized a number of items, including a machete, crowbar, two pairs of boots, and the black Honda Accord identified in the tip. App. 284, 13.

Counsel attempted to cast reasonable doubt on Mr. Lazar's guilt, by arguing that Berrios and Rosa were much more viable as suspects. After all, Berrios and Rosa, two seasoned drug dealers, aligned perfectly with the information police had consistently received from lay witnesses, indicating that the decedent had made himself a target of local drug dealers by snitching on the ones who sold in his neighborhood, a conflict that had likely escalated in recent weeks as the sidewalk outside Mr. Gutierrez's corner lot took the place of Ming River Palace Chinese Restaurant as the primary site for drug dealing in the neighborhood.

At trial, the prosecutor quickly shut down the defense's attempts to argue that Berrios and Rosa were suspects. *See e.g.,* N.T. 5/6/10, at 186 ("Conroy: Judge, there was some anonymous tips and they went and served a search warrant on a house and recovered a machete and questioned some guys. Hurley: It's all hearsay, it was thrown out, its irrelevant.") On direct, the Commonwealth asked Detective Baker: "Q. Did you participate in the investigation on a person named Victor Berrios? A. That was Detective Verrechio. Q. Do you know the results of that investigation? A. He was not arrested." N.T. 5/6/10, at 133-34. On cross, Baker was extremely circumspect about the details of the investigation on cross:

Q: Did any of your fellow detectives bring in [Victor] Barrios for questioning?
A: I don't recall.
Q: Do you want to check your file?
A: No.
Q: What about William Rosa, do you know if he was questioned?
A: I do believe he was spoken to, but I don't believe he was interviewed.
Q: Do you know who spoke to him?

A: No.

Q: Who would know?

A: Whoever spoke to him, sir.

Q: Would it be reflected anywhere in your files as the assigned investigator as to who spoke to him?

A: I would hope.

N.T. 05/06/10, at 173-174.

After trial, the Commonwealth continued to insist that Berrios and Rosa had been affirmatively excluded. In his initial PCRA, counsel for Mr. Lazar sought further information about Berrios and Rosa through formal and informal discovery requests. The Commonwealth again insisted that there was nothing to see--Berrios and Rosa had been ruled out by law enforcement. *See.* App. 51-52. 03/11/2013, Commonwealth's Response to PCRA Discovery Motion ("defendant asks the Commonwealth to contact a police sergeant, ask him to reveal the identity of a confidential informant, and then ascertain why the informant thought two people other than defendant were involved in the murder, *even though the police already investigated these two people and ruled them out*.") (emphasis added).

In habeas proceedings, Mr. Lazar continued to diligently pursue information related to Berrios and Rosa, and asserted that the state court had improperly failed to consider them in the prejudice analysis of his *Strickland* claim. Mr. Lazar's efforts to do so were met with unequivocal representations from the Commonwealth that "the evidence showed Berrios was not involved." App. 124. However, newly disclosed records reveal that this was simply not true; law enforcement never excluded Berrios and Rosa. The Commonwealth's related misrepresentations are material, and warrant a new trial under *Napue v. Illinois.*

1. **Newly discovered evidence reveals that law enforcement botched the investigation of Berrios and Rosa and never excluded them.**

As part of their investigation, law enforcement seized the Black Honda Accord identified by the tipster, owned by William Rosa, from the home of Victor Berrios. The newly disclosed DAO records reveal that the car was authorized to be released from evidence a mere two weeks after seizure, having never been tested or examined. App. 324.

On April 27, 2021, post-conviction counsel, Paul Jubas, received an email from the police department stating that the Honda was auctioned two months after it was seized on March 15, 2007. App. 140-141.[7] Subsequently, in September 2021, the DAO shared its file with counsel. The file contained a memorandum revealing that just two weeks after William Rosa's

_____

[7] Though *Brady* does not require a showing of diligence, in the present case Petitioner has been dogged in his efforts to obtain these materials. In January 2015, Mr. Lazar submitted a Freedom of Information Act (FOIA) request to the FBI seeking particular information regarding Berrios and Rosa, which the FBI denied on privacy grounds. App. 83-84. Mr. Lazar timely appealed and was again denied. App. 84. Mr. Lazar again timely appealed, receiving a denial from the U.S. Department of Justice's Chief Administrative Appeal Office. *Id*. Subsequently, he unsuccessfully sought mediation from the Office of Government Information Services. *Id*. Thereafter, Mr. Lazar filed a pro se Complaint against the FBI, requesting the court compel disclosure of the information sought regarding Gutierrez, Berrios, and Rosa. App. 83-92. In September 2016, the District Court granted the FBI's Motion to Dismiss and for Partial Summary Judgment, dismissing Mr Lazar's claim. *Lazar v. Fed. Bureau of Investigation*, 207 F.Supp.3d 557, 566 (E.D. Pa. 2016).

In March 2021, counsel for Mr. Lazar submitted an evidence search request to the Philadelphia Police Department requesting a search for several items recovered in the Gutierrez homicide investigation, including items collected for testing from the Gutierrez home, the serological sample recovered from the body of Dario Gutierrez, the black Honda Accord seized from Berrios's residence, as well as the machete, boots, and crowbar also seized from the Berrios residence, and the buccal swab taken from Mr. Lazar. App. 137-139.

On April 27, 2021, Mr. Lazar received a response from Matthew White of the Special Advisor's Office at Police Headquarters. Mr. White advised the following: (a) Two additional property receipts, #2753437 and #2697832, were discovered; these were attached to his email.; (b) No property receipt was located for the gold chain or empty holsters referenced in Mr. Lazar's request.; (c ) The vehicle on property receipt #3698334 was sold at auction on March 15, 2007.; (d) All other items referenced in the discovery request on property receipts #9006117, 2697829, 2697866, 9006154, and 2753422 were still in the custody of the Philadelphia Police Department. App. 140-141.

Black Honda was seized, it was deemed "no longer needed for the investigation" and a request was made to authorize its release to its owner/agent. App. 324. There are no reports or inventory logs demonstrating that the car was subjected to any testing or examination by police before it was released. Police never disclosed that the Honda was authorized for release from its custody and auctioned before any testing or even a basic search of the vehicle were conducted. The DAO file further reveals the overall paucity of the Commonwealth's investigation into Berrios and Rosa. The newly disclosed records establish that law enforcement failed to collect key pieces of evidence concerning Berrios and Rosa, and failed to even interview these two key suspects. Absent any one of these crucial steps, law enforcement could not credibly claim that Berrios and Rosa had been ruled out.

Minimal testing was conducted on a machete, crowbar, and two pairs of boots confiscated from Berrios' residence. The items yielded inconclusive results, there were no records disclosed reflecting tests performed for matching fibers, touch DNA, or Gutierrez's DNA. Likewise, Berrios and Rosa's DNA was apparently never compared to the samples taken from the murder scene. The Commonwealth's failure to test Berrios and Rosa's DNA considering the bloody crime scene is inexplicable.

Counsel had a right to rely on the Commonwealth's repeated assertions that Berrios and Rosa were affirmatively ruled out, and, further, he was reasonable to assume that this had been accomplished through forensic testing excluding Berrios and Rosa as the source of any of the samples recovered from the crime scene. Even the absence of any records reflecting DNA samples being taken from Berrios and Rosa would not have raised a red flag, given that Berrios and Rosa were convicted felons at the time the warrant on Berrios's house was executed, and their DNA would have been readily available to police in the Combined DNA Index System

(CODIS). Because of the Commonwealth's repeated misrepresentations, counsel had no way of knowing that even the most rudimentary steps were never taken - no DNA testing had never been done, nor had law enforcement even interviewed Berrios and Rosa regarding the Gutierrez homicide.

Counsel was never told that the detectives' files were bereft of any other evidence excluding Berrios and Rosa. The jury heard from the Commonwealth and detectives that the evidence conclusively excluded Berrios and Rosa as suspects and the case went cold until Mr. Lazar came into the picture. The Commonwealth withheld the evidence that would have exposed this narrative as false and impeached the police investigation. The Commonwealth had a responsibility to correct the false testimony. The "prosecutor's duty to seek justice trumps his or her role as an advocate to win cases for the Commonwealth." *Commonwealth v. Chmiel*, 643 Pa. 216, 239 (Pa. 2017). Failing to correct this false narrative, and instead perpetuating it for years runs afoul of due process and the Sixth Amendment, requiring relief.

> **2. The Commonwealth's misrepresentations continued throughout Mr. Lazar's appellate process, constituting an ongoing violation of *Brady* and *Napue*.**

"The prosecution's duty to disclose favorable evidence is not dependent upon a request from the accused. *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)"). The Commonwealth asserted that the tips were investigated and ruled dead ends. N.T. 5/6/10, at 186. Initial PCRA counsel, Jules Epstein, was also misled by the Commonwealth when he filed a Motion for Discovery requesting evidence related to Berrios and Rosa. The Commonwealth's response was unequivocal:

> In particular, defendant asks the Commonwealth to contact a police sergeant, ask him to reveal the identity of a confidential informant, and then ascertain why the informant thought two people other than defendant were involved in the murder, even though the police already investigated these two people and *ruled them out.*

App. 51-52 (emphasis added).

> [I]n his two factual description sections, he begins by stating that police found a machete at the home of Victor Berrios, a known drug dealer, nine days after the murder. Reply at 6-7, 9-10. Trial counsel argues this point in his opening using the classic strategy of trying to pin the crime on another person by mentioning initial police investigate leads that were *dead-ends.*

App. 72-78 (emphasis added). Throughout Mr. Lazar's defense the Commonwealth has asserted that Berrios and Rosa were dead-end leads. Trial and appellate counsel were entitled to rely on these representations after they made direct requests for pertinent information. In *Dennis v. Secretary, Pennsylvania Department of Corrections,* 834 F.3d 263, 2016 WL 4440925, the court emphasized that, "...pursuant to *Kyles* and, under United States Supreme Court precedent, it is clear that there is no additional prong to *Brady* and no "hide and seek" exception depending on defense counsel's knowledge or diligence. *See Banks*, 540 U.S. at 696, 124 S.Ct. 1256." Not only did the Commonwealth hide that Berrios and Rosa were never excluded, it failed to respond to a specific request for discovery. "When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *United States v. Agurs*, 427 U.S. 97, 106, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976).

