**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STEVEN LAZAR** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 14-6907** |
| | : | |
| **THE ATTORNEY GENERAL OF THE** | : | |
| **STATE OF PENNSYLVANIA, et al.** | : | |

**MCHUGH, J.**                                                                    **March 6, 2023**

**<u>MEMORANDUM</u>**

Petitioner Steven Lazar files this amended habeas petition after prevailing on a Rule 60(b) Motion that reopened these proceedings.  Previously, the Commonwealth opposed Lazar's petition.  I denied relief and the Court of Appeals affirmed.  Since then, new evidence has come to light and the Commonwealth has reconsidered its position.  Because of the Commonwealth's own misrepresentations to this Court about facts material to an analysis of prejudice, and because of two significant *Brady* violations, the Commonwealth now concedes that Lazar is entitled to relief on three of his nine claims: (1) that Lazar's counsel was ineffective for incorrectly stipulating that he had not taken methadone in the month preceding his confession, when he had actually taken methadone the day immediately prior; (2) that the Commonwealth violated Lazar's due process rights by withholding complete information about the Philadelphia Police Department's ("PPD") abbreviated investigation into two alternative suspects; and (3) that the Commonwealth violated Lazar's due process rights by withholding information about known instances of misconduct on the part of the lead detective.  Having carefully reviewed the parties' submissions, and having presided over this case for several years, I am persuaded that Petitioner is entitled to relief.  I will thus grant Mr. Lazar's habeas petition as to claims one, two, and four.

## I.      Relevant Background

In my prior memorandum, I summarized the facts from Mr. Lazar's trial and the procedural history of the case.  ECF 25 at 2-5.  I incorporate those facts herein and expand where necessary.

### A.  Underlying Crime and Initial Investigation

Mr. Dario Gutierrez was found dead in his home on January 9, 2007.  In the days immediately following, officers learned that Gutierrez had been clashing with drug dealers in his neighborhood.  One neighbor – a police officer who testified at Lazar's trial – reported that Gutierrez would chase drug dealers off his front steps, pour oil on his steps to dissuade them from sitting there, and was a leader in the neighborhood's "Townwatch" group.  Pet'r App. 3-4, ECF 48-1 at 4-5.[1]  The Philadelphia Inquirer published early comments from police officials about the murder, quoting Chief Inspector Joseph Fox as stating that Gutierrez "was very active in trying to lead his neighborhood in a fight against the drug activity," and that those engaged in drug activity may have assumed that Gutierrez was "calling the police" on them.  *Id.* at 8-11.

On January 11, 2007, a confidential informant contacted Sergeant Wilkins of the PPD with a tip about the murder.  The informant stated that he or she saw three people – two of which the informant later confirmed were William Rosa and Victor Berrios – enter Gutierrez's house.  *Id.* at 49-50.  Rosa and Berrios were able to enter Gutierrez's house without breaking in, according to the informant, by having a woman knock on the door first and then leave the front door open once she was invited inside.  *Id.*  The informant also told police that Rosa and Berrios drove a black Honda Accord when they did "their jobs."  *Id.*  On January 18, Berrios was arrested on an unrelated federal indictment.  *Id.*  Berrios consented to a search of his home at the time of arrest, and state and federal law enforcement also secured a search warrant based on both the federal crime and the

---

[1] Going forward, when referencing Petitioner's Appendix, I will rely on the appendix page numbers in the bottom right corner of the page.

informant's tip.  *Id.*  During the search, officers seized several items from Berrios' home as well as the black Honda Accord.[2]  The activity reports provided to Lazar's counsel document the informant's initial call and the items recovered during the search.  Pet'r Mot. for Relief Under 60(b) ¶ 25, ECF 33 at 7.

### B.  Lazar's Arrest and Interrogation

Fourteen weeks after Gutierrez's death, in April 2007, his daughter found a suitcase she did not recognize while cleaning out her father's back porch.[3]  The suitcase, which was promptly given to police, contained several items linked to Lazar, including a letter from a methadone clinic, a yearbook photograph, and his social security card.  On July 3, Detective David Baker, the lead investigator on the case, picked up Lazar at the methadone clinic and brought him to the police station for questioning.  Pet'r App. 340-41.  When Lazar told Baker that his friend had taken his suitcase and given it to someone else, Baker released Lazar and gave him back the bag.  *Id.*

But over the next few months, Lazar allegedly made several statements to other individuals implicating himself in the murder.  For example, he purportedly told two of his neighbors that he would be going to jail because he had "killed somebody with an axe," and he told one of his friends that "if you are going to kill somebody," the "best weapon to use . . . [is] a hatchet."  *See, e.g.*, *id.* at 478-79, 481.  He allegedly made similar statements to two other individuals, and all five witnesses would eventually testify at Lazar's trial.  (As discussed in more detail below, each was impeached to some degree, and none would be considered a pristine witness for the prosecution.)  Then, in November 2007, Lazar and his roommate, Robert Angely, both called the police after

---

[2] Although seized in a search of Berrios' house, the car was registered to William Rosa.  Pet'r App. 13.

[3] I do not reach the issue here, but it should be noted that the suitcase was considered a key piece of evidence in tying Lazar to the crime, and one of Lazar's claims for relief is that the prosecution improperly withheld a photograph of the yard that did not show the briefcase in the place where it was found at a point in time far closer to the murder.

they got into a dispute.  Once in the police car, Angely told the officers present that Lazar had implicated himself in Gutierrez's murder.  *Id.* at 478-79; Am. Pet., ECF 48 at 14.  Soon thereafter, homicide detectives brought Lazar back in for questioning.  This time, they interrogated him for over 30 hours.

During the interrogation, which began at 8:00 AM on November 19, Lazar gave two statements. Pet'r App. 344.  First, at 7:20 PM (over 11 hours after the interrogation began), Lazar stated that, on the night of the murder, he and a friend ("John") had been doing drugs in an abandoned house near the victim's home.  John had a hatchet and talked about robbing Gutierrez. *Id.* at 345-46.  Lazar explained that the two then briefly separated, and Lazar went into Gutierrez's home to look for John.  *Id.* at 346.  Lazar told the detective that he found John covered in blood, ransacking the drawers, and the victim dead.  *Id.*  The next afternoon, at 2:45 PM on November 20 (over 30 hours after the interrogation began), Lazar gave a second statement to Detective Rossiter that told a very different story.[4]  *Id.* at 350.  In this version, Lazar stated that John had gone to the victim's house for oral sex.  *Id.* at 351.  When the victim tried to perform oral sex on Lazar, Lazar hit the victim with his hand, and John hit the victim with the hatchet.  *Id.*  John also took the victim's wallet and went through his drawers.  *Id.*

### C.  Evidence at Trial

The Commonwealth relied upon three main pieces of evidence at trial: (1) Lazar's confession, (2) the testimony of the five individuals with whom Lazar allegedly discussed his role in the murder, and (3) Lazar's suitcase found in the victim's backyard.  Lazar's confession, however, was the central piece of the Commonwealth's case.  Before the jury heard his confession,