In 2022, the Commonwealth conceded that it had made repeated misrepresentations about Berrios and Rosa, proffering an internal memorandum from its file reflecting that as early as 2012, the District Attorney's office was aware that "there is no evidence police even investigated other suspects" in Mr. Lazar's case. Response to Motion for Relief Under 60B *from Final Order and Judgement,* No. 14-6907 (June 23, 2022), Ex. A; App. 516-526.

### 3. The evidence, and the Commonwealth's misrepresentations, are material under *Brady* and *Napue*.

The Commonwealth concealed that it botched its investigation, never testing the Black Honda for evidence, releasing it from evidence two weeks after it was seized and then auctioning it two months later, in March 2007. App. 140-141. A competent investigation would have involved a search and extensive processing of the vehicle.[8] The anonymous witness claimed the black Honda Accord was used by Berrios and Rosa in their crimes. That information bore out when police conducted a search warrant of Berrios's residence and recovered the exact car described in the tip, belonging to Rosa. Police clearly found the tip credible, using it as their basis for a search warrant of Berrios's house, and ultimately seizing a number of items, including the car.

At trial, the Commonwealth repeatedly distorted the investigation into Berrios and Rosa, preventing the jury from learning how incomplete and inconclusive it really was. This was part of the "cold case" refrain that the Commonwealth reiterated over and over again during trial. The jury and trial counsel were led to believe that all of the evidence related to Berrios and Rosa was tested and excluded them as suspects. The jury never heard of the incomplete investigation that has been newly revealed by the Commonwealth's files. App. 140-141. This evidence would have impacted the case at trial and during habeas proceedings. Had the botched investigation into Berrios and Rosa and its failure to conclusively exclude them not been misrepresented by the Commonwealth, trial counsel could have affirmatively rebutted the Commonwealth's assertion that the case went cold due to a lack of suspects, leads, and tips.

---

[8] If an evidentiary hearing is granted, counsel reserves the right to call detectives to testify as to the protocol and procedure utilized for when a vehicle is seized and released without conducting any search or testing.

The Commonwealth's misrepresentations likely tipped the scales during habeas proceedings. In its Response to Petitioner's Objections to the Magistrate's Report and Recommendation, as well as its Sur-Reply, the Commonwealth again misled the Court. *See* App. 126, ("As there shown, Victor Barrios, a local drug dealer on whom petitioner now wishes to pin the murder, was one of the initial non-fruitful leads police investigated. The victim had been known to chase drug dealers from his front steps, but the evidence showed Barrios was not involved.") This Court concluded that it had "profound concerns" about the case, stating also that "I must deny federal relief. Although I remain troubled by that result." *Lazar v. Coleman*, CV 14-6907, 2017 WL 783666, at *3 (E.D. Pa. Mar. 1, 2017). This Court's analysis of Mr. Lazar's IAC claim noted that Mr. Lazar's confession was "voluntary but withdrawal tainted" and that the five Commonwealth witnesses "all had various credibility problems." *Id.* at 7. This Court noted that these factors "strongly suggest that the deficient performance of Lazar's trial counsel was prejudicial." *Id.* at 8. With counsel lacking the evidence to make a concrete case at the time, the Court didn't even address Mr. Lazar's arguments that Berrios and Rosa had been improperly left out of the state court's prejudice analysis. On appeal the Third Circuit summarily dismissed the issue in a concluding footnote that relied on the Commonwealth's false representations: "Lazar also argues that the police recovered a machete from another person. This matters little, as this weapon was rusty and the police eliminated the owner as a suspect." *Lazar v. Superintendent Fayette SCI*, 731 Fed.Appx. 119, 123 (3d Cir. 2018). There is no doubt that had Mr. Lazar's counsel been able to present the lack of evidence excluding Berrios and Rosa, it may have had an impact on the outcome. *Napue,* 360 U.S. 264, 269, 79 S.Ct. 1173, (1959). Mr. Lazar is entitled to relief.

### C. Cumulatively these violations undermine confidence in Mr. Lazar's verdict.

A criminal defendant's right to due process is violated when a prosecutor presents testimony or evidence that she knew or should have known was actually false and material to the verdict. *See Napue v. Illinois*, 360 U.S. at 269-7; see also *United States v. Agurs*, 427 U.S. at 103; *Alcorta v. Texas*, 355 U.S. 28, 31-32 (1957). The use of false evidence at trial is material and therefore requires reversal under *Napue*, if it "may have had an impact on the outcome of the trial." *Napue*, 360 U.S. at 272; *accord Bagley*, 473 U.S. at 680 (holding that knowing use of perjured testimony is material unless it is harmless beyond reasonable doubt); *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008) (although *Napue* does not create a per se rule of reversal, "if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic"). There is no doubt that the failure to correct this testimony "may have had an impact on the outcome of the trial." *Napue*, 360 U.S. at 272.

The Commonwealth's misrepresentations painting Mr. Lazar as the lone suspect, including the conceded misrepresentations that Berrios and Rosa were "ruled out" undermine confidence in the jury. The perjured testimony of Detective Baker gave the jury the false impression that there were no leads coming in. Allowing this false testimony to stand before the jury violated Mr. Lazar's constitutional rights and requires relief.

### CLAIM III: Sarn Wilson received undisclosed favorable treatment in exchange for his testimony against Mr. Lazar.

Sarn Wilson was an essential witness against Steven Lazar. He backed up Russell Angely's testimony and purported that Mr. Lazar had made inculpatory statements about killing someone with an axe. On direct examination, Wilson testified that he had an open case for a robbery. N.T. 5/5/10, at 11. ADA Hurley repeatedly elicited testimony from Wilson that he had

not received any promises from her or anyone else associated with the Commonwealth in exchange for his testimony. *Id.* at 11-12. Newly disclosed evidence reveals the opposite. Sarn Wilson received immediate and significant favorable treatment after he testified. Wilson testified against Mr. Lazar on May 5, 2010. Two days later, while Mr. Lazar's trial was ongoing, Wilson entered an open plea. His suppressed case history records reveal that he asked his own court to defer sentencing so it could hear directly from ADA Eileen Hurley, because he had just testified in a homicide. App. 498-509. Three weeks later, on May 28, 2010, after a brief on the record discussion and two off the record sidebars, the Court sentenced Wilson to just two years of probation, and no jail time. *Id.* The Commonwealth withheld this evidence and failed to disclose that it provided favorable treatment to a key witness in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972).

In addition to suppressing the underlying evidence, the Commonwealth elicited and failed to correct false testimony from Mr. Wilson in which he denied receiving favorable treatment in exchange for his testimony in violation of *Napue v. Illinois*. The Commonwealth elicited blanket and unequivocal denials from Sarn Wilson that he had received any promises of favorable treatment from ADA Hurley or anyone associated with the Commonwealth:

Q. So you were arrested in January of this year, 2010?

A. Yes.

Q. Did I yesterday or today offer you anything for this open case that you have in exchange for your testimony today? Did I offer to get you a deal or help you out or anything like that?

A. No.

Q. Has anyone from the District Attorney's office offered you anything for your case in

exchange for your testimony here today or anyone from the Police Department?

A. No.

N.T. 5/5/10, at 11-12.

Yet, Wilson's own case record directly contradicts this. A mere two days later, Sarn Wilson went before his own sentencing court, entered into an open plea and asked to defer sentencing so the Court could hear from ADA Hurley. App. 498-509. He received a lenient sentence just three weeks later. Given Wilson's critical role at trial, the Commonwealth's use of false evidence at trial clearly "may have had an impact on the outcome of the trial" and thus requires reversal under *Napue v. Illinois*. *Napue*, 360 U.S. at 272.

### A. Sarn Wilson received undisclosed favorable treatment.

Previously unavailable transcripts from Sarn Wilson's guilty plea sentencing and his case history reveal that he received substantial and immediate favorable treatment for his testimony against Mr. Lazar. Sarn Wilson was arrested on January 10, 2010, for robbing an elderly woman of her purse. App. 496-497. Wilson had torn the woman's jacket in the process of wrenching the purse from her. He was charged with robbery, theft-unlawful taking, theft-receiving stolen property, simple assault, and recklessly endangering another person. *Id.* Wilson's newly disclosed case history records that he agreed to enter into an open plea for felony robbery of the third degree, and notes "[Defendant] to bring in ADA Hurley – [Defendant] says he testified in a homicide." The transcripts from May 7, 2010, confirm that the sentence was deferred so the Court could hear from Ms. Hurley about Wilson's cooperation:

The Court: And you know we're doing [sic] to defer the sentence?

Mr. Wilson: Yes, sir.

The Court: To hear from Ms. Eileen Hurley (ph)?

Mr. Wilson: Yes, sir.

The Court: So, we can defer this until May 28th, okay? Friday, May 28th.

App. 501.

Under Pennsylvania law, Wilson could have been sentenced to up to 7 years of incarceration for robbery of the third degree.[9] 18 Pa. Code §1103 (3). On May 28, 2010, the sentencing court, after two off the record discussions with ADA Hurley, sentenced Mr. Wilson to just two years' *probation*.

There need not be an explicit promise of leniency to trigger *Brady*'s due process protections; even "the possibility of a reward" creates an incentive to testify to the satisfaction of the government. *United States v. Bagley*, 473 U.S. at 683 ("The fact that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction."). Here the evidence is clear that Wilson expected favorable treatment and that ADA Hurley was well aware of this: Wilson entered a plea in his open robbery case just two days after testifying in Mr. Lazar's trial, explicitly requesting to defer sentencing for the court to hear from Mr. Lazar's trial prosecutor about Wilson's testimony, and then received an unusually lenient probationary sentence, especially considering that Wilson had a prior felony conviction for burglary in the first degree. App. 514-515.

---

[9] In addition to robbery, Sarn Wilson had originally been charged with simple assault, a second degree misdemeanor (18 Pa.C.S.A. § 2701), punishable by up to two years imprisonment (18 Pa.C.S.A. § 1104 (2)), Reckless endangerment of another person, a second degree misdemeanor (18 Pa.C.S.A. § 2705), punishable by up to two years imprisonment (18 Pa.C.S.A. § 1104 (2)), theft by unlawful taking, a first degree misdemeanor (18 Pa.C.S.A. § 3903 (b)), punishable by up to five years imprisonment (18 Pa.C.S.A. § 1104 (1)), and theft by receiving stolen property, a first degree misdemeanor (18 Pa.C.S.A. § 3903 (b)) punishable by up to five years imprisonment (18 Pa.C.S.A. § 1104 (1)).