---

[4] At the suppression hearing, one of the interrogating officers testified that Lazar was placed in a 10-foot by 8-foot interview room with a table and two metal chairs, where he was left overnight.  Am. Pet., ECF 48 at 12.  The officer testified that Lazar would have been given food and water but that he had no knowledge of whether that actually occurred.  *Id.*

defense counsel stipulated that Lazar, a known methadone user, had last taken a daily dose of methadone on October 24, nearly a month before his interrogation, and was therefore not dependent on methadone to manage his addiction at the time of his interrogation.  That stipulation was wrong, in a significant way: Lazar had actually last taken methadone at 10:34 AM on November 18, the day before the interrogation began.[5]  And shortly after giving the second statement, Lazar complained of painful urination and was taken to the hospital, where he reported leg pain, shaking, dizziness, nausea, and diarrhea, and blood tests were positive for multiple anti-withdrawal benzodiazepines, cocaine, and marijuana.  Notations in the hospital records describe Lazar's appearance as "neat and appropriate" and "oriented," his demeanor "irritable but cooperative," and his speech "normal in tone, rate, and rhythm."  PCRA Hr'g Tr. 12:23-13:5.  Lazar was diagnosed with depression and hypertension, but of greatest significance is that he received anti-withdrawal drugs.  As a result of counsel's erroneous stipulation, the jury heard evidence relating to Lazar's hospital visit, but did not have the context of Lazar being in acute methadone withdrawal at the time of his 30-hour interrogation and confession.

      The five civilian witnesses also testified about statements Lazar made to them purportedly implicating himself in the murder.  But, as mentioned above, all five witnesses had various credibility issues.  Angely, Lazar's friend and roommate, had a theft conviction and only contacted the police about Lazar's statements after getting into a dispute with Lazar; two other witnesses had

---

[5] Methadone is categorized as an "essential" medicine by the World Health Organization.  Though one might assume that withdrawal from a medication used to treat addiction is less traumatic than withdrawal from an abused substance itself, that assumption is problematic.  Highly respected addiction specialists first questioned it over 25 years ago.  *See generally* Michael Gossop & John Strang, *A Comparison of the Withdrawal Responses of Heroin and Methadone Addicts During Detoxification*, 158 Brit. J. Psychiatry 697 (1991).  And a recent empirical study surveying 215 inmates reflected that 70 percent would rather endure unsupported withdrawal from heroin than methadone, and that the trauma of methadone withdrawal following arrest was so severe as to discourage future participation in methadone treatment.  *See generally* Jeannia J. Fu et al., *Forced Withdrawal from Methadone Maintenance Therapy in Criminal Justice Settings: A Critical Treatment Barrier in the United States*, 44 J. Substance Abuse Treatment 502 (2013).

pending robbery or theft cases against them at the time of trial; and the last two witnesses changed their stories on the stand.  One of the witnesses who changed his story, Mark Kedra, testified at trial that parts of his police statement had been fabricated by law enforcement and that Detective Baker had shown Lazar images of the scene when they first met in July, implying that Baker fed Lazar information about the crime.  In addition to these witnesses, the Commonwealth also relied upon Lazar's suitcase, found in Gutierrez's backyard 14 weeks after his murder, as the central piece of physical evidence tying Lazar to the scene.

Additionally, the Commonwealth fended off Lazar's counsel's attempts to introduce a defense of alternative suspects.  Instead, the Commonwealth portrayed Lazar as the lone suspect in a case with no other leads, telling the jury that, after Gutierrez was murdered, "the case goes cold, and it goes cold pretty fast."  Def.'s Resp. to Am. Pet., ECF 50 at 9.  Similarly, Detective Baker testified that "[a]ctually until shortly after July it was still an open case, but there was no information coming in at all."  Id. at 10.  When defense counsel tried to introduce evidence about Berrios and Rosa, the prosecutor stated that the evidence was "all hearsay, it was thrown out, it's irrelevant."  Id.  Thus, the jury never heard about them, undermining the theory that drug dealers in the neighborhood had an interest in Gutierrez's death.  The jury convicted Lazar of second-degree murder, robbery, and possession of an instrument of crime.

### D.  Post-Conviction Proceedings

Lazar sought state post-conviction review, raising claims including ineffective assistance of counsel for his attorney's erroneous stipulation about when he had last taken methadone.  Am. Pet., ECF 48 at 9-10.  Lazar's post-conviction counsel also requested discovery from the Commonwealth about the anonymous tip inculpating Berrios and Rosa, seeking more information about who the tip came from and whether that individual had more information about the crime itself.  Id. at 10; Pet'r App. 44-45.  The District Attorney's Office ("DAO"), on behalf of the

Commonwealth, told the PCRA court in response that "the police already investigated these two people and ruled them out." Pet'r App. 51.

After a limited evidentiary hearing, the PCRA court agreed with Lazar that his counsel had been deficient in making the methadone-dosage-date stipulation but found no prejudice under *Strickland*. Am. Pet., ECF 48 at 10.  In addition to considering the evidence before the jury, the court heard competing expert testimony on the effects of methadone withdrawal and observational testimony from the interrogating detectives about Lazar's physical and mental state.  ECF 25 at 4. Both experts agreed that an individual suffering from withdrawal could still give a voluntary statement, but they disagreed about how fast withdrawal symptoms (such as nausea, runny eyes and nose, and restlessness) set in: Lazar's expert said it happened within a 24-to-36-hour window, while the Commonwealth's expert said it took longer, up to 50 hours.  *Id.*  Lazar's expert, Dr. George Woody, from the University of Pennsylvania Center for Studies of Addiction, testified that Lazar was on a high dose of methadone, that he was in withdrawal, and that his being in withdrawal undermined the reliability of the confession.  *Id.*  The detectives, for their part, testified that Lazar did not appear sick until just before he was taken to the hospital.  *Id.*  The court, however, gave the most weight to the notations in the hospital records.  *Id.*

The court ultimately concluded that even if the jury had been armed with all the new evidence and the correct methadone-dosage date, there was still no reasonable probability that the outcome of the trial would have been different.  As to Lazar's confession, the court stated, "[a]t best, [the jury] would have heard from competing experts that the defendant was experiencing an unknown quantum of withdrawal symptoms during the taking of his statements."  Tr. 15:8-11. Moreover, the court found that even disregarding Lazar's confession, there was "overwhelming evidence of guilt," Tr. 15:20-21 – namely, the implicating statements he made to the five

individuals who testified at trial.  The Superior Court affirmed, and the Pennsylvania Supreme Court denied Lazar's petition for review.