**B. The suppressed evidence that Sarn Wilson received favorable treatment is material.**

Suppressed evidence of favorable treatment impeaching a key Commonwealth witness is precisely the information contemplated by *Brady* and its progeny. Counsel, the jury, and the court never knew that a material benefit was bestowed on Sarn Wilson immediately after he testified against Mr. Lazar. Not only that, the jury was given the impression that Mr. Wilson had no possible incentive, as he repeated that no promises had been made to him by ADA Hurley or anyone associated with the Commonwealth.

The Commonwealth's failure to disclose this evidence is material and requires relief. Given the absence of forensic evidence tying Mr. Lazar to the scene, and the numerous credibility problems with Commonwealth witness Russell Angely and the two other incentivized informants, Wilson's testimony was critical. Angely had only implicated Mr. Lazar after he was arrested following a fight with Mr. Lazar at Lazar's home. Ten days after he personally picked Angely up from homicide, Wilson claimed to have overheard similar statements, leading to Mr. Lazar's arrest. N.T. 5/5/10, at 21.

Reasonably competent counsel would have used this suppressed evidence to impeach Mr. Wilson's credibility. Counsel would have questioned Wilson about his motivation for testifying, and the benefit he stood to gain if he walked the Commonwealth's line. Had the jury learned that Wilson expected to immediately go before his own sentencing court to inform it of his testimony against Mr. Lazar and to bring in ADA Hurley, it is reasonably likely the jury would have viewed Wilson's story in a different light.

Wilson's credibility was already wavering. He had repeatedly testified on the stand that he had given a statement the same night he picked up Russell Angely from the police station on November 2, 2007. N.T. 5/5/10, at 57. After being confronted by counsel with the date of his

actual statement, November 12, 2007, Wilson conceded he hadn't provided a statement that day. *Id.* at 75. Reasonably competent counsel would have used Sarn Wilson's desire for favorable treatment to highlight the inconsistencies in his account, and to portray Wilson as a person willing to say anything to help himself. Counsel also could have impeached the Commonwealth's case and investigation as a whole, noting that it was built almost exclusively on the testimony of five informants with serious credibility problems and incentives to cooperate with the Commonwealth. He could have effectively argued that Sarn Wilson's undisclosed case history was indicative of the Commonwealth's overarching efforts to bolster a faltering case against Mr. Lazar by dangling favorable treatment before compromised witnesses.

Here, the Commonwealth's *Brady* violations and the false testimony of Sarn Wilson obscured and directly misrepresented that Wilson almost immediately received favorable treatment in exchange for his testimony. The prosecutor not only failed to correct Wilson's testimony for the jury in violation of *Napue*, she intentionally elicited it, and then helped Wilson off the record at his sentencing shortly after. Allowing these falsehoods to stand uncorrected before the jury violated Mr. Lazar's constitutional rights and warrants relief.

### CLAIM IV: A recently disclosed Brady proffer from the Commonwealth reveals that Detective Baker had committed extensive investigative misconduct and perjured himself in a prior homicide trial, undermining confidence in Mr. Lazar's conviction.

A newly disclosed *Brady* proffer from the District Attorney's office reveals that Detective Baker's repeated false statements at trial were part of a long history of egregious misconduct that predated Mr. Lazar's case. The Commonwealth withheld from trial counsel that Baker had engaged in coercive interrogation tactics, including drafting fabricated witness statements and attempting to coerce witnesses into signing false statements. App. 183-282. Additional new evidence reveals that Baker had also repeatedly perjured himself in a prior

homicide trial. *Id.* Detective Baker's credibility was essential to the Commonwealth's case against Mr. Lazar. Had Baker's extensive history of relevant misconduct been properly disclosed, it would have decimated the reliability of his testimony in the eyes of the jury. It would have also supported the argument that the only reason Mr. Lazar knew any information about the murder was because Baker had fed it to him.

## A. Previously undisclosed evidence of Detective Baker's misconduct

The prior misconduct disclosure consists first of a 1998 finding of misconduct against Baker by the Internal Affairs Department of the Philadelphia Police Department. App. 185-86. The department sustained a finding against Baker for denying a suspect his right to counsel after the suspect had requested an attorney. *Id.*

Second, the disclosure includes stipulations from the Commonwealth related to the exoneration of Chester Hollman. According to the stipulations, in 1991 Detective Baker engaged in coercive interrogation tactics, including drafting fabricated witness statements and attempting to coerce witnesses into signing them. The Commonwealth stipulated that while investigating Hollman's case, it discovered a previously suppressed statement that had been prepared by Detective Baker for witness Tiffany Jones. App. 187-220. The statement, written by Baker for Jones, contains an admission that Jones was present during the crime. Jones refused to sign, "instead writing out the words 'This Story is a Lie. T.J.'at the end of the typed statement prepared by Detective Baker." App. 219.

The stipulations also detail that another key witness, Deirdre Jones, who had made an inculpatory statement about Holman, later testified in a PCRA hearing that "she was held in a homicide interview room for many hours and over the course of her interrogation by police detectives, she was coerced through threats of prosecution and the denial of counsel. She also

said detectives told her that Hollman was a member of a mob and posed a physical danger to her." App. 214. And that "ultimately, she signed a statement that was typed and prepared by police." *Id.* The stipulation details that Baker was called in rebuttal at the PCRA hearing, and "testified that Jones was not threatened or coerced and, if she had requested an attorney, she would have been provided access to a public defender who would have been in the building and available at the time." *Id*. The Commonwealth later determined that Hollman was "likely innocent" on account of the newly disclosed evidence and exculpatory DNA evidence establishing that officers coerced witnesses and withheld evidence. App. 201. Hollman was released in 2019. App. 187.

Also included in the disclosure was a Commonwealth filing revealing misconduct by Detective Baker in the investigation and conviction of another individual, Lavar Brown. It Detective Baker again fed witnesses information and also repeatedly perjured himself in the 2004 case. As the Commonwealth conceded in its filing:

> Both Lyons and Detective Baker claimed that her second written statement was the first and only account she provided to the prosecution. Instead, as will be described, they repeatedly misled the court about it in order to justify the introduction of evidence that bolstered and rehabilitated Lyons' trial testimony.

App. 232. The Commonwealth then detailed Baker's repeated perjured testimony in Brown's case, which, as in the present matter, obscured the Commonwealth's suppression of *Brady* material: "the Commonwealth did not disclose either of the 2003 proffer agreements or the existence of the December 2003 proffer session—facts that run directly contrary to both Lyons' and Detective Baker's trial testimony." App. 244-245. The filing conceded that the Commonwealth "not only failed to disclose Lyons' false statement to the defense, it allowed Lyons and Detective Baker to testify falsely about her history of cooperation." App. 271.

Detective Baker's extensive history of misconduct pre-dated Mr. Lazar's trial. Although the Commonwealth was aware of this critical impeachment evidence, it suppressed the information that would have impeached its essential law enforcement witness.

### B. Detective Baker's credibility was critical to the case against Mr. Lazar.

The Commonwealth's case against Mr. Lazar depended on Detective Baker's testimony concerning two key issues: the initial police contact with Steven Lazar and law enforcement's failure to observe the suitcase in the yard for 14 weeks after the crime.

First, Detective Baker met with Steven Lazar when he was initially brought in on July 3, 2007. Baker testified that he had not provided Mr. Lazar with any information about the crime during that initial interview.

> Q: Did you tell him what instrument or what kind of weapon you believed at the time to be used in the beating death of Mr. Dario Guttierez?
>
> A: No.
>
> Q: Please tell the jury why you did not tell Defendant that?
>
> A: When we speak to witnesses we don't give them information, we are there to get information from them.

N.T. 05/06/10, at 121-122. Detective Baker continued, denying that he showed Mr. Lazar any pictures or provided him with any information during their meeting.

> Q: Did you show the Defendant any pictures from Mr. Guttierez's crime scene?
>
> A: No.
>
> Q: How come?
>
> A: It didn't concern him at that time.
>
> Q: Did you tell the Defendant where Mr. Guttierez inside the house had been found and what, if any, evidence you found inside the house?
>
> A: No.
>
> Q: How come?
>
> A: Because we don't give out information, we get information.

N.T. 05/06/10, at 123. The prosecutor later argued that the witnesses' knowledge of specific facts of the crime proved Mr. Lazar's guilt, suggesting that Mr. Lazar was only able to tell them about the hatchet[10] because he was there: "And they used that hatchet, the Defendant, no one ever knew about, that only the Defendant told everyone about, that hatchet." N.T. 5/11/10 at 88.[11]

Second, Baker provided critical testimony about law enforcement's failure to observe the suitcase for fourteen weeks after the crime. Baker denied on direct (and initially on cross) that he had gone into the victim's backyard, and thus could not have seen the suitcase. Finally, he admitted that he had returned to the scene later in January and went into the backyard at that time. *Id.* at 123. He asserted however, that he hadn't seen the suitcase because "it's a large yard with vehicles in it, I'm not looking for a brief case, I'm looking for a weapon." N.T. 05/06/10, at 162. The suitcase was the only piece of physical evidence linking Mr. Lazar to the crime scene; it was purportedly discovered on the plastic chair in April by Evelyn Gutierrez directly outside her back door, and, despite being outside for 14 weeks, showed no signs of weatherization. N.T. 05/06/10, at 162. The prosecutor thus argued to the jury that Baker had simply "missed it." N.T. 5/11/10, at 66. *See also Id.* at 62 ("could they have done a better job? Absolutely. Could Baker have gone and stayed there longer than five minutes? Absolutely. . . The scene wasn't done correctly. It wasn't done right. They would have found it if they went in the yard and they didn't. They didn't. And he almost got away with it. He took advantage of it and is trying to take advantage of it again, and don't let him.").

---

[10] It was never conclusively established that the murder weapon was a hatchet.

[11] Before the Superior Court the Commonwealth argued that "Defendant mentioned an axe to all of these people even though Detective Baker deliberately had not told him that the victim was murdered with an axe. Only the killer, or someone who witnessed the killing, would have known the murder weapon was an axe." *Commonwealth of Pennsylvania, Appellee, v. Steven Lazar, Appellant.*, 2014 WL 2881016 (Pa.Super.), 25-26.