On December 5, 2014, Lazar filed a habeas petition in this Court, arguing the state court's decision was unreasonable because it failed to consider the entire record in making its prejudice determination.  ECF 1.  Lazar claimed, among other things, that the state court had unreasonably failed to account for evidence of a different suspect, Victor Berrios, in its prejudice determination. Pet'r Answer to Def's Resp., ECF 9 at 18.  The Commonwealth dismissed this argument, asserting that any leads to other suspects had come up as "dead-ends."  Def.'s Sur-Reply, ECF 12 at 20. Magistrate Judge Faith Angell concluded in her Report and Recommendation ("R & R") that the habeas petition should be denied and that no certification of appealability should be issued.  ECF 18.  In response to Lazar's objections to the R & R, the Commonwealth again stated that it had eliminated Berrios as a suspect: "Victor Barrios [sic], a local drug dealer on whom petitioner now wishes to pin the murder, was one of the initial non-fruitful leads police investigated.  The victim had been known to chase drug dealers from his front steps, but the evidence showed Barrios [sic] was not involved."  Def.'s Resp. to Pet'r's Objs., ECF 23 at 12.  I adopted the R & R in part, denying Lazar's habeas petition due to the "exceedingly deferential framework imposed by 28 U.S.C. § 2254(d)," but issuing him a certificate of appealability.  ECF 25 at 2.  In my memorandum, I expressed deep concern about the PCRA court's prejudice analysis, observing that the court did not account for the reliability of a confession elicited from someone suffering acute withdrawal.

Lazar appealed my decision to the Third Circuit, again raising claims which included the failure to consider Berrios as a viable alternative suspect in the prejudice analysis.  Pet'r App. to Mot. for Relief Under 60(b), ECF 33-2 at 11.  Yet again, the Commonwealth in response stated

that Mr. Berrios "was *quickly eliminated* as a suspect" and that, while Mr. Lazar has referred to Berrios as an alternative suspect, "[t]hat is false and was resolved against him at trial." *Id*. at 41 (emphasis added).  After oral argument, the Third Circuit denied relief.  *Lazar v. Superintendent Fayette SCI*, 731 F. App'x 119 (3d Cir. 2018).  Referring to Berrios, the Circuit noted that "Lazar also argues that the police recovered a machete from another person.  This matters little, as this weapon was rusty and the police *eliminated the owner* as a suspect."  *Id.* at 123, n.5 (emphasis added).

### E.  Newly Discovered Evidence

Several pieces of new evidence were discovered when the DAO turned over the homicide and prosecution files to Lazar's post-conviction team in 2021.  For the sake of brevity, I will only summarize those pieces of evidence relevant to the claims I address below.

#### 1.  *Evidence revealing the minimal investigation of Berrios and Rosa*

In 2021, defense counsel received several pieces of "previously undisclosed evidence showing that Berrios and Rosa did not appear to have been excluded as suspects" in the murder. Def's Resp. to Am. Pet., ECF 50 at 13.  First, in April 2021, in response to an evidence-search request, the PPD informed defense counsel that Rosa's black Honda Accord had been auctioned in March 2007, just two months after the car was seized from Berrios' home.  Pet'r App. 141. Then, in September 2021, the Conviction Integrity Unit ("CIU") at the Philadelphia DAO disclosed the homicide and prosecution files to defense counsel.  Within those files, counsel found a previously undisclosed memorandum revealing that, two weeks after the car was seized, PPD determined that it was "no longer needed in [their] investigation" and requested that the "vehicle be released to the authorized owner/agent."  *Id.* at 324.  No item in the file, however, suggested that the vehicle had ever been subject to any search, examination, or testing for forensic evidence.

When the Commonwealth reviewed the homicide and prosecution files, it conceded that "the PPD failed to take sufficient steps to exclude Berrios and Rosa as suspects, and that the DAO may have been aware of this fact." Def.'s Resp. to Pet'r's 60(b) Mot., ECF 38 at 8. Troublingly, as early as 2012, the chief of the DAO's PCRA unit wrote in an assignment memo that "there is no evidence police even investigated other suspects" in Lazar's case, yet the Commonwealth continued to repeatedly represent to the courts that other suspects had been affirmatively investigated and eliminated. *See* Ex. A to ECF 38; Pet'r App. 513. The Commonwealth further admitted:

> Not only did PPD auction Rosa's car without examining it, but PPD apparently did not compare Berrios or Rosa's DNA with samples taken from the murder scene. Only minimal testing was conducted on the machete, crowbar, and two pairs of boots recovered from Berrios's residence and the results were inconclusive. Fingerprints taken from Berrios, Rosa, Lazar, and several other individuals were compared to a latent print recovered from the crime scene, but no match was found for any of the individuals. There is no indication in the homicide or prosecution file that police conducted tests for [the victim's] DNA or matching fibers. Finally, there is no evidence in the files that police interviewed Berrios or Rosa. In short, there is little in the homicide or prosecution file to support the conclusion that Berrios or Rosa were excluded as suspects or that they were "dead ends."

Def.'s Resp. to Pet'r's 60(b) Mot., ECF 38 at 9.

### 2. *Tips about other suspects that were never investigated*

In addition, the Commonwealth's assertion that it had no leads before it found Lazar's suitcase is belied by numerous tips about specific drug dealers in Mr. Gutierrez's neighborhood found in PPD's homicide file. For example, a confidential informant contacted the police about Leon Ryans, an alleged drug dealer in Gutierrez's neighborhood, who purportedly stated that he "beat down an old head." Pet'r App. 356. A deeper dive into Ryans' history revealed that he was involved in drug sales and had been convicted of two violent crimes, including one for home

invasion and assault during which Ryans struck the victim in the head repeatedly with a florescent light and a crowbar.  There is no evidence that PPD ever interviewed Ryans in connection with its investigation after Gutierrez's death.

Likewise, on February 20, 2007, a woman named Holly ("Stacey") McBride reported that a drug dealer named Michael Bozyk believed that Gutierrez was murdered because he was "snitching on the boys selling" drugs in his neighborhood.  *Id.* at 438-39.  She also provided the names of two other drug dealers from the area who may have been involved.  *Id.*  But Lazar's counsel was not provided with the details of McBride's report and was informed only that McBride had been transported to the homicide unit for an interview.  Am. Pet., ECF 48 at 48.  Investigating officers also seemed to focus on two other potential suspects – Hector Valentin and Melvin Martinez – who sold drugs at the intersection outside of Mr. Gutierrez's home.  Pet'r App. 441-45, 491.  Significantly, this evidence plainly contradicts Detective Baker's trial testimony that "no tips" were coming in during the weeks immediately following Mr. Gutierrez's murder, or that the case was cold until Lazar's suitcase was found in July 2007.