In its closing, the Commonwealth repeatedly echoed Baker's account of his meeting with Lazar. "This is July 3rd. Detective Baker, he tells you, I picked him up at 11:55, the statement is at 12:40. In and out, short and sweet. It's only two pages long. He tells him he's investigating the beating death. He doesn't tell him any other details about the crime. His job is to get information, not give information." N.T. 05/11/10, at 123. The Commonwealth returned, repeatedly, to Baker's account of the suitcase, emphasizing the benign nature of his actions:

> [Baker] got the suitcase in April from Detective Williams. He told you, 'I didn't look at it until June.' Okay. So the whole month of May where did that go? I don't know. He was working and it is a tough job, they do a lot of cases. I didn't look at it until June. This is not someone who is trying to jam anything or frame anybody.

N.T. 5/11/10, at 68.

And the Commonwealth repeatedly and emphatically vouched for Baker, rebutting trial counsel's attempt to question his credibility: "And he wants you to think that Baker and Verrecchio and all those other detectives are going to risk their over a hundred years of experience, all of their lives, their livelihood, their pension, their family lives and lie about that?" N.T. 5/11/10, at 30. *See also Id.* at 68 ("they want you to believe that [Baker] got off his butt while talking to Russell Angely, somehow got crime scene photos, and was trying to put this on somebody. He wasn't.")

### C. The newly disclosed evidence of Detective Baker's lengthy history of investigative misconduct and perjury undermines confidence in the verdict.

Impeaching Baker's account of the yard and the suitcase was crucial to the defense. Trial counsel spent significant time in his closing argument attacking Baker's testimony. N.T. 5/11/10, at 30-35. Had the evidence of Detective Baker's misconduct been properly disclosed, reasonably competent defense counsel would have used it to thoroughly impeach his account. Given Baker's lengthy history of feeding witnesses information and lying about it on the stand, counsel could

have made a compelling case that Baker was the source of the information that later surfaced in the statements of Mr. Lazar and his roommates and neighbors.

There was support for this contention. Mark Kedra[12] testified that Mr. Lazar had been provided with details about the murder and shown crime scene photos during his July 3rd interview with Detective Baker:

Q: And Steve told you the cops told him it involved an axe, correct?

A: Yeah, he might have mentioned that, yeah.

Q: He told you his bag was found at the scene, correct?

A: In the backyard, yeah.

Q: He told you they showed him photos, correct?

A: Yeah.

Q: They showed him photos of the crime scene, correct?

A: Yes.

N.T. 05/06/10, at 56.

Reasonably competent counsel would have used Baker's history of misconduct to corroborate Mark Kedra's testimony about his conversation with Mr. Lazar. The newly disclosed evidence supported Kedra's testimony. This information would have not only influenced the jury, but also would have altered trial counsel's strategy and provided a strong line of argument in the suppression hearing. Without it, the prosecutor was able to easily dismiss counsel's argument as baseless, and reassure the jury that "those aren't Dave Baker's words, they are the defendant's words." N.T. 5/11/10, at 74. *See also* N.T. 5/04/10 at 27-28 ("Detective Baker drives up and finds Mr. Lazar. . . because it's a cold case, because it's an important case, because they want to solve it, they don't tell him too many details about the house and about what they found and how Mr. Gutierrez was killed.")

---

[12] Kedra also testified that his statement alleging that Mr. Lazar had confessed to the murder had been fabricated by police: "No, this is completely off because I had told the police about a couple dozen times that he had never said he was involved with the murder." N.T. 05/06/10, at 29.

Reasonably competent counsel also could have used the disclosure to impeach Baker's already improbable testimony about the yard. The suitcase was the only piece of physical evidence tying Lazar to the crime scene. Baker asserted under questioning that he went into the yard, "but that it's a large yard with vehicles in it, I'm not looking for a brief case, I'm looking for a weapon." N.T. 05/06/10, at 162. Counsel challenged this account extensively, noting that Ms. Gutierrez stated that she found the suitcase right outside the door, and challenging Baker's characterization of the yard. *Id.* In closing, trial counsel noted the improbability of Baker's story about the yard:

> [Baker] says, 'I didn't go into the yard.' And I crossed him and I pressed him and I pressed him. What did he say? 'I went in the yard.' He lied, he went in the yard. We all know he went in that yard. There was no briefcase. They want you to believe there was a briefcase. Ladies and gentlemen, there was no briefcase in that yard. It's crazy, I would submit to you, to think there was. There was 17 cops on the scene. They were there during daylight, then the detectives went out there.

N.T. 5/11/10, at 30.

Had counsel been armed with the evidence of Baker's history of perjury in a prior murder trial, he could have effectively impeached Baker's already specious account. Instead, the Commonwealth was able to easily dismiss counsel's argument, echoing Baker's testimony that "his job is to get information, not give information." N.T. 05/11/10, at 123.

That testimony repeats a familiar line for Detective Baker. Baker was also one of three homicide investigators who took statements used to convict Anthony Wright of a 1991 rape and murder which he was cleared 25 years later based on DNA evidence. *See Wright v. City of Philadelphia*, 229 F. Supp. 3d 322, 322 (E.D. Pa. 2017) ("After DNA evidence conclusively excluded Mr. Wright as the source of the biological evidence found at the crime scene, Mr. Wright's conviction was vacated. Upon retrial, a jury acquitted Mr. Wright of all charges. Mr. Wright spent 25 years in prison as a result of his wrongful conviction."). Wright's claim in his

§1983 suit that Baker and others had been personally involved in eliciting or coercing fabricated witness testimony and concealed that misconduct from prosecutors survived a motion to dismiss by the City of Philadelphia. *Id.* at 336-38. Wright averred that prior to obtaining witnesses statements, "Baker discussed Defendants' theory of the crime with St. James and Richardson, providing these witnesses with relevant details to incorporate into their eventual statement" and then falsely testified about these conversations. App. 151. In his deposition, Baker testified as he did in Mr. Lazar's trial: "What you do is you ask [a witness] what they know. You don't give them any information." Deposition of Detective David Baker, *Anthony Wright v. City of Philadelphia*, et al., No. 16-cv-0502 (E.D. Pa.), at 53. Newly disclosed evidence reveals that this familiar refrain from Baker is in fact contrary to his practices.

The prosecutor's highlighting of Baker's account during Mr. Lazar's trial reflects the centrality of Baker's testimony, and with it, the clear materiality of the *Brady* disclosure. The disclosure of Baker's past misconduct also intersects with the other newly disclosed evidence. Previously undisclosed evidence reveals that the Commonwealth had in its possession a photo of an empty chair in the yard, undermining Detective Baker's investigation and contradicting his related testimony. *See* Claim V. Additional evidence also reveals that Baker repeatedly perjured himself while discussing the early investigation, painting Steven Lazar as the only viable suspect in a cold case, when multiple undisclosed leads and tips proved otherwise. See Claims II, V; N.T. 5/11/10, at 30. Considered independently or in concert with the other newly disclosed evidence, Baker's extensive history of misconduct is material. The Commonwealth's failure to disclose it deprived counsel of significant impeachment evidence pertaining to the lead detective, whose testimony and conduct touched every aspect of the case against Mr. Lazar.

Given Detective Baker's prominent role in this case, and the clear and tangible nexus between his prior misconduct and his involvement in the present case, the disclosures undermine confidence in the proceedings and in Mr. Lazar's guilt. Relief is required.

> **CLAIM V: The Commonwealth failed to disclose a crime scene photograph in its file depicting an empty chair in the victim's backyard where Mr. Lazar's suitcase was purportedly found, undermining confidence in the verdict, and violating Mr. Lazar's rights under the state and federal constitutions.**

A review of the previously undisclosed DAO file reveals that the Commonwealth had in its possession a crime scene photograph depicting an empty chair in the backyard of Dario Gutierrez's home. The newly disclosed photo undermines the only evidence tying Mr. Lazar to the scene and directly contradicts Mr. Lazar's purported confession and the statements of Commonwealth witnesses Russell Angely and Sarn Wilson, who both claimed Mr. Lazar told them he left his bag at the scene. App. 478-83. The alleged presence of the suitcase in the chair was the only physical evidence linking Mr. Lazar to the victim's house, and it was the sole reason he came to the attention of detectives in the first place. The photograph casts significant doubt on Mr. Lazar's guilt, and the Commonwealth's failure to disclose it undermines confidence in Mr. Lazar's conviction.

### A. The suitcase and the investigation

The suit case was the only piece of evidence connecting Mr. Lazar to the crime scene, and a central thread running through the case investigation. No forensic evidence implicated Mr. Lazar in the murder of Dario Gutierrez. Over three and a half months after the crime, on April 25, 2007, Evelyn Gutierrez telephoned detectives to report that she had found a suitcase on top of a chair in the backyard. N.T. 05/04/10, at 73-74. She brought the suitcase inside of her home, opened it, and found inside of it several items belonging to Steven Lazar. *Id.* at 78. Detective Baker asked Detective Williams to pick up the suitcase. Detective Williams testified that she

picked the suitcase up inside of the home from Evelyn Gutierrez, never even going into the backyard:

> Q. Did she show you where she found it?
>
> A. No, she just told me she found it in the backyard.
>
> Q. Did you investigate the backyard?
>
> A. No, I did not.
>
> Q. Did you walk out to the backyard?
>
> A. No, I did not.

N.T. 05/04/10, at 92. One month after Detective Williams picked up the suitcase, Detective Baker examined its contents and found a yearbook, a letter from the methadone clinic, and a wallet belonging to Steven Lazar. N.T. 05/06/10, at 177-178. Detective Baker brought Mr. Lazar in for questioning about the suitcase. Mr. Lazar told Baker that he had been using drugs at an abandoned house in the neighborhood, and when police came, he hastily left, leaving the suitcase behind. App 340-341. Apparently satisfied that Lazar was not involved in the crime and the suitcase had no evidentiary value, Detective Baker released Mr. Lazar and allowed him to take the suitcase home with him.