3.  *Evidence about instances of misconduct on the part of an investigating detective*

Finally, the CIU also made several disclosures regarding the misconduct history of Detective Baker, who oversaw the investigation into Lazar.  First, the Commonwealth disclosed that, in 1998, PPD Internal Affairs sustained a finding of misconduct against Detective Baker after he denied a person in custody legal representation, even though the individual had invoked their right to counsel.  *Id.* at 185.  Baker admitted that he had been attempting to "convince" the individual to "become a Commonwealth witness by having him admit to his part in these murders." *Id.*

Second, the Commonwealth disclosed stipulations it made in 2021 revealing misconduct that Detective Baker committed in connection with the 2003 investigation and conviction of Lavar

Brown.  In that case, the Commonwealth failed to disclose that Detective Baker held an aborted proffer session with a key witness, which he ended because he believed that witness "provided a false account of the crime."  *Id.* at 231.  Thereafter, when Detective Baker held a second proffer session with the witness, he proceeded to record the statement, which was then disclosed to the defense.  *Id.*  At trial, both the witness and Detective Baker claimed that the witness's second statement was her first and only statement given to law enforcement.  *Id.* at 232.  In fact, the Commonwealth represented to the trial court that the witness could not have known any details of the crime unless she had been a direct witness, because the detective had only spoken to her once. *Id.* at 234-36.  Detective Baker then falsely testified that he had not spoken to the witness until the second proffer session.  *Id.* at 237-38; *see* Am. Pet., ECF 48 at 72-73.

Lastly, in the exoneration of Chester Hollman, a man who served 28 years for a murder he did not commit, the Commonwealth conceded that Detective Baker used coercive interrogation tactics in his 1991 investigation of the underlying crime.  The Commonwealth stipulated that, while investigating Hollman's post-conviction case, Detective Baker had prepared a statement for a potential witness named Tiffany Jones which was withheld from the defense.  In the statement, Jones purportedly admitted to being present during the crime but, when asked to sign the statement, she refused and instead wrote out "This Story is a Lie. T.J."  Pet'r App. 219.  Another witness, who made an inculpatory statement about Hollman initially, testified later that she only made that statement after being "denied the right to counsel," "held in a homicide interview room for many hours," "coerced through threats of prosecution," and told that Hollman "was a member of the mob and posed a physical danger to her."  *Id.* at 199-200, 214.[6]  The Commonwealth eventually found that DNA testing strongly suggested that Hollman was innocent, leading to his exoneration.

---

[6] Detective Baker rebutted that testimony, stating that the witness was not threatened, coerced, or denied an attorney.  *Id.* at 214.

**F.  Rule 60(b)**

On April 27, 2022, Mr. Lazar moved to set aside the final order and judgment denying habeas corpus relief in this matter pursuant to Federal Rule of Civil Procedure 60(b).  ECF 33.  In response, the Commonwealth conceded that it made misrepresentations to this Court that warranted relief for Mr. Lazar.  *See* Def.'s Resp. to Pet'r's 60(b) Mot., ECF 38 at 1 ("Had the courts known the truth – that detectives did not appear to have taken sufficient steps to eliminate alternative suspects – it is possible that the courts would have resolved Lazar's claims in his favor.").  After close consideration of the applicability of Rule 60(b) in this context, I granted Mr. Lazar's motion, reopening these habeas proceedings.  ECF 46.

## II.  Standard of Review

### A.  Exhaustion

"Without an express waiver by the state, a federal court is allowed under 28 U.S.C. § 2254(b)(1)(A) to grant a state prisoner's habeas petition only if the petitioner has exhausted all available state remedies.  In order to satisfy the exhaustion requirement, a federal habeas claim must have been 'fairly presented' to the state courts."  *Bronshtein v. Horn*, 404 F.3d 700, 725 (3d Cir. 2005) (citing *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  To be "fairly presented," the petitioner must "present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted."  *Id.* (citing *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999)); *see Duncan v. Henry*, 513 U.S. 364, 366 (1995) (stating that "mere similarity of claims is insufficient to exhaust").

But exhaustion is not a jurisdictional bar – it is a waivable defense.  *See* 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement."); *see also Sharrief v. Cathel*, 574 F.3d 225, 228-30 (3d Cir. 2009) (requiring the

state to expressly waive the exhaustion requirement but not mandating any "magic words").  Here,

the Commonwealth has expressly waived the exhaustion requirement as to Petitioner's claims two

and four.  Def.'s Resp. to Am. Pet., ECF 50 at 19-20.  As to claim one, the parties agree that the

claim has been fairly presented to the state court.

### B.  Ineffective Assistance of Counsel

To determine whether a petitioner may prevail on a claim alleging ineffective assistance of

counsel, courts follow the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668

(1984).  First, the petitioner must show that counsel's performance was deficient, such that their

errors "fell below an objective standard of reasonableness" and "were so serious that counsel was

not functioning as the 'counsel'" constitutionally guaranteed to criminal defendants.  *Id.* at 687-

88.  Second, the petitioner must show that the deficient performance was prejudicial.  *Id.* at 687.

This requires showing that counsel's errors "were so serious as to deprive the defendant of a fair

trial, a trial whose result is reliable."  *Id.*  To determine prejudice, the court must decide whether

there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different."  *Id.* at 694; *see also Smith v. Robbins*, 528 U.S. 259, 285-

86 (2000).  On the other hand, counsel cannot be found ineffective for "failing to raise a meritless

argument."  *Real v. Shannon*, 600 F.3d 302, 309 (3d Cir. 2010) (citing *Parrish v. Fulcomer*, 150

F.3d 326, 328 (3d Cir. 1998)).

### C.  Merits review of federal habeas claims

Under federal habeas law, review of a state court conviction is limited in nature and relief

may only be granted in two circumstances.  First, relief may be granted where the state court's

adjudication of a claim asserted in a habeas petition "resulted in a decision contrary to, or involved

an unreasonable application of, clearly established federal law, as determined by the Supreme

Court of the United States."  28 U.S.C. § 2254(d)(1).  Under the "contrary to" clause, a federal

court may grant a habeas petition "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Under the "unreasonable application" clause, a federal court may grant the petition if the state court used the proper legal principle from federal law but applied that principle to the facts of the case in a manner that is objectively unreasonable.  *Id*. at 413. Significant deference is owed to state court adjudication of an issue by the federal habeas court, but "deference does not imply abandonment or abdication of judicial review."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

The second circumstance in which habeas relief may be granted occurs when the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2). Similarly, this standard is "demanding but not insatiable."  *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

## III.   Discussion

Mr. Lazar presents nine claims for relief in his amended habeas petition.  Due to the *Brady* violations and the Commonwealth's misrepresentations to this Court and others, it has conceded that Lazar is entitled to relief on his first, second, and fourth claims.  *See* Def.'s Resp. to Am. Pet., ECF 50 at 3.  Having carefully reviewed the parties' submissions and having prior familiarity with this case by virtue of having denied his initial habeas petition, I conclude that that Mr. Lazar is entitled to relief on these three claims.[7]

---

[7] Because I find claims one, two, and four warrant relief, I do not reach Mr. Lazar's remaining claims.  In addition to the three claims addressed here, Mr. Lazar's remaining six claims include: (1) newly disclosed *Brady* evidence demonstrates that a witness, Sarn Wilson, received favorable treatment in exchange for his

**A. The PCRA court unreasonably determined that Mr. Lazar was not prejudiced by counsel's erroneous stipulation about the timing of his last dose of methadone.**