Six months later, on November 2, 2007, Steven Lazar's roommate, Russel Angely, was being transported by police from Mr. Lazar's home following a fight between the two men, when he suddenly volunteered to police that Mr. Lazar had told him about a murder. *Id*. at 109-112. At the station, on November 2, 2007, Angely provided a statement in which he claimed that Steven Lazar told him that he had been interviewed at Homicide regarding "killing some guy" and they had found his wallet, yearbook, and other personal possessions near the body, but that detectives had released him following the interview. App. 478-80. Angely told police that Mr. Lazar said he

"had to leave his stuff there because they had to get out of there." *Id.* Sarn Wilson, another friend, brought paperwork to get Angely released from the Homicide unit. N.T. 05/04/10, at 73-74. Ten days later, Wilson gave his own statement. He told police that Mr. Lazar had confessed to him as well, and told him that "he forgot and left his bag at the scene." App. 481-83.

At trial, the Commonwealth did not proffer (to counsel or the court) any photographs of the chair where Evelyn Gutierrez reported finding the suitcase. They disclosed only photographs of the backyard that had been taken long after the suitcase was discovered, and none of that depicted a chair or a suitcase. The newer photographs are easily distinguished because, as Evelyn Gutierrez testified, the family had done a great deal of work on the back of the house in order to sell it, including replacing the fence and tearing down a large wooden upper deck structure. The photographs introduced at trial depict the home as it was when the family sold it in 2009. App. 488-90. Evelyn Gutierrez described the newer photos of the yard as follows:

Q: Is that the gate that was back there on January of '07?
A. No, sir.
Q. Was there another gate back there?
A. There was a gate here but this fencing, they replaced it when that property was sold because that wasn't there before. It was just a straight gate.
Q. Okay. But in any event that entire -- you couldn't gain access through the back, it was gated around, correct?
A. Correct, but the fence when it was there was very weak, so you could easily move it around and go under it or whatever.

N.T. 05/04/10, at 91-92. All the photos disclosed to trial counsel capture the house *after* the remodel; the weak fence had already been replaced and the overhang structure (which the Commonwealth theorized had shielded the bag from weather) had been removed. *Id*.

At trial, Officer Terrance Lewis, the technician assigned to photograph the scene on January 7th, 2007, testified that he never took photos of the backyard. N.T. 5/05/10 at 152.

Similarly, Detective Crystal Williams, who recovered the suitcase from Evelyn Gutierrez, failed to take photos of the yard. She testified that, in fact, she never even went into the yard, having picked up the suitcase from inside the house. *Id.* at 92. According to the testimony and police reports, Detective Baker was the only officer who went into the yard before the bag was discovered. Though he initially denied having gone into the yard, he conceded on cross-examination that, in fact, he had visited the yard a couple of weeks or a month after the murder. N.T. 5/06/10, at 159. Detective Baker is the only witness who testified that he was in the yard while it was in the condition represented in the photograph.

### B. The suitcase at trial

The suitcase was already a tenuous connection. For the initial crime scene investigation and another fourteen weeks after the crime, it had gone completely unnoticed. It and its contents were perfectly dry and maintained, despite having been sitting outside during the winter and spring months of January through April. Law enforcement photographs depict receipts and yearbook pages that show no signs of exposure, no running ink, no pages stuck together.

The physical crime scene evidence already clearly indicated that no one had left through the back door: "the deadbolt is locked on the back door, the ladder is up against it, the dust pan is on top of it." N.T. 5/11/10, at 63. Photos of the backdoor reveal that there was even a newspaper wedged between the door and the door jam.

Yet, the Commonwealth was able to use these facts against Mr. Lazar, arguing that these were merely the signs of Mr. Lazar's meticulous crime, the suitcase being his only mistake: "[t]hey wanted to make it look like no one was there. They did everything they could. They were very, very careful about that. But they forgot one thing, when you're doing something like this and when you got two bags you're loading around and working with somebody, he made a

mistake. He left that bag there." N.T. 5/11/10, at 64. And again: "He places that there and goes inside and then forgot about it absolutely. Absolutely. You have the bag there, you have no forced entry." *Id.* at 65.

In opening argument, the Commonwealth explained that "the police had missed [the suitcase on the chair]. Well, the family doesn't go to the house either, understandably, until about in April. . . when they go to the house in April of '07, they go into the backyard, which the police had never gone into and never looked. . . And what Ms. Evelyn Guttierez [sic] will tell you is she found a suitcase on a chair by the back door." N.T. 5/04/10, at 25-26.

Evelyn Gutierrez testified that she found the suitcase, which contained various personal items of Mr. Lazar, on a plastic chair in the yard behind the residence. She testified that "There was a seat back there, my father used to go back there to get air because there were trees back there. But this particular day I went there and I saw a bag there." N.T. 5/04/10, at 74. *See also, id.* at 94 ("Q: And it was on a plastic chair, correct? A: Yes, sir.").

On direct examination, Detective Baker claimed that he hadn't entered the yard when he was conducting the crime scene investigation: "Q. At that point did you go into the yard at all attached to 2767 North Mascher Street? A. No." N.T. 5/6/10 at 101. Initially, Baker maintained this position during cross examination: "Q. Can you tell me in reviewing the file why no one went out that back door to look? A. I can tell you I did not." *Id.* at 151. Baker ultimately conceded that he did go into the yard: "It's on the activity sheet when I went to the house and spoke to the neighbors, this was two weeks later." *Id.* at 159. After being asked to produce the activity sheet, Baker said there might not be an activity sheet after all and stated "I don't know what day it was." *Id.* at 160. Having finally admitted that he went into the yard, Baker then

testified that when he inspected the yard he must have missed the bag, because "it's a large yard with vehicles in it, I'm not looking for a brief case, I'm looking for a weapon." *Id.* at 162.

In closing, trial counsel argued that Detective Baker and other investigators had gone into the backyard, and knew that the bag had not been there immediately after the murder occurred: "We all know he went in that yard. There was no briefcase." N.T. 5/11/10, at 30. *See also id.* at 33 ("there's no pictures out in the yard because there was nothing of evidentiary value, just like they didn't take pictures in the basement.") In closing, the prosecutor first stuck with the original story, that law enforcement had not gone into the yard, telling the jury "they would have found it if they went in the yard and they didn't." N.T. 5/11/10 at 62. Then, acknowledging Baker's admission on cross that he had in fact gone into the yard, changed tactics, telling the jury that Baker must have "missed it;" "we know that the Defendant's bag is there and they missed it. They missed it." N.T. 5/11/10, at 66.

What counsel did not know, and the jury never heard, is that the Commonwealth had in its file a photograph clearly depicting the backyard prior to its remodel, plainly showing a plastic chair --empty, with no suitcase. App. 302. Armed with this photograph, counsel would have had evidentiary support for his argument that the suitcase was simply not in the chair between the months of January and April. Second, he could have used the chair to impeach Detective Baker's testimony that Baker had missed the suitcase because he was only looking for weapons. Given the tenuous nature of the evidence against Mr. Lazar, the undisclosed photograph is material. Without the suitcase in that chair in January, the Commonwealth's case implodes.

### C. The previously undisclosed photo undermines confidence in the verdict and amounts to a violation of *Brady v. Maryland*.

#### 1. The chair photo was suppressed.

The chair photo was never previously disclosed to Mr. Lazar's counsel and remained in the exclusive possession of the Commonwealth until the DAO and H-File were disclosed to undersigned counsel in September 2021. The existence of a photograph of the chair where Mr. Lazar purportedly left his suitcase after the murder has never been disclosed or acknowledged in any past proceeding. It is not in prior counsel's file, or anywhere in the record in this case. At a hearing, Mr. Lazar will show that prior counsel never saw this photograph.

#### 2. The evidence is exculpatory and material.

The photograph of the empty chair squarely contradicts the Commonwealth's narrative of the case. The photograph depicts *the* chair described by Evelyn Gutierrez. From all indications, this was *the* chair where Evelyn Gutierrez found a bag on April 27. Evelyn Gutierrez repeatedly referred to a single chair: "There was *a* seat back there." N.T. 5/04/10, at 74. She also identified it as a plastic seat. *Id.* 94. There was never any indication that there was a second chair in the yard. The chair in the photograph matches her description of *the chair* where the Commonwealth claimed Mr. Lazar left his suitcase.

The state of the yard depicted in the photograph also indicates that the photo was taken around the time the crime occurred. Unlike later photos of the yard that were presented at trial and included in the Commonwealth's file, the chair photo depicts a broken-down fence. When presented with newer photos of the house, Evelyn Gutierrez said the yard looked different when the crime occurred, "this fencing, they replaced it when that property was sold because that wasn't there before. . . . the fence when it was there was very weak, so you could easily move it

around and go under it or whatever. N.T. 5/04/10, at 91-92. The picture of the chair depicts the old broken-down fencing described by Evelyn Gutierrez. App. 302.

Although Mr. Lazar maintains that the evidence of the empty chair exculpates him, he need not prove that this evidence exonerates him in order to obtain relief under *Brady v. Maryland*. *Kyles*, 514 U.S. at 434-35. Instead, he must show that the newly disclosed evidence undermines confidence in his verdict. Here it clearly does. The photograph calls into question law enforcement's investigation and the Commonwealth's narrative around it. At his trial, the Commonwealth actually used the ineptitude of officers as an explanation for why they had not found the chair and the suitcase: "could they have done a better job? Absolutely. Could Baker have gone and stayed there longer than five minutes? Absolutely. . . The scene wasn't done correctly. It wasn't done right. They would have found it if they went in the yard and they didn't. They didn't. And he almost got away with it. He took advantage of it and is trying to take advantage of it again, and don't let him." N.T. 05/11/10 at 62. The photo of the chair eviscerates that narrative, revealing that investigators did inspect the yard, but failed to disclose what they found.

Similarly, Detective Baker's insistence that he never went into the backyard, and then his reluctant admission that he did, are seen in a new light with the disclosure of the chair photo. Reasonably competent counsel would have examined Baker about this chair, impeaching Baker's testimony that he missed the suitcase because he was only "looking for weapons." *Id* at 162. Counsel also would have used the photo to highlight for the jury that the police did in fact closely inspect the yard in the days and weeks that followed the murder, and that they did not detect a suitcase because there simply was not one there. *See* N.T. 5/11/10, at 30. Instead, counsel was left with mere argument:

There was no briefcase. They want you to believe there was a briefcase. Ladies and gentlemen, there was no briefcase in that yard. It's crazy, I would submit to you, to think there was. There was 17 cops on the scene. They were there during daylight, then the detectives went out there.