In Mr. Lazar's first claim, he argues that the state court's ruling that he was not prejudiced by his trial counsel's failure to obtain, review, and present records to the jury about his state of withdrawal at the time of his confession was unreasonable.  Am. Pet., ECF 48 at 37-38; *see Commonwealth v. Lazar*, No. 2191 EDA 2013 (Pa. Super. Ct. July 23, 2014), ECF 1 at 29-30, 33 (noting that while the PCRA court found trial counsel's erroneous stipulation resulted in a deficient performance under *Strickland*, Lazar could not establish prejudice because the five civilian witnesses established "overwhelming evidence of guilt").  When Lazar first argued prejudice in this federal habeas proceeding, he contended that the state court unreasonably failed to consider the entire record, including (1) his confession's reliability, separately from its voluntariness, (2) the lack of credibility of the five witnesses who testified against him, and (3) evidence of alternative suspects.  In response, the Commonwealth characterized any argument about alternative suspects as "the classic strategy of trying to pin the crime on another person by mentioning initial police investigat[ive] leads that were dead-ends."  Def.'s Sur-Reply, ECF 12 at 20.  After a magistrate judge issued a Report and Recommendation, the Commonwealth reemphasized this point, stating that "Victor Berrios, a local drug dealer on whom petitioner now wishes to pin the murder, was one of the initial non-fruitful leads police investigated . . . the evidence showed Berrios was not involved."  Def.'s Resp. to Pet'r's Objs., ECF 23 at 12.  I

---

testimony; (2) newly disclosed *Brady* evidence includes a crime scene photograph of an empty plastic chair in the victim's backyard *without* Lazar's suitcase, undermining the only physical evidence tying Lazar to the scene and impeaching Detective Baker's testimony about PPD's investigation of the backyard; (3) newly disclosed *Brady* evidence shows that PPD had sustained a finding of physical abuse again Detective Rossiter, who took Lazar's statement; (4) the Commonwealth's failure to disclose critical evidence and Detective Baker's false testimony both render the conviction unreliable and violate Mr. Lazar's right of due process; (5) the cumulative effect of the suppressed evidence undermines confidence in the verdict; and (6) Mr. Lazar is innocent.

therefore placed little weight on Lazar's argument about alternative suspects when reviewing his original petition.

Noting the exceedingly deferential AEDPA framework, I denied Lazar's petition. Nonetheless, I expressed profound concerns about the state court's prejudice analysis. Now, having been granted the opportunity under Rule 60(b), Lazar presents this claim again alongside the Commonwealth's concession that it misrepresented the record when it stated to this Court that law enforcement had investigated and excluded Berrios and Rosa as suspects. Lazar thus requests that I reconsider the issue of prejudice absent the Commonwealth's misrepresentations. Upon a review of the record free of the Commonwealth's distortions, I find that the scales tip in Lazar's favor, and federal habeas relief is warranted.

Before I address the merits of Lazar's claim, I must address the matter of exhaustion. The parties agree that because Lazar does not ask me to consider any new evidence in deciding this claim, and only requests that I consider the claim uncorrupted, the point has been properly exhausted. *See* Am. Pet., ECF 48 at 28-29, 41 n.6; Def.'s Resp. to Am. Pet., ECF 50 at 19. I will follow this course but note that, to the extent that the Commonwealth argues it is proper for me to address this claim, I take its position to be the equivalent of an express waiver.[8]

Given the unusual posture of this case, the clearest way to approach the analysis is to recapitulate my earlier discussion of prejudice, and then consider whether my final conclusion is different in the absence of the Commonwealth's misrepresentations. Previously, I observed that

---

[8] The state court has not been given an opportunity to review this claim free of the Commonwealth's misrepresentations. *See* Pet'r App. 52 (showing that the Commonwealth asserted to the state court that "the police already investigated [Berrios and Rosa] and ruled them out"). But for present purposes, as to claim one, the question is one of reconsideration of this Court's previous analysis on prejudice. I also note that, aside from the Commonwealth's concession that such reconsideration is proper because of its misrepresentations, Lazar's second claim, for which the Commonwealth has expressly waived exhaustion, involves essentially the same issue – the failure to disclose the limited nature of the investigation into alternative suspects.

an individual is even more likely to be prejudiced by their counsel's deficient performance when the tainted evidence is a confession.  A voluntary confession has "always ranked high in the scale of incriminating evidence," *Bram v. United States*, 168 U.S. 532, 544 (1897), and is "among the most effectual proofs in the law."  *Hopt v. Utah*, 110 U.S. 574, 584-85 (1884).  A defendant's voluntary confession has a "profound impact on the jury" and "is probably the most probative and damaging evidence that can be admitted against him."  *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (citations omitted).  But a confession is only entitled to carry such weight when it is voluntary *and* reliable.  *See Smith v. United States*, 348 U.S. 147, 153 (1954) ("Moreover, though a statement may not be 'involuntary' within the meaning of this exclusionary rule, still its reliability may be suspect if it is extracted from one who is under the pressure of a police investigation – whose words may reflect the strain and confusion attending his predicament rather than a clear reflection of his past.").  Indeed, both voluntariness and reliability are critical, as it is well accepted that a person can give a voluntary but false confession.  *See e.g.*, Fadia M. Narchet et al., *Modeling the Influence of Investigator Bias on the Elicitation of True and False Confessions*, 35 L. & Hum. Behav. 452, 452 (2010) (explaining that "modern day, psychologically based interrogation practices can lead individuals to provide false confessions for crimes that they did not commit.").

Here, even assuming Mr. Lazar's confession may have been voluntary, his experiencing methadone withdrawal – which required treatment when he was taken to the hospital at the end of his 30-plus-hour interrogation – significantly undermines his confession's reliability.  *See In re Gault*, 387 U.S. 1, 44-45 (1967) ("[U]nder certain stresses a person, especially one of defective mentality or peculiar temperament, may falsely acknowledge guilt."); *Crane v. Kentucky*, 476 U.S. 683, 689 (1986) ("[T]he physical and psychological environment that yielded the confession can

also be of substantive relevance to the . . . defendant's guilt or innocence."). As I stated in my 2017 memorandum, it is not a new idea that someone whose mental and emotional faculties are impaired by methadone withdrawal could freely give a false confession.[9] Nor is it a new idea that when the confession is given during "prolonged and persistent" interrogation, as Lazar's was here, the confession is even less reliable. *Ashcraft v. Tennessee*, 322 U.S. 143, 161-62 (1944) (Jackson, J. dissenting). As also noted previously, it is therefore difficult to conclude that there is no "reasonable probability" that "the result of the proceeding would have been different" had the jury known of Lazar's state during the interrogation and heard from an expert on the impacts of methadone withdrawal. *Strickland*, 466 U.S. at 694.