When considered against the other evidence against Mr. Lazar, the photograph of the chair is clearly material under *Brady*. The suitcase was the only piece of evidence linking Mr. Lazar to the crime scene, and was the only reason why he came to the attention of investigators. A photograph proving that it had not been in the yard from January until it was discovered in April severs this link. It also eviscerates Mr. Lazar's purported confession, as well as the witness statements against him. As the Commonwealth emphasized, "this is the case that probably would have gone unsolved had the Defendant never opened up his mouth. Because there wasn't a lot of evidence, wasn't there? And because no one went out in the yard, no one went in the yard that night." N.T. 5/11/10 at 59. In the statement, which was taken after 30 hours of interrogation in the midst of methadone withdrawal, Lazar allegedly stated "I left with [my] one bag, [but] [t]here were two bags, one was left there." N.T. 5/11/10, at 81. It similarly establishes the unreliability of the informant statements. App. 478-83. Without the suitcase, the case against Mr. Lazar dissolves.

This Court should look with skepticism at the fact that the Commonwealth failed to disclose this photograph to the defense and the tribunal. "There are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request. For though the attorney for the sovereign must prosecute the accused with earnestness and vigor, he must always be faithful to his client's overriding interest that 'justice shall be done.'" *United States v. Agurs*, 427 U.S. 97, 110–11, (1976). The photo is certainly relevant, and its suppression undermined the truth seeking process.

### 3. Mr. Lazar is entitled to a hearing.

At a minimum, this Court should hold an evidentiary hearing to determine the origin of the newly disclosed photograph. A photo of an empty chair in the yard should absolutely have been turned over to trial counsel and raises numerous material issues of fact. By failing to turn it over, the Commonwealth tied counsel's hand behind his back throughout trial. As the Pennsylvania Supreme Court has made clear, the "purpose of Rules 1507 and 1508 is to assure that an evidentiary hearing be held on a post-conviction petition if there are factual issues to be resolved." *Id.* at 466. Petitioner should now have the opportunity to address the outstanding factual issues that have been created by the failure to timely disclose this evidence. At a hearing, counsel could examine Detective Baker and other law enforcement officers in order to determine the circumstances of the photograph and the investigation. The previously undisclosed photo of an empty chair raises material issues of fact and casts grave doubt on the entire case against Mr. Lazar. This Court should grant a hearing and any other relief this Court deems appropriate.

> **CLAIM VI: A new prior misconduct disclosure reveals that Detective Rossiter, who took Mr. Lazar's alleged confession, had previously been investigated for and had a sustained finding of physical abuse of a suspect.**

A new prior misconduct disclosure from the District Attorney's Office contains documentation of a 1990 sustained finding of physical abuse against Detective Rossiter. The report concludes that Detective Rossiter had beaten and bloodied a suspect. In addition, the report details that Rossiter made false statements in his own defense. Rossiter took Mr. Lazar's purported confession, and testified in the preliminary hearing, suppression hearing, and trial that he had not pressured Mr. Lazar to confess and that Lazar was not experiencing symptoms of withdrawal during the 37 hours he was held. N.T 02/19/08, at 27-28, 5/3/10, at 95-100, 5/10/2010, at 157. In addition, Rossiter conducted the interview of June Blasé and was present

for the interviews of John Barry and Mark Kedra. N.T. 5/10/2010, at 132. Kedra testified that his statement alleging that Mr. Lazar had confessed to the murder had been fabricated by detectives: "No, this is completely off because I had told the police about a couple dozen times that he had never said he was involved with the murder." N.T. 05/06/10, at 29. Despite Detective Rossiter's significant role in the case, and Mr. Lazar's challenges to the statements produced by Rossiter's interrogations, the Commonwealth failed to disclose a significant and relevant past sustained finding of misconduct against him.

### A. Rossiter's misconduct.

The summation of the sustained finding against then P/O Rossiter states that "[b]ased on the facts of the case there is a discrep[a]ncy betwee[n] [Redacted name of other officer] and P/O Rossiter's statements." App. 339. The other officer "stated that he removed [suspect] from the Trans Am and had him under control face down on the ground without a struggle or any apparent injuries." *Id.* However when he "relinquished control of [redacted] to P/O Rossiter to provide flash to police radio . . . [the other officer] related-that when he observed [redacted] in the wagon he had blood on his face." *Id.* Rossiter stated, to the contrary, that "when [redacted] exited the Trans Am he tried to struggle free of [redacted]'s grip; so, he tackled him to the ground where he sustained his injury." *Id.* The report notes that "in view of the discrep[a]ncy and the statement of [redacted] who stated that he was struck several times while he was on the ground; plus the statement of [redacted] who stated that he observed P/O Rossiter jabbing downward with his nightstick, the allegation of physical abuse is sustained." *Id.*

The Commonwealth suppressed this report which showed that then P/O Rossiter had beaten and bloodied a suspect with his nightstick who was already "under control." *Id.* Not only did Rossiter commit this brutal act, documented by both his fellow officer and the victim, he lied

about it. Rossiter fabricated a story that the suspect had "tried to struggle free" of his fellow officer's grip and "tackled him to the ground" but this was immediately contradicted by the statements of his fellow officer, who admitted that he Rossiter actually beat the victim, repeatedly hitting him with his nightstick as he lay on the ground. *Id.* This report was not disclosed to counsel for Mr. Lazar until November 2021.

### B. The newly disclosed Brady proffer pertaining to Detective Rossiter undermines confidence in the verdict.

Had Detective Rossiter's prior misconduct been properly disclosed, reasonably competent counsel would have used the information to impeach his testimony and cast further doubt on the reliability of Mr. Lazar's supposed confession. Rossiter played a crucial role at trial and in the investigation of Mr. Lazar. Rossiter took Mr. Lazar's alleged confession. He was present at various other points throughout the 37 hours that Mr. Lazar was held.[13] Rossiter repeatedly testified at the preliminary hearing, suppression hearing, and at trial that he had not coerced Mr. Lazar during this meeting or provided him with information from other witness statements. N.T 02/19/08, at 27-28, 5/3/10, at 95-100, 157, 5/10/2010, at 157. He also asserted that Mr. Lazar did not appear to be experiencing withdrawal symptoms and did not request methadone or other medical assistance. N.T 05/03/10, at 99-100, 05/10/10 at 176. Rossiter also conducted the interview with June Blasé, and was present for interviews with John Barry and Mark Kedra, who later testified that his statement had been fabricated. N.T. 5/10/2010, at 132, 138.

Armed with the information that Detective Rossiter had brutally abused a suspect in his custody, reasonably competent counsel would have impeached his account of Lazar's alleged

---

[13] The Court: Did you see him the whole time?
THE WITNESS: I did see him. I saw when he was brought in. I saw him at his apartment. And, of course, I saw
him at the conclusion of my statement with him. N.T 02/19/08, at 27. *But see id.* at 112 ("Q. So you go home at 12 o'clock, he's still there, he's alert, he's attentive and cooperative, correct?  A. Yes. Q. You come back at 7 o'clock in the morning, right? A. That's correct.")

confession before the jury. Critically, counsel could have emphasized that Rossiter had not only beaten and bloodied a person in his custody, he had lied about it. Counsel could have noted that without the statements of Rossiter's fellow officer, his prior deception might also have gone uncorrected.

Reasonably diligent counsel also would have presented Rossiter's past misconduct at the suppression hearing. Counsel would have used the undisclosed misconduct to impeach Rossiter's testimony about Mr. Lazar's purported confession, especially given the context of Mr. Lazar's statement, which was given after he was held in a room for over 30 hours. Instead, counsel, this Court, and the jury were never told that the detective who took the alleged confession had a sustained finding of misconduct, the details of which reveal that Rossiter had severely physically abused a suspect in his custody and then made false statements in the aftermath. The Commonwealth's failure to disclose this evidence of significant misconduct by the officer who took Mr. Lazar's purported confession "undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985).

At Mr. Lazar's trial, the Commonwealth not only withheld evidence of Rossiter and Baker's misconduct, they capitalized on it, repeatedly urging the jury to reject counsel's unsubstantiated claims of police coercion. *See* N.T. 5/11/10, at 30 ("He wants you to think Baker and Verrechio and all those other detectives are going to risk their over a hundred years of experience, all of their lives, their livelihood, their pension, their family lives and lie about that?"). Had counsel been armed with these disclosures, he could have easily rebutted the Commonwealth's arguments. Instead, he was left to stand by, while the Commonwealth improperly vouched for these officers.

**CLAIM VII: Evidence demonstrating that Baker repeatedly testified falsely at trial, the Commonwealth failed to disclose critical evidence and then argued its absence undermines confidence in the verdict and negates the reliability of Petitioner's conviction such that due process is violated.**

As discussed extensively above, the newly disclosed evidence decimates the case against Mr. Lazar. The three wobbly pillars of the Commonwealth's case, Mr. Lazar's alleged confession, witness statements, and the only physical link (a suitcase found 14 weeks later in the victim's backyard) are all refuted by a newly disclosed photograph of an empty chair where the Commonwealth purported Mr. Lazar left his suitcase after the murder. The new evidence reveals that the Commonwealth was aware that Detective Baker, a critical Commonwealth witness who initially interviewed Mr. Lazar, and Detective Rossiter, who took his final statement, each had a history of serious and relevant misconduct predating Mr. Lazar's trial. Finally, the newly disclosed evidence betrays the Commonwealth's narrative that Mr. Lazar was the only plausible suspect in the murder. The Commonwealth withheld evidence that directly corroborated the defense's alternative theory and then used perjured testimony to argue      the opposite before the jury.

"Reliability is ... a due process concern." *White v. Illinois*, 502 U.S. 346, 363-64 (1992). Hence, the due process clauses of the federal constitution require that criminal convictions be reliable and trustworthy. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974); *Thompson v. City of Louisville*, 362 US 199, 204 (1960). Thus, the use of false, inaccurate,   or   misleading testimony, such as that provided by White, deprives the defendant of a fair trial if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Napue*, 360 U.S. at 271; *Mooney v. Holohan*, 294 U.S. 103 (1935); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Alcorta v. Texas*, 355 U.S. 28 (1957); *Giglio*, 405 U.S. 150.