In addition, in characterizing the testimony of the five witnesses who testified against Lazar as providing "overwhelming evidence" of guilt, the state court overstates the record because of the witnesses' various credibility problems. As previously described, one witness, Lazar's friend and roommate, had a theft conviction and only contacted the police after getting into a dispute with Lazar; two witnesses had felony proceedings pending during Lazar's trial; and, perhaps most importantly, two witnesses recanted or changed their story on the stand.

---

[9] In one study, "it was found that police detainees' claims of having consumed illicit substances during the 24 hours preceding their arrest was the single best psychological variable that predicted the likelihood of a confession being made in interview. These findings highlight the importance of drug withdrawal as a factor that may motivate some drug addicts to make a confession, which may on occasions prove to be false. One explanation for such findings is that drug withdrawal leads to mental states which limit the drug addict's ability for rational thinking and autonomy." Gisli H. Gudjonsson et al., *The Relationship of Alcohol Withdrawal Symptoms to Suggestibility and Compliance*, 10 Psych., Crime & L. 169, 169 (2005); *see* S.E. Davison & D.M. Forshaw, *Retracted Confessions: Through Opiate Withdrawal to a New Conceptual Framework*, 33 Med. Sci. & L. 285, 285 (1993) (explaining that the circumstances of interrogating a person experiencing withdrawal "are such that the suspect could be more likely to give an unreliable confession"); Stephanie Madon et al., *How Factors Present During the Immediate Interrogation Situation Produce Short-Sighted Confessions Decisions*, 37 L. & Hum. Behav. 60, 61 (2013) (explaining that preexisting vulnerabilities, like the impulse to end withdrawal symptoms, impacts a suspect's reasoning capabilities during an interrogation and "increase[es] the chances that even innocent suspects might confess").

Lastly, Lazar argues that the state court unreasonably failed to consider the presence of alternative suspects, further undermining its prejudice analysis.  As of 2017, applying the required deference standard, I denied relief in part because the Commonwealth buttressed its position with its argument that other suspects had been ruled out and that Lazar was the only credible suspect. But, as discussed above, soon after Gutierrez was killed, PPD began learning about Gutierrez's ongoing disputes with drug dealers in his neighborhood.  Then, an anonymous source informed law enforcement that two known drug dealers, later confirmed to be Berrios and Rosa, entered Gutierrez's home.  The informant stated that Berrios and Rosa were able to enter Gutierrez's home without breaking in by sending a female companion to knock first, who left the front door unlocked when she was let in.  The tipster added that the men drove a black Honda Accord when they did "their jobs."

When the argument about alternative suspects was presented to me in 2017, it was countered by the Commonwealth's misrepresentations that any other investigative leads were "dead ends" and "non-fruitful," and that "evidence showed that [those initial suspects were] not involved" in the crime.  Def.'s Resp. to Am. Pet., ECF 50 at 14; Def.'s Sur Reply, ECF 12 at 20. Even still, at that time, I stated that the factors in front of me "strongly suggest that the deficient performance of Lazar's trial counsel was prejudicial."  ECF 25 at 8.  Now, with a record free of distortions and the ability to properly appraise all of Lazar's arguments, I find that the state court's ruling of no prejudice, which failed to consider the reliability of Lazar's withdrawal-tainted confession, the credibility issues of the Commonwealth's witnesses, and the presence of alternative suspects, cannot be said to have been based on a reasonable application of the law to the facts

under § 2254(d)(1).[10]  That is so because the reasonableness of any legal analysis is necessarily undermined when it is performed on the basis of a tainted set of facts – a set of facts which, in this case, was polluted by the Commonwealth's repeated misrepresentations about a purportedly conclusive investigation into Berrios and Rosa.  In short, given that my earlier analysis as to the existence of prejudice resulted in an extremely close call, having reconsidered that analysis with a distortion-free record, I am persuaded that a finding of unreasonableness under § 2254(d)(1) is the correct outcome.

Having found the state court's application of law to fact unreasonable, I must review the claim de novo.  *See Breakiron v. Horn*, 642 F.3d 126, 138 (3d Cir. 2011) ("If we determine that the Pennsylvania Supreme Court's ruling was contrary to or an unreasonable application of *Strickland*, then we still must review the claim de novo to determine whether [Petitioner] is entitled to relief.").  There is no dispute that counsel's errant stipulation constitutes deficient performance.  And, as I stated even before learning of the Commonwealth's misrepresentations, I would have found that Lazar was prejudiced by counsel's mistakes because the tainted evidence is an unreliable confession, and especially so in light of the minimal physical evidence and effectively impeached witness testimony from Lazar's trial.  Importantly, the Commonwealth heavily relied on the confession throughout its presentation and, most significantly, in its closing argument.  *See United States v. Brownlee*, 454 F.3d 131, 148 (3d Cir. 2006) ("[I]t is difficult for the Government to argue with effect that the admission of the confession did not contribute to Brownlee's conviction when it submitted just the opposite view to the jury during the trial.").  I

---

[10] The Petitioner asserted that the state court's ruling was unreasonable under § 2254(d)(2), and the Commonwealth argued that the ruling was unreasonable under both § 2254(d)(1) and (d)(2).  I find a ruling on § 2254(d)(1) more appropriate, especially because the state post-conviction court did not know at the time that the Commonwealth was misrepresenting the extent of its investigation into alternative suspects. I thus find that, although the PCRA court identified the correct legal principle, it unreasonably applied that principle in its prejudice analysis.  *See Williams*, 529 U.S. at 409-13.

thus find upon de novo review that Lazar's counsel's performance was deficient, and that counsel's error resulted in prejudice.  Consequently, I will grant habeas relief as to Lazar's first claim.

### B.  The Commonwealth withheld *Brady* evidence, warranting habeas relief.

Lazar's second and fourth claims involve admitted due process violations.  Under *Brady v. Maryland*, 373 U.S. 83 (1963), "the prosecution's suppression of evidence favorable to a criminal defendant violates due process when the evidence is material to guilt or punishment."  *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006).  "Prosecutors have an affirmative duty 'to disclose [*Brady*] evidence . . . even though there has been no request [for the evidence] by the accused,' which may include evidence known only to police."  *Dennis v. Sec'y, Pa. Dep't Corr.*, 834 F.3d 263, 284 (3d Cir. 2016) (quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999)).  "To establish a *Brady* violation, it must be shown that (1) evidence was suppressed; (2) the evidence was favorable to the defense; and (3) the evidence was material to guilt or punishment."  *Risha*, 445 F.3d at 303 (citing *Brady*, 373 U.S. at 87).  Favorable evidence may include exculpatory as well as impeaching evidence, and evidence used to "attack . . . the thoroughness and even the good faith of the investigation."  *Kyles v. Whitley*, 514 U.S. 419, 445 (1995); *see Dennis*, 834 F.3d at 284.  Evidence is material when "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different" or when the disclosure "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Cone v. Bell*, 556 U.S. 449, 469-70 (2009); *Kyles*, 514 U.S. at 435.  "In judging materiality in a case involving multiple *Brady* violations, the Supreme Court has mandated that the effect of the violations should be 'considered collectively, not item by item.'"  *Simmons v. Beard*, 590 F.3d 223, 234 (3d Cir. 2009) (citing *Kyles*, 514 U.S. at 436).