Due process is denied when the circumstances of a trial render it fundamentally unfair. *See e.g. Taylor v. Kentucky*, 436 U.S. 478, 487-88 & n. 15 (1978) (prejudicial effect of potentially damaging instructions and prosecution argument violated due process guarantee of fundamental fairness); *Donnelly v. DeChristoforo*, 416 U.S. 637, 639 (1974) (considering totality of prosecutorial misconduct in context of entire trial to decide if misconduct was sufficiently prejudicial to render trial fundamentally unfair and violate defendant's due process rights). Here, a conviction based on the testimony of a proven liar, in a case tried by a prosecutor who has shown himself willing to commit gross acts of misconduct in an effort to obtain a conviction at any cost, renders Petitioner's conviction fundamentally unfair. Due process was violated; a new trial is warranted.

### CLAIM VIII: The cumulative effect of the suppressed evidence undermines confidence in the outcome at trial.

Viewed in isolation, each of the claims herein, based on the information disclosed by the DA, individually and cumulatively, is sufficient to show that Petitioner's due process rights were violated. But this Court must also view these claims together, considering the cumulative effect of the errors. Viewed together, the evidence requires that Mr. Lazar's conviction be vacated. *Kyles*, 514 U.S. at 436-37 (impact suppressed evidence must be viewed collectively). In this Petition, Petitioner has proffered new evidence which could not have been previously discovered, which establishes that the DA withheld evidence refuting its theory of the crime and contradicting its witnesses against Petitioner.

The United States Supreme Court recently reiterated *Brady v. Maryland's* cumulative effect standard. In *Wearry v. Cain*, the Court reversed the Louisiana state postconviction court because it improperly evaluated the materiality of each piece of evidence in isolation rather than cumulatively. *Wearry v. Cain*, 577 U.S. 385 (2016). The suppressed evidence in *Wearry*

included statements casting doubt on the star witness's credibility. *Id*. at 389. The Court held that when considered cumulatively, in light of the evidence against him, the undisclosed evidence undermined confidence in Wearry's conviction. *Id*. at 393. Considering the significance of the evidence withheld in Mr. Lazar's case as well as the weakness of the case against him at trial, here too we can no longer "be confident that the jury's verdict would have been the same." *Kyles*, supra., at U.S. 453.

The only piece of physical evidence connecting Mr. Lazar to the victim's home, the scene of the crime, was his suitcase, found in the backyard 14 weeks after the murder. The victim's daughter reportedly found the suitcase sitting on a chair while cleaning out the backyard almost four months after her father's death. A newly disclosed photograph of the chair, sitting empty without a suitcase, establishes that the Commonwealth withheld material evidence. Based upon testimony about the state of the yard, there is every indication that the photo was taken *before* Gutierrez's daughter discovered the suitcase. This exculpatory evidence refutes police and civilian witness testimony and most importantly, eviscerates the Commonwealth's theory that Mr. Lazar left the suitcase in Gutierrez's backyard on the day of the murder, and that it sat undetected and unweathered for 14 weeks. The photo disproves Mr. Lazar's statement and the statements of two witnesses, which reference the suitcase, corroborating his argument that the statements were a product of police coercion. Without the suitcase in the chair, the Commonwealth's case falls like a house of cards.

Casting a further pall on the case against Mr. Lazar are new *Brady* disclosures made by the Commonwealth in November 2021, revealing a pattern and practice of misconduct by Detectives David Baker and Kenneth Rossiter. The Commonwealth suppressed disturbing evidence of misconduct predating Mr. Lazar's trial. Detective Baker's misconduct is significant

and bears a clear nexus to Mr. Lazar's conviction as he had repeatedly coerced statements and fed information to witnesses and suspects. Mr. Lazar has always maintained that his knowledge of the crime, echoed in the statements from him and the witnesses, came from Baker's initial meeting with him--an argument that was supported by one of the Commonwealth's witnesses on cross. Detective Rossiter had previously physically abused a suspect and took Mr. Lazar's final statement, which Mr. Lazar has consistently maintained was coerced. Rossiter also took one of the witness' statements implicating Mr. Lazar, which that witness maintained was fabricated. Additional newly disclosed evidence reveals that the Commonwealth provided undisclosed favorable treatment to another key witness, Sarn Wilson, and repeatedly elicited false testimony to the contrary. *See* Claim III.

The new disclosures further undermine confidence in Mr. Lazar's conviction. They also underscore the lengths that the Commonwealth was willing to go for this conviction. For the Commonwealth to affirmatively vouch for Detective Baker and deride the argument that he fed Mr. Lazar information--while withholding evidence of similar misconduct in other homicide cases--constitutes a violation of Mr. Lazar's constitutional rights and undermines confidence in his verdict.

Finally, the Commonwealth repeatedly represented that any tips it had received had been affirmatively ruled out, and that Dario Gutierrez's murder had long been a cold case in which Mr. Lazar was the only plausible suspect. Newly disclosed files revealed that officers had extensive information pointing to credible alternative suspects that were simply abandoned. This suppressed information includes a specific threat against Dario Gutierrez, tips about drug dealers with recent arrests on Mascher street, and detailed information and an investigation into a wanted man who had committed a similarly brutal crime with a crowbar.

In addition to withholding this information, the Commonwealth has now admitted that it repeatedly distorted the investigation of disclosed alternative suspects Victor Berrios and William Rosa, which prevented the jury from learning how incomplete and inconclusive it really was. The assertion that Berrios and Rosa had been conclusively eliminated as suspects was part of the "cold case" refrain that the Commonwealth reiterated over and over again during trial. These misrepresentations tipped the scales during habeas proceedings during which Mr. Lazar repeatedly sought information and raised claims concerning the two suspects, only to be unequivocally and inaccurately refuted by the Commonwealth. *See* Claim I.

Each of these claims is meritorious. While each of these alone warrant a new trial, collectively the prejudice is clear. Petitioner was denied a fair trial, by virtue of the Commonwealth's failure to comply with constitutional and ethical standards. Viewed collectively, the claims and evidence in this Petition combined establish his actual innocence. They also clearly establish that the Commonwealth committed grave errors under *Brady* and *Napue*. Viewed together there can be no question that the "cumulative prejudice" suffered by Petitioner satisfies constitutional and statutory requirements. For the reasons discussed above, given the underlying weakness of the evidence against Mr. Lazar, combined with the newly disclosed evidence of the photo of an empty chair photo, key detectives' histories of relevant misconduct, and the Commonwealth's misrepresentations and suppression of multiple viable alternative suspects, relief is required. *See Kyles*, supra., at U.S. 453. This Court should grant relief.

### CLAIM IX: Mr. Lazar is innocent.

The United States Supreme Court held in *McQuiggin v. Perkins* that a credible showing of actual innocence provides an equitable exception to AEDPA's statute of limitations. 133 S.

Ct. 1924, 1928 (2013). In *Schlup v. Delo*, 513 U.S. 298 (1995), and *House v. Bell*, 547 U.S. 518 (2006), the Supreme Court ruled that "a convincing showing of actual innocence enabled habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013). In *McQuiggin*, the Supreme Court took up the question of whether a showing of actual innocence likewise enables habeas petitioners to overcome a failure to comply with AEDPA's statute of limitations. *Id*.; *see also* 28 U.S.C. § 2244(d)(1)(A) (Under AEDPA, a state prisoner ordinarily has one year to file a federal habeas petition, beginning from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."). The Court resolved the issue in favor of habeas petitioners with colorable actual innocence claims, holding that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* or *House*, or, as in this case, expiration of the statute of limitations." *McQuiggin*, 133 S. Ct. at 1928. This holding represented a new application of the "fundamental miscarriage of justice" exception to procedural default intended to ensure that "federal constitutional errors do not result in the incarceration of innocent persons." *Id*. at 1931 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

Under *Schlup* and *McQuiggin*, a petitioner raising a gateway claim of innocence must raise sufficient doubt of guilt to undermine confidence in the outcome of the trial. *Schlup*, 513 U.S. at 316. To establish the requisite probability, a petitioner must demonstrate that, "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Schlup*, 513 U.S. at 327-28) (quotation marks removed). A habeas petitioner may satisfy this burden using "new, reliable evidence that 'undermine[s] the [trial] evidence pointing to the identity of the [perpetrator] and

the motive for the [crime].'" *Reeves v. Fayette SCI*, 897 F.3d 154, 161 (3d Cir. 2018) (quoting

*Goldblum v. Klem*, 510 F.3d 204, 233 (3d Cir. 2007)) (alterations in original).

As the Supreme Court has emphasized:

> [T]he *Schlup* standard does not require absolute certainty about the petitioner's
> guilt or innocence. A petitioner's burden at the gateway stage is to
> demonstrate that more likely than not, in light of the new evidence, no
> reasonable juror would find him guilty beyond a reasonable doubt—or, to
> remove the double negative, that more likely than not any reasonable juror
> would have reasonable doubt.

*House*, 547 U.S. at 537.

While the actual innocence standard is exacting, it is not insurmountable. The Supreme

Court in *House* found the *Schlup* standard satisfied even though it was "not a case of conclusive

exoneration," as "[s]ome aspects of the State's evidence . . . still support an inference of guilt,"

and "[i]f considered in isolation, a reasonable jury might well disregard" the alternative

perpetrator evidence presented by House. *House*, 547 U.S. at 552, 553-54; *see also Wolfe v.*

*Johnson*, 565 F.3d 140, 155-56 (4th Cir. 2009) (remanding *Schlup* issue for an evidentiary

hearing even though the essential affidavit relied upon by petitioner to demonstrate his innocence

was subsequently disavowed by the affiant and the district court had previously found the affiant

incredible).

As detailed above, the case against Mr. Lazar was already tenuous. There was no forensic

evidence implicating Mr. Lazar and no eye-witnesses. Prior to the recent disclosure of

exculpatory evidence, this Court had already questioned the integrity of Mr. Lazar's conviction.

While denying his ineffective assistance of counsel claim "solely on the exceedingly deferential

framework imposed on me by 28 U.S.C. 2254(d)," this Court wrote:

> [T]he five civilian witnesses all had various credibility problems: one, Lazar's friend, had
> a theft conviction and had contacted the police about Lazar's statements only after getting
> into a dispute with Lazar; two others had pending robbery or theft cases against them at

the time of trial; and the last two changed their stories on the stand. Thus to the extent courts should ever feel comfortable finding the untainted evidence to be "overwhelming" and sufficient grounds for finding no prejudice, this does not seem like the right case for it.