Here, the Commonwealth concedes that it violated Lazar's due process rights by failing to disclose evidence about (1) the lack of investigation into alternative suspects Berrios and Rosa and

(2) Detective Baker's history of misconduct.[11]  After my own review of the suppressed evidence and Lazar's claims, I agree that the Commonwealth violated Lazar's due process rights under *Brady*.  Thus, Mr. Lazar's amended petition is granted on claims two and four as well.

### 1.  Alternative suspects

At Mr. Lazar's trial, his counsel sought to argue that Berrios and Rosa were viable alternative suspects.  Counsel had some scant evidence tying Berrios and Rosa to the crime – the confidential informant's tip, stating that the two dealers entered Gutierrez's home behind a female companion and that they use a black Honda Accord "when they [did] their jobs," as well as a search warrant and property receipt, indicating that Berrios' home was searched and Rosa's black Honda Accord was seized.  In addition, Berrios and Rosa were known drug dealers in Gutierrez's neighborhood, and another witness had testified that Gutierrez had an ongoing dispute with local dealers conducting business on his front steps.  But any attempt to raise these arguments was swiftly shut down by the Commonwealth, as Detective Baker and the prosecutor maintained throughout that there were hardly any leads in the weeks following Gutierrez's murder and that any tips that did come in were deemed "irrelevant."  The Commonwealth sustained this narrative during Lazar's post-conviction proceeding as well, representing to both the state and the federal habeas court that these suspects were "dead ends" and that PPD had "ruled them out."

Lazar now argues that the previously undisclosed files from the PPD and DAO show that the Commonwealth did not effectively rule out either individual as a suspect in Gutierrez's murder.  Indeed, an internal memorandum from the file requests that Rosa's Honda Accord be released to its owner just two weeks after it was seized, without any record of an examination or forensic testing, let alone a basic search of its contents.  Pet'r App. 324.  A later email from PPD further

---

[11] As discussed above, the Commonwealth has expressly waived the affirmative defense of exhaustion as to these claims.

reflects that the vehicle was sold at auction about five weeks after the memorandum requesting its release. *Id.* at 140. In addition to failing to search the car or run any forensic testing on it, law enforcement neglected to interview Berrios and Rosa; conducted only minimal testing yielding inconclusive results – which did not include testing for matching fibers, touch DNA, or Gutierrez's DNA – on the items seized from Berrios' residence; and failed to compare Berrios' and Rosa's DNA with samples taken from the murder scene. Any indication that these suspects had been "ruled out" is therefore unsupportable.[12] In fact, even in 2012 – just two years after Lazar's trial – a DAO attorney wrote in an internal memorandum that "there is no evidence police even investigated other suspects." *Id.* at 513. As I discuss below, I conclude that this previously undisclosed evidence meets the *Brady* standard and warrants relief.

The first two prongs of *Brady* are readily demonstrated. First, the memorandum on Rosa's car and the dearth of any investigation into Berrios and Rosa were withheld. *See Strickler*, 527 U.S. at 282 (noting that evidence may be suppressed "either willfully or inadvertently"). The prosecutor and the police repeatedly maintained that Berrios and Rosa had been ruled out and that the case went cold before finding Lazar's suitcase, and Lazar's counsel was entitled to take them at their word. As Petitioner argues, the evidence needed to undermine this narrative was withheld from the defense. Am. Pet., ECF 48 at 60-61. And, while there is no requirement that Petitioner demonstrate diligence to make out a *Brady* claim, Lazar has well documented his attempts to obtain additional information about the investigation into these suspects. *See Dennis*, 834 F.3d at 290

---

[12] Moreover, as discussed in my recitation of the facts, the records reveal several other tips and leads that went unexplored by law enforcement in the investigation following Mr. Gutierrez's death, including into several other neighborhood drug dealers who had reason to be disgruntled with Gutierrez. Am. Pet., ECF 48 at 47-56. In its analysis, the Commonwealth did not take a position as to the impact of this evidence, finding that withheld evidence of the minimal investigation into Berrios and Rosa was enough to warrant relief under *Brady*. But the other evidence withheld would also have provided fertile ground for cross-examination of the lead detective at trial.

("[T]he United States Supreme Court has never recognized an affirmative due diligence duty of defense counsel as part of *Brady* . . . [t]o the contrary, defense counsel is entitled to presume that prosecutors have 'discharged their official duties.'"); Pet'r App. 83-92, 137-41 (documenting Lazar's Freedom of Information Act request and litigation, and counsel's request to PPD).  Second, the evidence was favorable to Lazar, as it would have allowed counsel to impeach Detective Baker's testimony about "irrelevant" leads from early in the case, and would have bolstered Lazar's theory that there were other viable suspects for the murder.  *See Dennis*, 834 F.3d at 286 (finding "exculpatory and impeachment evidence that would have bolstered [Petitioner's] alibi" to "easily" meet *Brady*'s first prong); *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (noting that favorable evidence can be exculpatory or impeaching).

Finally, this evidence is material, as there is a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  *Cone*, 556 U.S. at 469-70; *Kyles*, 514 U.S. at 435.  Because of the Commonwealth's suppression, the jury never learned that evidence related to Berrios and Rosa had been collected but not reasonably tested.  Competent counsel would have impeached Detective Baker's testimony that there were no leads prior to April 2007 with evidence that the Commonwealth failed to take necessary affirmative steps to rule out these two suspects, both who had a motive that aligned with witness testimony regarding Gutierrez's disputes with neighborhood drug dealers.  *See Dennis*, 834 F.3d at 296, 311 (finding suppressed evidence of alternative suspects as well as impeachment evidence to be material under *Brady*).  And, when the failure to rule out viable, alternative suspects is compounded by the government witnesses' severe credibility problems and the minimal physical evidence tying Lazar to the scene, a reasonable probability emerges that this evidence would have changed the result of the proceeding.  Lazar is thus entitled to relief on this claim.

25

2. *Detective Baker's misconduct history*

Additionally, the Commonwealth violated *Brady* when it failed to turn over evidence of past incidents of Detective Baker's misconduct, all which could have been used to effectively impeach his testimony. As summarized above, this misconduct history includes three significant instances:

1. In 1998, PPD Internal Affairs found that Baker committed misconduct when he denied a suspect access to counsel during an interrogation where Baker was seeking a confession;

2. In the 1991 investigation of Chester Hollman, later shown to have been wrongfully convicted, Detective Baker used coercive interrogation tactics that included fabricating a witness statement and urging the witness to sign it; and

3. In the 2003 investigation of Lavar Brown, another wrongful conviction, Detective Baker failed to disclose an initial contradictory witness statement and later testified that he had only interviewed the witness once.