*Lazar v. Coleman*, CV 14-6907, 2017 WL 783666, at *4 (E.D. Pa. Mar. 1, 2017).

### A. Newly disclosed evidence reveals that Mr. Lazar is innocent

Mr. Lazar's confession, key witness statements, and the only physical link (a suitcase found 14 weeks later in the victim's backyard) are all completely undermined by a newly disclosed photograph of an empty chair where the Commonwealth purported Mr. Lazar left his suitcase after the murder. Previously suppressed evidence also reveals that critical law enforcement witness Detective Baker, who initially interviewed Mr. Lazar, and Detective Rossiter, who took his final statement, each had a history of serious and relevant misconduct predating Mr. Lazar's trial. Finally, the newly disclosed evidence betrays the Commonwealth's narrative that Mr. Lazar was the only plausible suspect in the murder. In fact, the Commonwealth withheld evidence that directly corroborated the defense's alternative theory and showed the victim had been threatened in the months preceding his death. The Commonwealth has now conceded that it repeatedly falsely argued its two key suspects, Berrios and Rosa, had been excluded. The jury was led to believe that Mr. Lazar was law enforcement's lone suspect and that the evidence against him was sound and reliable. Now that the District Attorney's Office of Philadelphia has disclosed its file, it has become clear that Mr. Lazar is innocent, and his conviction was the product of clear and direct violations of *Brady* and *Napue.* It is upon this Court to serve the justice Mr. Lazar was denied nearly fifteen years ago.[14]

---

[14] Mr. Lazar has always maintained his innocence. Immediately after the verdict was read Mr. Lazar stated: "I'm sorry for your family, but I'm not the person that killed your father. . . I want to say I'm innocent." N.T. 5/11/10, at 147-148.

## 1. The Commonwealth withheld an exculpatory crime scene photograph.

The only piece of physical evidence connecting Mr. Lazar to the victim's home, the scene of the crime, was his suitcase, found in the backyard 14 weeks after the murder. Evelyn Gutierrez, Dario Gutierrez's daughter, reportedly found the suitcase sitting on a chair while cleaning out the backyard almost four months after her father's death. A newly disclosed photograph of the chair, sitting empty without a suitcase, establishes that the Commonwealth withheld material exculpatory evidence and proves Mr. Lazar's innocence. Based upon testimony about the state of the yard, it is clear that the photo was taken *before* Evelyn Gutierrez discovered the suitcase. This exculpatory evidence refutes police and civilian witness testimony and most importantly, eviscerates the Commonwealth's theory that Mr. Lazar left the suitcase in Gutierrez's backyard on the day of the murder, and that it sat undetected and unweathered for 14 weeks. Without the suitcase in the chair, the Commonwealth's case falls like a house of cards.

The photograph of the empty chair proves the confession was a fabrication. After Mr. Lazar was arrested, he was placed in a 10 foot by 8 foot room for over 37 hours during which, with every passing hour, he was suffering increasingly severe methadone withdrawal. In his final statement, Mr. Lazar allegedly confessed to being present when another man murdered Mr. Gutierrez with a hatchet, and stated that he had left his bag at the scene. The newly disclosed photograph conclusively reveals what Mr. Lazar has always argued: the confession was a fabrication, fed to him by officers.

The testimony of multiple Commonwealth witnesses is also refuted by the empty chair photograph. Both Russell Angely and Sarn Wilson relayed that Mr. Lazar told them he left the suitcase in the backyard. It is now apparent from the photograph of the empty chair that their stories were false and the facts contained therein stem from Detective David Baker's initial

meeting with Mr. Lazar. The suitcase touched every element of the case against Mr. Lazar, the newly disclosed photograph revealing that he did not leave it at the scene exculpates him.

It is not, however, the only newly disclosed evidence to do so.

> **2. Extensive misconduct by Detective David Baker and Detective Kenneth Rossiter further undermines the integrity of Mr. Lazar's conviction.**

New disclosures reveal a pattern and practice by Detective Baker of coercing statements and feeding information to witnesses and suspects. Detective Baker's misconduct is significant and bears a clear nexus to Mr. Lazar's conviction. Mr. Lazar has always maintained that his knowledge of the crime, echoed in the statements from him and the witnesses, came from Baker's initial meeting with him--an argument that was supported by one of the Commonwealth's witnesses on cross. Mark Kedra testified that Mr. Lazar had told him that Detective Baker had provided him with details of the murder and shown him crime scene photos during their interview. N.T. 5/11/10, at 55-56. The Commonwealth mocked this argument: "And he wants you to think that Baker and Verrecchio and all those other detectives are going to risk their over a hundred years of experience, all of their lives, their livelihood, their pension, their family lives and lie about that?" N.T. 5/11/10, at 30. *See also Id.* at 68 ("they want you to believe that [Baker] got off his butt while talking to Russell Angely, somehow got crime scene photos, and was trying to put this on somebody.")

The new disclosures reveal that Detective Rossiter had previously physically abused a suspect. Rossiter took Mr. Lazar's final statement, which Mr. Lazar has consistently maintained was coerced. The Rossiter disclosure also corroborates testimony from Mark Kedra. Interviewed by Detective Rossiter, Kedra accused police of fabricating the part of his statement which alleged that Mr. Lazar had told him he committed the murder: "No, this is completely off

because I had told the police about a couple dozen times that he had never said he was involved with the murder." N.T. 5/6/10, at 29.

The new disclosures further establish Mr. Lazar's innocence. They also underscore the lengths that the Commonwealth was willing to go for this conviction. For the Commonwealth to affirmatively vouch for Detective Baker and deride the defense's arguments that he fed Mr. Lazar information--while withholding evidence of similar misconduct in other homicide cases-- constitutes a violation of Mr. Lazar's constitutional rights and undermines confidence in his verdict.

> **3. Newly disclosed evidence reveals that the Commonwealth elicited false testimony about Steven Lazar's role as the lone suspect in the case.**

So too does the Commonwealth's insistence that Berrios and Rosa had been excluded, which they now admit was false. In addition to withholding information about them, the Commonwealth's repeated distortion of law enforcement's investigation prevented the jury from learning how incomplete and inconclusive it really was. The assertion that Berrios and Rosa had been conclusively eliminated as suspects was part of the "cold case" refrain that the Commonwealth reiterated over and over again during trial. These misrepresentations tipped the scales during habeas proceedings during which Mr. Lazar repeatedly sought information and raised claims concerning the two suspects, only to be unequivocally and inaccurately refuted by the Commonwealth.

The Commonwealth repeatedly represented that any tips it had received had been affirmatively ruled out, and that Dario Gutierrez's murder had long been a cold case in which Mr. Lazar was the only plausible suspect. Newly disclosed files revealed that officers had extensive information pointing to credible alternative suspects that were simply abandoned. This

suppressed information includes a specific threat against Dario Gutierrez, tips about drug dealers with recent arrests on Mascher street, and detailed information and an investigation into a wanted man who had committed a similarly brutal crime with a crowbar.

### 4. Newly disclosed evidence further establishes the lack of credibility of the witnesses against Mr. Lazar.

This Court previously recognized that the witnesses against Mr. Lazar were unreliable, observing that "the five civilian witnesses all had various credibility problems: one, Lazar's friend, had a theft conviction and had contacted the police about Lazar's statements only after getting into a dispute with Lazar; two others had pending robbery or theft cases against them at the time of trial; and the last two changed their stories on the stand." *Lazar v. Coleman*, CV 14-6907, 2017 WL 783666, at *4 (E.D. Pa. Mar. 1, 2017). One of the latter two witnesses, Mark Kedra, testified that police had fed him information and fabricated a statement inculpating Mr. Lazar.

In addition to the credibility issues this Court already recognized, newly disclosed evidence reveals that critical witness Sarn Wilson received immediate and significant favorable treatment after he testified against Mr. Lazar. Despite repeatedly testifying that he had received no offers of favorable treatment on his own robbery case, just two days after Wilson's testimony he went before his own sentencing court to enter an open plea and defer sentencing so the court could hear from Mr. Lazar's prosecutor ADA Hurley. Thereafter, ADA Hurley did speak with Wilson's sentencing judge, and Wilson did receive an incredibly lenient sentence of probation. This evidence further establishes Mr. Lazar's innocence, eviscerating the already unreliable witness testimony against him.

### B. Relief is required

For the reasons discussed above, no reasonable jury would vote to convict in light of the underlying weakness of the evidence against Mr. Lazar, combined with the newly disclosed evidence of the photo of an empty chair photo, key detectives' histories of relevant misconduct, and the Commonwealth's misrepresentations and suppression of multiple viable alternative suspects. Petitioner meets the standards of *Schlup* and *McQuiggin*.

### REQUEST FOR RELIEF

Steven Lazar is actually innocent. He has established multiple violations of his constitutional rights. For all of the above reasons, Mr. Lazar respectfully requests that this Court vacate his conviction, order a new trial, and order any other relief that this Court deems appropriate.


Respectfully submitted,


PAUL JUBAS, ESQUIRE
Pa. I.D. No.: 311832
PAUL JUBAS LAW, P.C.
P.O. Box 10704
Pittsburgh, PA 15203
(412) 230-0023
pjubasesq@gmail.com

*Counsel for Steven Lazar*

By: s/ Jennifer Merrigan
Jennifer Merrigan
Pa I.D. No.: 318243
Elie Kirshner
Pa I.D. No.: 330863
Jenny Osborne
Pa I.D. No.: 328656
Phillips Black
1901 S. 9th, 608
Philadelphia, Pa 19148
888.532.0897 (tel)
888.543.4964 (fax)
j.merrigan@phillipsblack.org


Dated: September 8, 2022

Philadelphia, Pennsylvania

**CERTIFICATE OF SERVICE**

I, Jennifer Merrigan, certify that the foregoing Amended Petition for Writ of Habeas Corpus was served upon all counsel of record in this case via the ECF filing system pursuant to the Federal Rules of Civil Procedure, and first class copies of this Amended Petition have been mailed to the following:

Eric Armel
SCI Fayette
50 Overlook Drive
LaBelle, PA 15450

Josh Shapiro, Esq.
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120

Jessica Attie
Conviction Integrity Unit
Philadelphia District Attorney's Office
2 South Penn Square
Philadelphia, PA 19107

/s/ Jennifer Merrigan
Jennifer Merrigan

Dated: September 8, 2022