Pet'r App. 184-220, 232-71. Significantly, these instances – all of which predate Lazar's 2010 trial – center on Baker's treatment of suspects and witnesses in custody, and his willingness to testify falsely about his dealings with them to buttress the prosecution's case.

Once again, the first two prongs of *Brady* are clearly met. The Commonwealth knew of Detective Baker's history of misconduct prior to Lazar's trial and did not turn it over. *See Strickler*, 527 U.S. at 280-82 (confirming that even evidence "known only to police investigators and not to the prosecutor" can still be the basis of *Brady* material). Between the Internal Affairs finding, the Hollman witness who wrote "This is a Lie" on Baker's fabricated statement, and Baker's apparently false testimony in Brown's case over a witness's conflicting statements, the Commonwealth had relevant information on Baker's prior misconduct that it did not disclose. Further, because that information could have been used to impeach Detective Baker on the stand,

it is favorable evidence under *Brady*'s second prong.  *See id.* at 281-82 (noting that favorable evidence can be exculpatory or impeaching).

Lastly, the suppressed, favorable evidence of Detective Baker's misconduct is material, such that it would have "undermine[d] confidence in the outcome of the trial," in part because Baker's testimony was so critical to the Commonwealth's case.  *Dennis*, 834 F.3d at 285 (quoting *Kyles*, 514 U.S. at 434).  At Lazar's trial, the Commonwealth argued that his confession proved his guilt because it included information about the crime that he could not have known if he had not committed it himself.  To bolster this point, the prosecutor asked Detective Baker on the stand whether he told Lazar any information about the crime, type of weapon, or items found inside Mr. Gutierrez's home during their initial meeting in July 2007.  Am. Pet., ECF 48 at 73.  Detective Baker testified, "[w]hen we speak to witnesses we don't give them information," and that "we don't give out information [to suspects], we get information."  *Id.*  In closing, the prosecutor repeated that Baker's initial meeting with Lazar was "short and sweet," and that Baker did not tell Lazar "any other details about the crime."  *Id.* at 75.  Moreover, the prosecutor bolstered Baker's testimony at certain points during the trial, stating that Baker and his team were not going to "risk their over a hundred years of experience, all of their lives, their livelihood, their pension, their family lives and lie" on the stand.  *Id.*

Had the defense been armed with the suppressed evidence of Baker's misconduct, it could have effectively combatted this argument and testimony.  Notably, the instances of misconduct withheld center on coercing witnesses and fabricating witness statements.  This information would thus directly undermine Baker's testimony that "[w]hen we speak to witnesses we don't give them information."  Further, another witness, Mark Kedra, testified that his initial statement to police implicating Lazar had been fabricated by law enforcement and that Lazar had been showed photos

27

of the murder on the day that he retrieved his suitcase.  *Id.* at 76.  Kedra's testimony combined with the suppressed evidence would have devastated Baker's credibility, showing that the same misconduct that occurred in the Hollman and Brown cases may have occurred in Lazar's case. Specifically, the withheld evidence would have cast doubt on Baker's testimony regarding his initial meeting with Lazar, raising the possibility that, as he had in prior cases, Baker fed Lazar information that Lazar then referenced in his later confession.  Not only that, but the evidence of false testimony would have undermined Detective Baker's credibility overall – a witness who played a central role in the Commonwealth's case.

Additionally, Baker's testimony was critical to the Commonwealth's narrative about Lazar's suitcase – the only piece of physical evidence tying Lazar to the murder scene.  The Commonwealth relied on Baker to explain to the jury why the bag had not been found until Gutierrez's daughter discovered it 14 weeks after the crime occurred.  Although Baker initially testified that he never went into the backyard when law enforcement processed the scene, and thus he could not have seen the suitcase, he admitted on cross that he *had* gone into the backyard but had not noticed the suitcase because "it's a large yard" and he was "looking for a weapon."  *Id.* at 74, 77.  Gutierrez's daughter, however, testified that she saw the suitcase on a plastic chair "immediately upon entering [her father's] backyard" in April of 2007 – months after he had died. *Id.* at 13.  To rehabilitate his testimony, the prosecutor stated in closing that Baker could have done a better job processing the scene, but that Lazar should not be allowed to "take advantage" of law enforcement's mistake.  *Id.* at 74.  Once again, had defense counsel been armed with evidence of Baker's prior conduct, counsel would have been able to challenge his credibility in front of the jury.  The jury had already seen Baker give conflicting testimony under oath about his investigation of the backyard.  Had the jury also heard that Baker had testified less than truthfully in at least two

other murder trials, they would have been even less likely to believe him – including his testimony regarding the suitcase.

As the lead investigator in the case, Detective Baker, was a critical government witness. He testified to the key piece of physical evidence tying Lazar to the murder, and he represented to the jury that Lazar could not have known the weapon used in the murder if he had not been there himself, adding legitimacy to Lazar's confession.  Thus, for the reasons described above, I find that the suppressed impeachment evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," warranting relief on Lazar's claim.  *Kyles*, 514 U.S. at 435.

**C.  The combined weight of Lazar's claims favors relief.**

The Third Circuit has recognized that "errors that individually do not warrant a new trial may do so when combined." *Marshall v. Hendricks*, 307 F.3d 36, 94 (3d Cir. 2002).  Furthermore, "unified consideration of the claims in the petition well satisfies the interests of justice because the cumulative effect of the alleged errors may violate due process, requiring the grant of the writ, whereas any one alleged error considered alone may be deemed harmless."  *United States ex rel. Sullivan v. Cuyler*, 631 F.2d 14, 17 (3d Cir. 1980).

Here, defense counsel made an egregious error in failing to recognize that his client was coping with methadone withdrawal over the course of a 30-hour interrogation.  That mistake alone had profound import, but with the confession already admitted, the defense had a particularly urgent need to demonstrate its unreliability.  Consequently, evidence pointing away from Lazar as the perpetrator, and evidence suggesting that the investigating detective was not worthy of credence, were of heightened importance.  The admitted *Brady* violations involved information that would have been central to the presentation of Lazar's defense.  It is therefore appropriate to

consider the cumulative effect of the errors.  In my view, the combination of error is also a basis for relief.

### D.  Relief

Petitioner's counsel has requested that I order Mr. Lazar's release.  I do not see that as an appropriate exercise of authority given the present posture of the case.  My analysis makes no determination of Mr. Lazar's guilt or innocence, and only reflects that the process resulting in his conviction was constitutionally deficient.  As I construe Pennsylvania law, because of the potential for a life sentence, second-degree murder is not a bailable offense.  *See* 42 Pa. C.S. § 5701.  Eligibility for release pending retrial is therefore properly a matter for state authorities.  The appropriate remedy is to grant the writ conditionally and order Mr. Lazar's retrial within a reasonable period of time.

## IV.   Conclusion

For the reasons set forth above, Lazar's Amended Habeas Petition is granted as to claims one, two, and four.  An appropriate order follows.


                                                            /s/ Gerald Austin McHugh
                                                          United States District Judge